## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **FREEDOM FROM RELIGION** | § | |
| **FOUNDATION, INC.** | § | |
|     **Plaintiff,** | § | |
| | § | |
| **-vs-** | § | **CASE NO. 1-16: CV-00233** |
| | § | |
| **GOVERNOR GREG ABBOTT, in his** | § | |
| **official and individual capacities, and** | § | |
| **JOHN SNEED, Executive Director of the** | § | |
| **Texas State Preservation Board, in his** | § | |
| **official and individual capacities,** | § | |
|     **Defendants.** | § | |

## PLAINTIFF'S BRIEF OPPOSING MOTION TO DISMISS

## I.    INTRODUCTION.

This is not a case about the Government's right to articulate its own message. There is no message of its own that the Government wishes to state. Instead, this case is about censorship and exclusion of viewpoints from a public forum based on the personal disapproval of individual government officials. This case is about the conceit of the censor and the braying of the bully.

Until this suit, the Defendants agreed that viewpoints displayed in the State Capitol constitute private speech. Governor Abbott, in fact, previously tried to justify removal of Freedom From Religion Foundation, Inc.'s ("FFRF") Bill of Rights display on his mistaken view that the First Amendment does not protect private speech on government property that the Governor considers offensive to the sensibilities of Christians. The Governor was right in his view that FFRF's display represents private speech, but wrong in his understanding of the First Amendment. FFRF's Bill of Rights display is undeniably the protected speech of a private party.

The Defendants, Governor Abbott and John Sneed, misread the Supreme Court's recent decision in *Walker v. Texas Division, Sons Of Confederate Veterans, Inc.*, ___ U.S. ___, 135 S.

Ct. 2239 (2015).  This decision does not support the Governor's unilateral decision to censor any speech that he finds offensive.  According to Governor Abbott, after *Walker*, any speech allowed by the Government on public property constitutes Government speech that is entirely subject to his whim.  The Supreme Court, however, has not repudiated the public forum principles whereby speech may not be excluded based on the viewpoint discrimination of individual government officials.  Governor Abbott's argument notwithstanding, viewpoint and content restrictions on speech allowed on public properties are presumptively unconstitutional.  Here, Governor Abbott undeniably censored FFRF based on his personal disapproval of FFRF's supposed blasphemy.

The First Amendment principles applicable to this case are not new or unclear. Government officials may not censor speech in public forums based on disapproval of the speaker's viewpoint.  Nor was the status of the State Capitol as a public forum unclear where temporary private displays are allowed, including standalone nativity scenes which the State justifies as private speech in a public forum.  Viewpoint neutrality has long been the law in such circumstances as the present case, whether Governor Abbott knows it or not.

## II.   STATEMENT OF FACTS ALLEGED IN FIRST AMENDED COMPLAINT.

A complete recitation of the factual allegations made by FFRF can be found in FFRF's First Amended Complaint for Declaratory, Injunctive and Compensatory Relief. (Dkt. No. 15.) Allegations pertinent to the Defendants' Motion to Dismiss are excerpted in attached Appendix Exhibit 1.

## III.   FEDERAL RULE 12(b)(6) STANDARD IS APPLICABLE TO THE DEFENDANTS' MOTION.

The Defendants have moved to dismiss FFRF's Complaint in its entirety for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6).  They alternatively move to dismiss claims brought against them in their personal capacities, contending that they

are entitled to qualified immunity.  Both arguments by the Defendants implicate, in the first instance, the Rule 12(b)(6) standard.

"Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A government actor is not entitled to qualified immunity if: (1) "the facts that plaintiff has alleged or shown make out a violation of a constitutional right" and (2) "the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.* at 232, citing *Saucier v. Katz*, 533 U. S. 194, 201 (2001).

When deciding a qualified immunity claim, the facts are taken in the light most favorable to the party asserting the injury, *i.e.*, do the facts alleged show that the official's conduct violated a constitutional right?  *Saucier*, 533 U. S. at 201.  Because the Defendants seek qualified immunity in a motion to dismiss under Rule 12(b)(6), therefore, the court accepts all well-pleaded facts as true and views those facts in the light most favorable to the plaintiff.  *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007).  The court must also draw all reasonable inferences from well-pleaded facts in favor of the non-moving party.  *Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009); *see also Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005)("the complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff.").

Although a court may opt to address the qualified immunity factors in either order, *Pearson*, 555 U.S. at 242, here Governor Abbott's alternative arguments each implicate the Rule 12(b)(6) standard for failure to state a claim.  As a result, initial consideration of this issue is deemed most efficient and logical before considering whether the law applicable to the well-

pleaded facts was clearly established.

## IV. VIEWPOINT CENSORSHIP IN A PUBLIC FORUM VIOLATES THE FIRST AMENDMENT, AS ALLEGED IN FFRF'S FIRST AMENDED COMPLAINT.

### A. Government Permitting And Scheduling Of Speakers On Government Property Does Not Transform All Discourse Into Government Speech.

The Defendants incorrectly argue that essentially all speech on public property is now deemed government speech if a permit or license is required. The Supreme Court's decision in *Walker*, however, did not effect any such sea change in First Amendment law, contrary to the Governor's assumption. The Supreme Court addressed the unique issue of government-issued license plates in *Walker*. The Court did not purport therein to adopt new rules for determining government speech, but instead applied the principles established in *Pleasant Grove v. Summum*, 555 U.S. 460 (2009).

In *Walker*, the Supreme Court deemed a Texas specialty license plate to be government speech, relying on *Summum*, a case dealing with privately donated permanent monuments in public parks. The Court held that the various monuments in the park were a form of government speech, reasoning primarily that "permanent monuments displayed on public property typically represent government speech." The Court further explained that "it certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." *Id.* at 471. Based on such permanency, and the resulting public identification of the government as speaker, the Court concluded that permanent monuments in a public park necessarily constitutes government speech, in part because such permanency is logistically inconsistent with treating them as private speech.

Forum analysis, as the Supreme Court noted in *Summum*, has usually been applied "in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program." *Id.* at 478. Speakers and parades are temporary additions to a park. *Id.* At some point "speakers, no matter how long-winded, eventually come to the end of their remarks;" the last parade float will eventually go by. *Id.* at 479. Monuments, by contrast, are permanent additions to a park, and a park can accommodate only a limited number of monuments. To require a city to be viewpoint neutral in accepting monuments for a park, therefore, would likely require the city to overload the park with permanent structures. *Id.* at 479-80.

The Supreme Court, including in *Summum* and *Walker*, did not conclude that all private speech that occurs on government property is government speech. To the contrary, courts have routinely found that making government property accessible to private speakers may result in protected speech under the First Amendment. For instance, in *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U. S. 753 (1995), the Supreme Court concluded that a religious display next to the State House in Columbus, Ohio, constituted private expression despite private parties needing to apply for display of their messages. The State's policy in that case permitted a private party to display an unattended religious symbol in a public forum located next to the State Seat of Government.

Administrative regulations made the Square available in *Pinette* "for use by the public . . . or free discussion of public questions, or for activities of a broad public purpose," and gave the Capitol Square Review and Advisory Board responsibility for regulating public access. To use the Square, a group had to fill out an official application form and meet several criteria, which

concern primarily safety, sanitation, and noninterference with other uses of the public forum. *Id*. at 757-58. Significantly, in *Pinette*, the Court recognized the difference between government speech and private speech, yet concluded that the religious display at issue did not constitute government speech merely because conducted on or close to the symbols of government. *Id*. at 765-66.

In *Summum*, the Supreme Court recognized that temporary displays, such as in *Pinette*, may constitute private speech, because of their temporary nature, while permanent monuments pose a completely different problem. The Court explained the distinction as follows:

> Respondent compares the present case to *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 115 S. Ct. 2440, 132 L. Ed.2d 650 (1995), but that case involved a very different situation--a request by a private group, the Ku Klux Klan, to erect a cross for a period of 16 days on public property that had been opened up for similar temporary displays, including a Christmas tree and a menorah. *See Id.*, at 758, 115 S. Ct. 2440, 132 L. Ed.2d 650. Although some public parks can accommodate and may be made generally available for temporary private displays, the same is rarely true for permanent monuments.

*Summum,* 555 U.S. 460 at 480.

Requiring a license or permit to use government property, in short, is fully consistent with a public forum. It is not transformative of all private discourse into government speech. In *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), for example, the Supreme Court ruled that a park-permitting ordinance constituted a content-neutral time, place, and manner regulation of the use of a public forum as long as applied in a content-neutral manner subject to definite standards. "A licensing standard which gives an official authority to censor the content of a speech differs *toto coelo* from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like." *Id.* at 322-23. Significantly, the Court in *Thomas* did not conclude that the permitting process converted private speakers into public speakers, and

noted that "even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." 534 U.S. at 323 (citing *Forsyth County v. Nationalist Movement*, 505 U. S. 123, 131(1992)).  The Supreme Court has thus "required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review. *Id*.

The decision in *Arkansas Society of Freethinkers v. Daniels*, 2009 U.S. Dist. LEXIS 116982 (E.D. Ark. 2009), applies the principles relevant to the present case particularly well. Arkansas had a policy that permitted private parties to place temporary displays on the Capitol grounds, including an annual nativity scene, but the State nonetheless excluded a Winter Solstice display that the Arkansas Society of Freethinkers wished to exhibit.  In evaluating the claims, the Court concluded that the Government violated the First Amendment rights of the Arkansas Society of Freethinkers and enjoined the Secretary of State from further denying the Freethinkers the right to display their proposed Winter Solstice on the Capitol grounds.

Before reaching its conclusion in *Society of Freethinkers*, the Court first concluded that the case did not involve government speech, but rather, by "issuing a policy that permits private parties to install temporary displays on the Capitol grounds, the State intentionally created a forum for private speech."  *Id.* at *9.  As such, according to the Court, "the State may enforce only content-neutral, narrowly-drawn restrictions that are necessary to serve a significant government interest."  *Id.*

Finally, the Court explained, as an aside, that "if the display of the nativity scene and the exclusion of other holiday displays could be construed as government speech or a state-

sponsored message, it would more likely than not amount to a violation of the Establishment Clause under controlling case law." *Id.* at **9-10.

Considering the well-established precedents, the Capitol displays at issue in the present case clearly constitute private speech rather than government speech.  In the first place, as alleged in FFRF's First Amended Complaint, Governor Abbott and the State Preservation Board have themselves recognized an intent to create a public forum, which is perceived as such by the public.  In addition, the Government has no discrete government message that it seeks to convey by opening up the Capitol for temporary exhibits.  Exhibits in the State Capitol also do not interfere with any Government function, nor are they incompatible with the use of Capitol space designated for displays.  Displays in the State Capitol also are not permanent and may be placed for no more than five days.  The messages conveyed by displays in the State Capitol, moreover, are not determined in practice or in the abstract by Government officials, but rather by individual private speakers.  In fact, the State Preservation Board, in practice, does not exercise control over of the content or viewpoint of displays in the Capitol.  Finally, Texas Government officials have no long-established policy or practice of treating temporary displays in the State Capitol as government speech.

In short, the lynchpin of the Defendants' defense in this case fails at the threshold.  The Defendants' claimed justification for censoring FFRF hinges on their argument that all displays permitted in the Capitol constitute government speech, rather than private speech.  The Defendants' argument is disingenuous given the Defendants' own prior understanding and recognition of the public forum created in the Capitol.  Their argument is also belied by the known historical record.  Finally, the Defendants' rationale fails as a matter of law based on the overwhelming weight of authority.

**B.      Content and Viewpoint Discrimination In A Public Forum Undeniably Violates The First Amendment.**

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. Federal Election Commission*, 558 U.S. 310, 340 (2010). Chief amongst the evils the First Amendment prohibits are government "restrictions distinguishing among different speakers, allowing speech by some but not others." *Id.* Indeed, the Supreme Court has called viewpoint discrimination "an egregious form of content discrimination" and has held that "the Government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1995).

The Supreme Court has identified "three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985), *citing Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 45 (1983). For free speech purposes, the most accessible of these is the traditional public forum where any content-based prohibition on communicative activity receives strict scrutiny review: any exclusion based on content must be "necessary [and narrowly drawn] to serve a compelling state interest." *Perry*, 460 U.S. at 45. Such "quintessential public forums" include streets and parks, which have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* Notably, the state-owned plaza at the Ohio capitol building is also a traditional public forum. *Pinette*, 515 U.S. at 761. As is the capitol ground in Arkansas. *Soc'y of Freethinkers*, at *12.

Nonpublic forums lie at the other end of the spectrum, where, "[i]n addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. Examples of nonpublic fora include airport terminals, *Intl. Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992), a military installation devoted to basic training, *Greer v. Spock*, 424 U.S. 828, 837–38 (1976), and a public school's internal mail system, *Perry*, 460 U.S. at 46.

Lying between these two extremes are "designated public forums," which include areas that are not quintessentially public forums, but that the state has nevertheless "opened for use by the public as a place for expressive activity." *Id.* at 45. In a designated public forum, the Government "is bound by the same standards as apply in a traditional public forum." *Id.* at 46. This means that content-based restrictions on speech by the Government receive strict scrutiny review. Examples include university facilities subject to an established reservation policy, *Widmar*, 454 U.S. at 267–68, and school board meetings where the board retains "broad authority to structure the discussion," *City of Madison v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 177, 178–79 (1976).

Here, FFRF's First Amended Complaint alleges facts sufficient to conclude that the Texas Capitol qualifies as either a traditional public forum or a designated public forum. The First Amended Complaint establishes, for example, that like the Capitol Square Review and Advisory Board in *Pinette*, the Texas State Preservation Board has a policy and practice of permitting "a variety of unattended displays" in certain areas of the Capitol for those who have "fill[ed] out an official application form and [met] several criteria." *Pinette*, 515 U.S. at 757–58

(holding that private party's unattended display on State Capitol property was private speech, fully protected under the Free Speech Clause) (*see also* FFRF's First Amended Complaint, ¶¶ 19–21, 27–32).

At the very least, FFRF's First Amended Complaint alleges facts sufficient to conclude that areas of the Texas Capitol have been *designated* as a public forum for the display of private exhibits. Like the university facilities in *Widmar*, areas of the Texas capitol are subject to reservation by private groups and, as with the school board meetings in *City of Madison*, the Government's broad authority to regulate the time, place, and manner of that speech is consistent with the designated public forum analysis.

The court ultimately need not determine precisely whether the Texas State Capitol is a traditional or a designated public forum because content or viewpoint censorship are precluded in all fora. *See Kissick v. Huebsch*, 956 F.Supp.2d 981, 999 (W.D. Wisc. 2013) (holding that the Wisconsin State Capitol "may be thought of as either a traditional or a designated public forum"). In *Kissick*, the court declined to decide which of the two types of forum applied to the Wisconsin State Capitol since "[i]n either type of forum, content-based discrimination against speech is subject to strict scrutiny." *Id.*

Private groups have long understood that areas of the Texas Capitol are treated like a "public square" (FFRF's First Amended Complaint, at ¶ 40), and that displays in the Capitol "represent constitutionally protected expression by private citizens in traditional or designated public forums." *Id.* at 45. The State Preservation Board has traditionally treated exhibits in the Capitol as private speech, *Id.* at 48, 50, and explicitly requested FFRF to include a disclaimer with its display indicating that "it was privately funded and displayed." *Id.* at 51.  FFRF's Bill of

Rights display, in short, constitutes private speech in a public forum that is subject only to neutral content and viewpoint regulation.

A neutral regulation of a public forum must be applicable without reference to the content of a speaker's message. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (2015) (finding that municipal code regulating the display of signs based on the type of information they convey imposed content-based restrictions on private speech and did not survive strict scrutiny review). Content-based regulations include laws regulating speech "by particular subject matter" or "by its function or purpose." *Id.* "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Id.* at 2230, *citing Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

In a designated public forum, "[r]easonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry*, 460 U.S. at 46, *citing Widmar v. Vincent*, 454 U.S. 263, 269-70 (1981). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional . . . ." *Reed*, 135 S.Ct. at 2226.

"Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U. S. 123, 134, (1992); *see also Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005). "Speech cannot be . . . punished or banned, simply because it might offend" those who hear it. *Forsyth County*, 505 U. S. at 134-35.

FFRF's First Amended Complaint establishes that its exhibit was banished from the Capitol due to its content and viewpoint. In his letter demanding the removal of FFRF's display, Governor Abbott criticized its viewpoint in great detail, calling FFRF's message "tasteless sarcasm" and claiming that it "promotes ignorance and falsehood." *See* First Amended Complaint, ¶¶ 75–83.  Defendant's Motion to Dismiss, moreover, supports the conclusion that FFRF was censored based on its viewpoint. The Defendants characterize the censorship of FFRF's display as a "value judgment," Motion to Dismiss at 11, and concede that it was "the Exhibit's disrespectful speech towards those of a different view—Christians in particular— which triggered its removal." *Id.* at 7.

In the end, this is not a case that involves any ambiguity as to the Defendants' reason for removing FFRF's Bill of Rights display from the Texas Capitol.  Governor Abbott acted unequivocally on the basis of his disapproval of the content of FFRF's display and Mr. Sneed acted on that disapproval without thought of constitutional obligations.  In these circumstances, only a narrowly drawn regulation in support of a compelling interest would save the Defendants' actions from obviously violating FFRF's First Amendment rights.  The Defendants, however, offer no such justification for their actions, which actions amount to a fit of pique.  The Defendants, instead, argue simply that FFRF's display is too offensive to Christian sensibilities to be protected speech under the First Amendment.  This reasoning is wrong under long-established First Amendment law.

### C.     FFRF's Bill of Rights Display Constitutes Protected Speech Under the First Amendment.

The Defendants' argument that FFRF's Bill of Rights display constitutes unprotected speech is contradicted by basic First Amendment principles.  The Defendants argue that FFRF's otherwise benign display is so offensive to Christians that it simply cannot be tolerated on

government property.  According to the Defendants, government officials have every right to exclude displays that the Governor considers to be offensive.  Well-established First Amendment principles, however, dispel the misapprehension under which the Governor labors.

"The First Amendment generally prevents government from proscribing speech . . . or even expressive conduct . . . because of disapproval of the ideas expressed.  Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 382 (1992).  Restrictions upon the content of speech have been allowed only in a few limited areas, "which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.* at 382-83.  Thus, restrictions upon the content of speech are permitted in only a few limited areas, including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct.  *United States v. Stevens*, 559, U.S. 460, 468 (2010); *United States v. Richards*, 755 F.3d 269, 273-74 (5th Cir. 2014).  "Fighting words" also have been excluded from the scope of the First Amendment, although even here "the government may not regulate use based on hostility -- or favoritism -- towards the underlying message expressed." *R.A.V.*, 505 U.S. at 319-320.  With respect to speech that can be regulated because of its constitutionally proscribable content, moreover, the government may not make a content-based distinction, such as by "proscribing only libel critical of the government." *Id.* at 383-84.

The sweeping protection that the First Amendment offers "may not be denied simply because of hostility or hostile audience reaction.  The First Amendment applies to even 'loathsome' and unpopular speech with the same force as it does to speech that is celebrated and widely accepted." *Bible Believers v. Wayne County, Michigan*, 805 F.3d 228, 243 (6th Cir. 2015).  Thus, "listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth*

*County v. Nationalist Movement,* 505 U.S. 123, 134 (1992). "Simply stated, the First Amendment does not permit a heckler's veto." *Bible Believers*, 805 F.3d at 252.

In the present case, FFRF's Bill of Rights display undeniably does not constitute proscribable speech. The display is not obscene. Nor is it defamatory or libelous. The display does not advocate imminent lawless action. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). And it does not include "fighting words" that would "tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). In fact, contrary to the Governor's literary tirade, FFRF's Bill of Rights display does not at all even mock or disparage Christian beliefs or religious convictions.

Governor Abbott's contemporaneous justification for removing FFRF's display from the Capitol, in short, is unsupported by any known precedent and conflicts with basic tenets of the First Amendment. In the first place, blasphemy or sacrilege, of which Governor Abbott essentially accuses FFRF, has long been deemed protected speech under the First Amendment. The Supreme Court, for example, held in *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 528-29 (1952), that a New York statute authorizing state officials to censor "sacrilegious" films unconstitutionally abridged the rights to free speech and free press. The Court explained its reasoning as follows:

> New York's highest court says there is 'nothing mysterious' about the statutory provision applied in this case: 'It is simply this: that no religion, as that word is understood by the ordinary, reasonable person, shall be treated with contempt, mockery, scorn and ridicule. . .' This is far from the kind of narrow exception to freedom of expression which a state may carve out to satisfy the adverse demands of other interests of society. In seeking to apply the broad and all-inclusive definition of 'sacrilegious' given by the New York courts, the censor is set adrift upon a boundless sea amid a myriad of conflicting currents of religious views, with no charts but those provided by the most vocal and powerful orthodoxies. New York cannot vest such unlimited restraining

> control over motion pictures in a censor. *Cf. Kunz v. New York*, 340 U. S. 290 (1951).  Under such a standard the most careful and tolerant censor would find it virtually impossible to avoid favoring one religion over another, and he would be subject to an inevitable tendency to ban the expression of unpopular sentiments sacred to a religious minority. Application of the 'sacrilegious' test, in these or other respects, might raise substantial questions under the First Amendment's guaranty of separate church and state with freedom of worship for all. However, from the standpoint of freedom of speech and the press, it is enough to point out that the state has no legitimate interest in protecting any or all religions from views distasteful to them which is sufficient to justify prior restraints upon the expression of those views. It is not the business of government in our nation to suppress real or imagined attacks upon a particular religious doctrine, whether they appear in publications, speeches, or motion picture.

*See also Calman v. Cortes*, 723 F. Supp.2d 766, 786-789 (E.D. Penn. 2010) (Blasphemy Statute requiring rejection of corporate name applications perceived to be irreverent or offensive to religious beliefs, but accepting applications that are respectful or reverent to religious beliefs, conveys a message of state endorsement of religion over non-religion).

The Supreme Court similarly has recognized satire as a protected form of speech under the First Amendment.  In *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988), in fact, the Supreme Court concluded that an "outrageousness" standard in the area of political and social discourse is too inherently subjective under the First Amendment to sustain a suit for damages. "The fact that society may find speech offensive is not a sufficient reason for suppressing it." *FCC v. Pacifica Foundation*, 438 U. S. 726, 745-746 (1978).  "Satire is a long-established artistic form that uses means such as 'ridicule, derision, burlesque, irony, parody, or caricature' to sensory the 'vices, follies, abuses, or shortcomings' of an individual or society."  *Farah v. Esquire Magazine*, 736 F.3d 528, 536 (D.C. Cir. 2013).  Not surprisingly, therefore, "satirical speech enjoys First Amendment protection." *Id.*

Any government regulation that burdens speech based on disapproval of the message

16

conveyed is subject to strict scrutiny, and content-based regulations are presumptively invalid. *In re Tam*, 808 F.3d 1321, 1334 (Fed. Cir. 2015). "Viewpoint-based regulations, targeting the substance of the viewpoint expressed, are even more suspect." *Id.* at 1335. Finally, "the legal significance of viewpoint discrimination is the same whether the government disapproves of the message or claims that some part of the populace will disapprove of the message." *Id.* at 1336.

Here, Governor Abbott's actions, ostensibly to protect Christian observers from offense, cannot be justified by denying that FFRF's display constitutes protected speech. The Governor's argument that offensive speech cannot be permitted on government property, moreover, is contrary to the law, including the logic of the protections of the First Amendment.

### D.   The State Preservation Board's Standards Give Unfettered And Arbitrary Discretion To Officials In Violation Of The First Amendment.

As a restraint on speech, any permitting scheme must meet certain constitutional requirements. In particular, such a scheme may not delegate overly broad licensing discretion to government officials. "A Government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view. To curtail such risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth County,* 505 U.S. at 130-31. *See also Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002) ("[W]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content . . . ."); *Niemotko v. Maryland*, 340 U.S. at 268, 271-73 (1951) (licensing criteria must have definitive standards or other controlling guides to apply in granting or withholding a permit); *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (permitting standard based upon "the general

welfare of the citizens" impermissibly gave government officials uncontrolled discretion in violation of the First Amendment).

In the present case, the formal standards of the State Preservation Board for permitting displays in the Capitol include the requirement that a display "promote a public purpose." This, in turn, is further defined as meaning that "the public must have a direct interest in the purpose and the community at large must be benefitted." These standards, to the extent they constitute an identifiable standard, would appear to give government officials unfettered discretion to determine whether an exhibition should be allowed.

This present case exemplifies precisely the danger of such unfettered discretion. Governor Abbott purports to justify his censorship of FFRF on the basis that the Bill of Rights display does not promote a public purpose; nor does the public supposedly have a direct interest in FFRF's purpose; and the community at large is not benefited. On the other hand, Governor Abbott has cheered the display of Christian nativity displays on government property, including in the State Capitol, despite no apparent public purpose in which the public has a direct interest and that benefits the community at large.

As a practical matter, the State Preservation Board apparently has not rigorously applied its formal standards. Other than FFRF's display, no other display has been interfered with based upon its content or viewpoint. In this case, however, Governor Abbott's purported application of the formal standards in order to censor FFRF illustrates precisely the danger of giving a licensor unfettered discretion to approve or deny the right to speak. Governor Abbott's "application" of the formal standards of the State Preservation Board to the Bill of Rights display clearly violated FFRF's First Amendment rights.

## V.     THE DEFENDANTS' ACTION ALSO VIOLATED FFRF'S RIGHT TO EQUAL PROTECTION.

The Defendants also incorrectly argue that FFRF's First Amended Complaint does not state an Equal Protection claim.  The Defendants contend that no similarly situated speakers have been treated more favorably than FFRF who also engaged in offensive speech.  By this analysis of what constitutes "similarly situated," even racial minorities could not claim entitlement to Equal Protection because they are of a different race than racial majorities and, therefore, not similarly situated.

The Governor's logic would render the protections of the Equal Protection Clause nugatory.  The Supreme Court, in fact, has recognized a close relationship between Equal Protection and the First Amendment, as in *Police Department of Chicago v. Mosley*, 408 U.S. 92, 96 (1972):

> Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

"The right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has, therefore, a firmer foundation than the whims of personal opinions of a local governing body."  *Niemotko v. Maryland*, 340 U. S. 268, 272 (1951).

The Defendants' argument that no one is similarly situated to FFRF misses the important point that FFRF is similarly situated to other speakers in the Capitol except for discriminatory treatment on the basis of protected speech.  For example, FFRF is similarly situated to the exhibitor of the nativity scene in the State Capitol.  Because that display admittedly espouses a distinctly Christian message, without interference by Governor Abbott, the censorship of FFRF's display because of its supposed offensiveness to Christians is precisely the arbitrary and differential treatment prohibited by both the First Amendment and Equal Protection Clause of the United States Constitution.  The Defendants, moreover, discriminated against FFRF based on hostility to FFRF's own non-religious beliefs, which are protected under the Equal Protection Clause.  FFRF is, in fact, a member of a protected class.

Governor Abbott's ill-conceived censorship of FFRF would not escape equal protection scrutiny, moreover, even based on the Defendants' remarkable claim that FFRF has no peer in terms of offensiveness.  The Defendants contend that FFRF is not part of any protected class for equal protection purposes and, therefore, without actionable recourse.  The Defendants' view of the Equal Protection Clause, however, is too narrow.  In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), for example, the Supreme Court recognized that a plaintiff alleging discrimination on grounds other than membership in a protected group may nevertheless prevail on an equal protection claim under a "class of one" theory.  In such case, a plaintiff must show that it was intentionally treated differently from others similarly situated and that there was no rational basis for the difference in treatment.  In this case, as FFRF's First Amended Complaint details, Governor Abbott has a history of personal hostility to FFRF and has allegedly treated FFRF differently than other speakers to whom he does not have personal antipathy.  The Governor, moreover, cannot plausibly contend that differential treatment on the basis of

protected First Amendment speech is a rational basis for adverse treatment.  By all measures, therefore, FFRF's First Amended Complaint states a claim under the Equal Protection Clause of the Constitution.

## VI.   GOVERNOR ABBOTT'S CENSORSHIP OF FFRF ALSO STATES A CLAIM UNDER THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT.

Governor Abbott's preference for religious displays in the State Capitol also violates FFRF's rights under the Establishment Clause of the First Amendment.  As the Supreme Court recognized in *Pinette*, "giving sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter) would violate the Establishment Clause (as well as the Free Speech Clause, since it would involve content discrimination)."  *Pinette*, 515 U.S. at 766.  The Supreme Court further explained in *Pinette* that "one can conceive of a case in which a governmental entity manipulates its administration of a public forum close to the seat of government (or within a government building) in such a manner that only certain religious groups take advantage of it, creating an impression of endorsement that is in fact accurate."  *Id.*

The Supreme Court's suspicions are borne out in this case, where the Defendants have unabashedly "manipulated" their administration of the State Capitol premises so as to exclude a speaker perceived to have a message hostile to Governor Abbott's own preference for Christian messaging in the Capitol.  The First Amended Complaint, moreover, alleges that the Governor's actions were motivated by personal hostility to FFRF because of its advocacy of separation of state and church.  These allegations, admitted for purposes of the present Motion, are clearly sufficient to state an additional claim against the Defendants under the Establishment Clause.

**VII.   FFRF'S CONSTITUTIONAL RIGHT TO PARTICIPATE EQUALLY IN THE STATE'S PUBLIC FORUM WAS CLEARLY ESTABLISHED AT THE TIME THAT DEFENDANTS CENSORED FFRF'S DISPLAY.**

FFRF's Amended Complaint states multiple claims upon which relief may be granted, including First Amendment censorship.  The Defendants, therefore, are not entitled to qualified immunity from Plaintiff's claims for nominal damages if "the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009), *citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)  (internal citations omitted).

After citing the applicable standard for overcoming a qualified immunity defense—that the law must have been "clearly established" at the time of the violation—Defendants inexplicably argue that the Governor "was plainly vested with the authority to call for the removal of FFRF's Exhibit" and that "the Executive Director's compliance with his superior's wishes, after consultation with another member of his Board, was reasonable." (Motion to Dismiss at 7–8.)  These contentions *do not* address the relevant inquiry.  Whether Defendants believed that they had the general authority to regulate the forum, or that they were following orders, is immaterial to their constitutional obligations.  Obliviousness is not a basis for qualified immunity.

"To determine whether state officials had 'fair warning' that their conduct was unconstitutional, we consider the status of the law both in our circuit and in our sister circuits at the time of the defendants' actions." *Kovacic v. Villarreal*, 628 F.3d 209, 214 (5th Cir. 2010).  In this instance, it was well settled in the Fifth Circuit and nationally at the time that Defendants removed FFRF's display from the Capitol that government officials cannot censor a message in a public forum based on the content or viewpoint of that message.

The Supreme Court has characterized the principle that "the government may not regulate speech based on its substantive content or the message it conveys" as "axiomatic." *See Rosenberger*, 515 U.S. at 829.  Once it has established a public forum, "a State's right to limit protected expressive activity is sharply circumscribed: It may impose reasonable, content-neutral time, place, and manner restrictions . . . but it may regulate expressive content only if such a restriction is necessary, and narrowly drawn, to serve a compelling state interest." *Pinette*, 515 U.S. 753, 761 (1995); *see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992); *Frisby v. Schultz*, 487 U.S. 474, 481 (1988); *Cornelius*, 473 U.S. 788, 800 (1985); *Perry*, 460 U.S. 37, 45 (1983); *Carey v. Brown*, 447 U.S. 455, 462 (1980); *cf. Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 101 (1972) ("The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives."); *Cantwell v. Connecticut*, 310 U.S. 296, 311 (1940) (statute must be "narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State").

 "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Reed*, 135 S.Ct. at 2230, *citing Rosenberger*, 515 U.S. at 829.  Viewpoint discrimination "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger*, 515 U.S. at 830.

Defendants are aware that the state has opened areas of the Capitol for speech, given that they are tasked with scheduling use of that forum. Based on the state of the law, it would be clear to any reasonable government official tasked with regulating a forum that they cannot discriminate against speech on the basis of content or viewpoint.  Governor Abbott's claim that

the State Preservation Board "has no obligation to approve displays that purposefully mock the sincere religious beliefs of others," Motion to Dismiss at 7, has no support in the relevant case law. Though FFRF does not agree that its display mocked religion, the case law clearly establishes that even undesirable viewpoints must be permitted in a public forum. Governor Abbott's claim that FFRF's display constitutes unprotected speech is simply contrary to the clearly established first principles of the First Amendment.

It was also well established that "under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Carey*, 447 U.S. at 463, *citing Mosley*, 408 U.S. at 96. The state cannot permissibly discriminate against undesirable viewpoints. It cannot proscribe even speech advocating racism and violence, *Brandenburg v. Ohio*, 395 U.S. 444 (1969), or the burning of the American flag, *Texas v. Johnson*, 491 U.S. 397 (1989). These are not obscure points of law. These cases have been discussed at length in virtually every constitutional law textbook since they were decided.

The extreme similarity between this case and *Pinette* is further compelling proof of the clearly established state of the law. FFRF's display—depicting three founding fathers and the Statue of Liberty gathered around the Bill of Rights and a sign wishing readers a "Happy Winter Solstice"—cannot fairly be described as offensive, and it certainly is not in a league with the plainly racist, unpatriotic, and bigoted speech that has been previously protected under the First Amendment. Defendants could not have reasonably believed that they were on solid constitutional grounds in censoring FFRF's speech based on its message.

Defendants' remaining arguments do nothing to detract from the well-settled state of the law in this case. Governor Abbott's claim that FFRF's display "undermines rather than

promotes any public purpose" is not only inaccurate but irrelevant. FFRF's First Amended Complaint ¶ 76. The government may not censor speech because it finds it is not "clean and healthful and culturally uplifting in content." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 563 (1975). Similarly, Defendants' urging that the court consider what school children on field trips would think if they walked by an offensive display in the Capitol is nothing more than a distraction. Motion to Dismiss at 11. The Government may not justify an otherwise unconstitutional regulation by claiming "that it was adopted for the salutary purpose of protecting children." *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968) (invalidating for vagueness a Texas ordinance that classified films as either "suitable for young persons" or "not suitable for young persons").

Defendants are not entitled to qualified immunity from FFRF's claim for nominal damages. Taken in the light most favorable to FFRF, the alleged facts demonstrate that areas of the Texas Capitol constitute a public forum for the display of private messages. Not only have private parties seeking to erect displays in the Capitol historically viewed the Capitol as a forum for such displays, but the State Preservation Board treated FFRF's display as private in this instance. The alleged facts further demonstrate that Defendants removed FFRF's display from the Capitol's forum due to the display's content and the viewpoint expressed. It is not only "clearly established," but *axiomatic* that the government may not censor speech based on its content or its viewpoint. In this case, the Defendants, both Governor Abbott and Mr. Sneed, acted in open defiance of their clearly established constitutional duties and they should be held accountable.

**VIII.  FFRF DID NOT WAIVE ITS CONSTITUTIONAL AND STATUTORY CLAIMS AGAINST THE DEFENDANTS AS A MATTER OF FACT AND LAW.**

The Defendants also incorrectly claim that FFRF agreed to allow them to violate their constitutional rights without recourse.  In making this argument, the Defendants read without comprehension both the facts and the applicable law.  FFRF did not agree to waive claims and indemnify the Defendants for their own intentional wrongful acts.  Nor are broad *a priori* waivers of constitutional and statutory rights even enforceable under either federal or Texas law.

The Defendants misread their own policies regarding alleged waiver of rights, in the first place.  The Defendant's policies do not waive claims based upon the Defendants' wrongful actions, when read fairly and reasonably.  The Request for Exhibits in the Capitol and Capitol Extension Form, signed by FFRF, states only that "I understand that I am responsible for any damages to the building or grounds as a result of my exhibit."  (Exh. 1 to Motion to Dismiss.) The State Preservation Board's policy for exhibits, moreover, states further that an exhibit holder agrees to indemnify and hold the State of Texas harmless for any claims "brought by any third party which result from the exhibit holders' presence, equipment, or use of the Capitol or the Capitol Extension."  (Exh. 3 to Motion to Dismiss.)  Finally, the State Preservation Board's policies relieve State actors of liability if "said injury, loss or damage is not the result of the negligence of an SPB employee." (Exh. 3 to Motion to Dismiss.)  From these provisions, the Defendants draw the unreasonable conclusion that FFRF waived any claims against them for their own wrongful conduct.

The Defendants also misread the law applicable to alleged waiver of rights.  Under Texas law, the language relied upon by the Defendants is not effective as a prospective waiver of rights or agreement to indemnify the Defendants for their own wrongful conduct.  This is relevant because in determining whether FFRF agreed to absolve the Defendants for their own wrongful

26

conduct, the Court applies ordinary state law principles that govern the formation of contracts. As the issue here involves an alleged indemnity provision of a contract, therefore, the Court looks to the operative state law, which is Texas law in this case. *See e.g., Smith v. Seacor Marine LLC*, 495 F.3d 182, 185 (5th Cir. 2007).

"Texas courts place great restrictions on a party's ability to exculpate itself, in advance, of responsibility for its own negligence." *Hamblin v. Lamont*, 433 S.W.3d 51, 55 (Tex. App. 2013). Toward this end, Texas strictly construes indemnity contracts and has adopted the "express negligence doctrine." *Id*. at 56. The express negligence doctrine mandates that a party use express language, within the four corners of the contract, specifically stating that the party will be indemnified for liability arising from the party's own negligence. *Id*. "References to liabilities or claims in general will not suffice; instead, the language must specifically refer to liability pertaining to the party's own negligence." *Id*.

The public policy concern associated with extraordinary risk-shifting applies with equal or greater force to intentional torts. *Id*. at 57. "As such, only an indemnity provision specifically stating an intent to indemnify the indemnitee for the indemnitee's intentional torts should be enforceable against the indemnitor for the indemnitee's intentional acts." *Id*.

Here, the provisions in question plainly do not expressly state FFRF's intent to indemnify the Defendants for their own intentional torts. Moreover, whether public policy would prevent the Defendants from prospectively exculpating themselves with respect to intentional torts, even if the indemnity provisions contained such specific language, is questionable. *Id*. Accordingly, because the provisions in question do not specifically state an intent to release and indemnify the Defendants for liability arising from their own intentional torts, the Defendants' motion should be denied without further consideration.

Agreements to prospectively waive substantive rights are not enforceable, in any event. The Defendants' argument to the contrary, based for instance on the enforceability of arbitration provisions, is oblivious to the unambiguous language of undisputed authorities.  For example, in *Venture Cotton Cooperative v. Freeman*, 435 S.W.3d 220, 229 (Tex. 2014), the court recognized that "when parties agree to arbitrate a statutory claim, 'a party does not forego the substantive rights afforded by the statute; it only submits to the resolution in an arbitral, rather than a judicial, forum.'"

Similarly, in *Poly-America LP* 262 S.W.3d 337, 352 (Tex. 2008), the Texas Supreme Court observed that arbitration agreements typically function simply as forum-selection clauses, rather than statutory waivers, and generalized that "an arbitration agreement covering statutory claims is valid so long as the arbitration agreement does not waive substantive rights and the procedures are fair so that the employee may effectively vindicate his statutory rights." Arbitration provisions relating to federal statutory claims, moreover, also are not enforceable when a party is forced to forego the substantive and remedial rights afforded by the statute. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 105 S. Ct. 3346, 87 L. Ed. 2d 440 (1985).

The Defendants' argument that FFRF prospectively absolved the Defendants of liability for constitutional and statutory violations, including § 1983 claims and remedies under § 1988, is contrary to all known authority.  The Defendants either ignore such principles or do not understand them.  In either case, the Defendants' argument that FFRF waived its statutory right to attorneys' fees under § 1988 is unequivocally wrong.

## IX.      CONCLUSION.

The Defendants' Motion to Dismiss should be denied in its entirety.  In the first place, FFRF's First Amended Complaint clearly states claims upon which relief may be granted, including claims under the First Amendment, the Equal Protection Provision, and the Establishment Clause of the United States Constitution.  The Defendants' viewpoint and content discrimination against FFRF's Bill of Rights display, in a public forum, constitutes an obvious and egregious violation of the First Amendment.

The Defendants' alternative Motion to Dismiss only the individual capacity claims against them on the basis of qualified immunity should also be denied.  The status of the State Capitol as a public forum, and the constitutional prohibition on content and viewpoint discrimination regarding access to public forums, was clearly established before the Defendants' imposed censorship in this case.  Similarly, the protected status of even offensive speech under the First Amendment was well-established as one of the fundamental actuating premises of the First Amendment.

Finally, the Defendants claim that FFRF waived any redress for constitutional violations is contrary to the fact of the matter and applicable law.

For all of the above reasons, the Defendants' Motion should be denied.

<div style="margin-left: 50%;">

Respectfully submitted,

BOARDMAN AND CLARK, LLP
1 S. Pinckney St., Suite 410
Madison, Wisconsin  53703-4256
Telephone:  608-257-9521
Telecopier:  608-283-1709

BY:  */s/ Richard L. Bolton*_____
Richard L. Bolton
Wisconsin State Bar No. 1012552
Email:  rbolton@boardmanclark.com

</div>

Daniel H. Byrne
Texas State Bar No. 03565600
Email:  dbyrne@fbhf.com
Lessie G. Fitzpatrick
Texas State Bar No. 24012630
Email:  lfitzpatrick@fbhf.com
FRITZ, BYRNE, HEAD & FITZPATRICK, PLLC
221 West 6th Street, Suite 960
Austin, Texas  78701
Telephone:     (512) 476-2020
Facsimile:     (512) 477-5267

Sam Grover
Wisconsin State Bar No. 1096047
Email:  sgrover@ffrf.org
Patrick Elliott
Wisconsin State Bar No. 1074300
Email:  pelliott@ffrf.org
FREEDOM FROM RELIGION
FOUNDATION, INC.
P. O. Box 750
Madison, Wisconsin  53701
Telephone:  608-256-8900
Telecopier:  608-204-0422

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was filed electronically via the Court's CM/ECF system on this the 31st day of May, 2016, which will send notification to the following:

Anna Marie Mackin
Austin R. Nimocks
Brantley Starr
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78701
Telephone: (512) 475-4080
Telecopier: (512) 320-0667
Email: Anna.mackin@texasattorneygeneral.gov
Email: Austin.nimocks@texasattorneygeneral.gov
Email: Brantley.starr@texasattorneygeneral.gov


*/s/ Richard L. Bolton*
Richard L. Bolton

f:\docs\wd\26318\34\a2480991.docx

# PLAINTIFF'S APPENDIX

# EXHIBIT 1

## PERTINENT FACTS ALLEGED IN FIRST AMENDED COMPLAINT (DKT. No. 15.)

The Defendant, Greg Abbott, is the Governor of Texas, and he also is the Chairman of the State Preservation Board.  (FFRF's First Amended Complaint ¶14.)  The Texas State Preservation Board, is an agency of the State of Texas established in 1987.  (FFRF's First Amended Complaint ¶15.)  The duties of the State Preservation Board include approval and scheduling of Capitol events and exhibits displayed in the public areas of the Capitol.  (FFRF's First Amended Complaint ¶16.)  The Defendant, John Sneed, is the Executive Director of the State Preservation Board.  (FFRF's First Amended Complaint ¶17.)

Some areas of the Texas State Capitol are open to the public for expression and civic engagement.  (FFRF's First Amended Complaint ¶19.)  The public areas of the State Capitol can be used for events, as well as communicative displays or exhibits, upon approval by the State Preservation Board.  (FFRF's First Amended Complaint ¶20.)  The State Preservation Board "has allowed and should continue to allow diverse viewpoints to be expressed in Capitol displays," Governor Abbott has acknowledged. (FFRF's First Amended Complaint ¶21.)

The functions of the State Preservation Board include scheduling and approving exhibits for display within the public areas of the Capitol.  (FFRF's First Amended Complaint ¶26.)  The stated criteria for exhibit approval do not limit use of the public premises to use by discrete identifiable groups or displays dedicated solely to the discussion of specified substantive subjects. (FFRF's First Amended Complaint ¶27.)  The formal criteria for approval of displays, both facially and as applied in the present case, however do apparently allow consideration of the acceptability of viewpoints expressed.  (FFRF's First Amended Complaint ¶28.)

The formal criteria for exhibit approval require that exhibits must be for a "public purpose," defined as something in which the public generally has a direct interest and in which

the community at large is to be benefitted.  (FFRF's First Amended Complaint ¶29.)  Stated criteria further require that exhibits promote the public health, education, safety, morals, general welfare, security, and prosperity of all of the inhabitants or residents within the state. (FFRF's First Amended Complaint ¶30.)

The State Preservation Board previously has treated exhibits as private speech in a public forum.  (FFRF's First Amended Complaint ¶31.)  The State Preservation Board, on information and belief, had not previously censored or rejected displays or exhibits based on disapproval of the speaker's message, prior to summarily removing FFRF's exhibit; even overtly religious displays have been approved by the Board based on the treatment of such displays as private speech.  (FFRF's First Amended Complaint ¶32.)

In 2014, for example, the State Preservation Board approved the display of a Christian nativity scene in the Capitol's Ground Floor Rotunda.  (FFRF's First Amended Complaint ¶33.) The display of a Christian nativity scene in the Capitol in 2014 was the first time that an exhibit promoting a specific religion had been displayed in the Texas Capitol.  (FFRF's First Amended Complaint ¶34.)  The standalone nativity scene was initially unveiled in the front of the Texas Capitol building and then moved for display in the basement of the Capitol for one week in December of 2014.  (See Exhibit 1.)  (FFRF's First Amended Complaint ¶35.)

The fact that Christian displays in the State Capitol are privately funded and sponsored, ostensibly without government aid or endorsement, is deemed significant to the State Preservation Board's approval of a nativity display in the Texas State Capitol.  (FFRF's First Amended Complaint ¶47.)  The State Preservation Board gave the green light to a nativity scene in the State Capitol after concluding that private donors made possible the display without State sponsorship, support, or endorsement.  (FFRF's First Amended Complaint ¶48.)

The State Preservation Board deems exhibits like the nativity scene in the Texas Capitol to be private speech rather than speech endorsed by the Preservation Board.  (FFRF's First Amended Complaint ¶49.)  According to the Preservation Board, "Our's [the Board's] is a much broader property management role and we want to accommodate the public in many forms of expression."  (FFRF's First Amended Complaint ¶50.)  In communications to coordinate FFRF's Bill of Rights exhibit, a State Preservation Board employee noted that the 2014 Christian nativity scene had included a disclaimer of state involvement and requested that "FFRF post a similarly worded sign accompanying *your display*, mentioning the sponsor, *and that it was privately funded and displayed*." (Emphasis added).  (FFRF's First Amended Complaint ¶51 and Exhibit 2.)

In addition to the State Preservation Board, other groups erecting temporary displays in the Texas capitol have treated those displays as private speech in a public forum, including the Texas Nativity Scene Project, "we have a right to be in the public square and express our views as much as anyone else," (FFRF's First Amended Complaint ¶37), the former General Counsel to the Texas Secretary of State Trey Trainor, "[the capitol is] where Texans come to express themselves," (FFRF's First Amended Complaint ¶40), the Thomas More Society, who described display of the nativity scene in the capitol as "represent[ing] classic free speech and free exercise of religion by private citizens in the public square," (FFRF's First Amended Complaint ¶43), and the American Civil Liberties Union of Texas. (FFRF's First Amended Complaint ¶¶52–54).

Texas State officials, including the State Preservation Board, organizations displaying messages in the capitol, and other civil rights legal organizations have all considered and treated displays in the State Capitol as private speech in a public forum.  (FFRF's First Amended Complaint ¶¶36–55.)  Nor did the State Preservation Board treat displays other than FFRF's as

government speech in 2015: It permitted the display of a Christian nativity scene at the same time as FFRF's display without premature removal. (FFRF's First Amended Complaint ¶56.)

Consistent with past practice and application of the criteria for approval of displays, the Executive Director of the State Preservation Board and his staff approved and scheduled an exhibit for display by FFRF, for 5 days in December of 2015.   (FFRF's First Amended Complaint ¶57.)  FFRF submitted an exhibit application to the State Preservation Board on July 7, 2015, which the State Preservation Board approved after FFRF's revisions, without any editorial control or alteration of FFRF's substantive message.   (FFRF's First Amended Complaint ¶58.)

FFRF described its proposed display in its application as "Cutout figures celebrating the December 15 nativity of the Bill of Rights.  The figures will be self-standing and will be between 4 and 6 feet tall."  (FFRF's First Amended Complaint ¶59.)  FFRF further described its proposed exhibit, as "a temporary display in the Ground Floor Rotunda that celebrates freethought and the United States as the first among nations to formally embrace the separation of state and church." (FFRF's First Amended Complaint ¶61.)   Finally, FFRF explained its proposed exhibit as an effort "to celebrate the views of Texans who are part of a religious minority or have no religion at all."   (FFRF's First Amended Complaint ¶62.)   FFRF sought to diversify the limited expression displayed in 2014, manifested by the stand-alone Christian nativity display in the State Capitol.  (FFRF's First Amended Complaint ¶63.)

The stated purpose of FFRF's display was to "educate the public and celebrate the 224th anniversary of the ratification of the Bill of Rights on December 15, 1791.  Also, to celebrate the Winter Solstice on December 22 and to educate the public about the religious and nonreligious diversity within the State."  (FFRF's First Amended Complaint ¶65.)

The State Preservation Board approved FFRF's exhibit on August 6, 2015.  (FFRF's First Amended Complaint ¶66.)   Texas members of FFRF subsequently gathered in the Texas Capitol's Ground Floor Rotunda in December and put FFRF's display in place.  (FFRF's First Amended Complaint ¶67.)  As described in its application, FFRF's display featured Benjamin Franklin, Thomas Jefferson, George Washington, and the Statue of Liberty gathered around the Bill of Rights, which was placed reverently in a manger.  (FFRF's First Amended Complaint ¶68 and Exhibit 3.)

Accompanying FFRF's display was a requested sign that read:  "Happy Winter Solstice/At this Season of the Winter Solstice, we honor reason and the Bill of Rights (adopted December 15, 1791)/Keep State & Church Separate/On behalf of Texas members of the Freedom From Religion Foundation." (FFRF's First Amended Complaint ¶69.)  No disruptions, incidents, controversy, or complaint ensued after FFRF's exhibit went on display in the State Capitol on December 18, 2015, except for the objection of Governor Abbott.   (FFRF's First Amended Complaint ¶70.)  FFRF's display was at all times owned by FFRF, scheduled for a limited period of display, and FFRF was totally responsible for its message.  (FFRF's First Amended Complaint ¶71.)

Despite the calm response to FFRF's exhibit, the staff of the State Preservation Board removed FFRF's exhibit three days later, without notice or opportunity to object by FFRF. (FFRF's First Amended Complaint ¶72.)   FFRF's exhibit was removed upon the demand of Governor Abbott, who objected to the viewpoint of FFRF's exhibit.  (FFRF's First Amended Complaint ¶73.)  Governor Abbott wrote to the Defendant Sneed on December 21, 2015, "as Chairman of the State Preservation Board," demanding that Sneed "remove [FFRF's] display from the Capitol immediately."  (FFRF's First Amended Complaint ¶74.)  In his letter, Governor

5

Abbott claimed that FFRF's display failed to meet State Preservation Board criteria for approval, including because the display "does not educate," or promote public morals and the general welfare.  (FFRF's First Amended Complaint ¶75.)  Governor Abbott accused FFRF of "tasteless sarcasm," called its message "spiteful" and "intentionally designed to belittle and offend," and claimed that the display "undermines rather than promotes any public purpose."  (FFRF's First Amended Complaint ¶76.)

Governor Abbott, in his screed to the Executive Director of the State Preservation Board, concluded that "the general public does not have a 'direct interest' in the Freedom From Religion Foundation's purpose.  That organization is plainly hostile to religion and desires to mock it." (FFRF's First Amended Complaint ¶82.)  Governor Abbott further claimed that FFRF's exhibit was indecent ("it violates general standards of decency") and he compared it to a crucifix immersed in a jar of urine.  (FFRF's First Amended Complaint ¶83.)

Governor Abbott later expounded on his letter to the Defendant Sneed, which letter he released to the public.  (FFRF's First Amended Complaint ¶84.)  In a social media message, a December 22 "tweet," the Governor referred to FFRF's display as offensive and the Governor boasted that he had demanded removal of the FFRF exhibit from the Capitol.  (FFRF's First Amended Complaint ¶85.)

The Defendant Sneed, after receiving the Governor's demand, consulted with State Preservation Board member Charlie Geren, who advised Sneed that because Governor Abbott wants the FFRF exhibit taken down, "I told John [Sneed] that, if I were him, I'd take it down." (FFRF's First Amended Complaint ¶86.)  The Defendant Sneed then directed that the FFRF exhibit be immediately removed from display in the Capitol, without providing any notice or explanation to FFRF.  (FFRF's First Amended Complaint ¶87.)

Governor Abbott has a history of hostility directed against FFRF.  (FFRF's First Amended Complaint ¶88.)  In December of 2011, for example, Governor Abbott, who was then the Texas Attorney General, warned FFRF to stay out of Texas, stating: "Our message to the atheists is don't mess with Texas and our Nativity scenes or the Ten Commandments."  (FFRF's First Amended Complaint ¶89.)  At that time, Governor Abbott further proclaimed: "I want the Freedom From Religion Foundation to know that our office has a history of defending religious displays in this State."  (FFRF's First Amended Complaint ¶91.)

Governor Abbott also attacked FFRF during a press conference in October 2012, during which he stated:  "We will not allow atheist groups from outside of the State of Texas to come into the State, to use menacing and misleading intimidation tactics, to try to bully schools to bow down at the altar of secular beliefs."  (FFRF's First Amended Complaint ¶94.)  During the press conference in October 2012, Governor Abbott contemptuously described FFRF as "an atheist group from Wisconsin, who came into the State of Texas and tried to silence these students."  (FFRF's First Amended Complaint ¶95.)  Governor Abbott further expressed his self-styled respect for freedom of speech, in terms that are curious and telling in the circumstances:  "We are not going to either tolerate or accept these atheist groups trying to prevent that freedom of expression here in the State of Texas."  (FFRF's First Amended Complaint ¶96.)

Governor Abbott has consistently advocated for displays of religion in the public sphere, while actively opposing any expression of nonreligious principles.  (FFRF's First Amended Complaint ¶103.)  When the City of Orange removed a nativity scene from City Hall after FFRF requested to put a banner up as well., Governor Abbott encouraged the City to continue to display a nativity scene, without allowing FFRF's banner.  (FFRF's First Amended Complaint ¶102.)

In silencing FFRF, the Defendants applied standards and procedures not utilized in cases involving other Capitol displays, including application of criteria that the State Preservation Board has not considered for other exhibitors.  (FFRF's First Amended Complaint ¶106.)

FFRF's exhibit is not obscene, nor does it involve "fighting words," or other proscribable content.  (FFRF's First Amended Complaint ¶127.)  Also, FFRF's exhibit does not disparage or ridicule the Christian religion, nor express hate for any religion, nor incite or disturb the public peace.   FFRF's exhibit also is not lewd, vulgar or lacking in serious educational content. (FFRF's First Amended Complaint ¶128.)