UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **FREEDOM FROM RELIGION FOUNDATION, INC.** | § | |
| **Plaintiff,** | § | |
| | § | |
| **-vs-** | § | **CASE NO. 1-16: CV-00233** |
| | § | |
| **GOVERNOR GREG ABBOTT, in his** | § | |
| **official and individual capacities, and** | § | |
| **JOHN SNEED, Executive Director of the** | § | |
| **Texas State Preservation Board, in his** | § | |
| **official capacity,** | § | |
| **Defendants.** | § | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

### MOTION

The Plaintiff, Freedom From Religion Foundation, Inc., respectfully moves the court for summary judgment holding that the Defendants violated FFRF's constitutional rights, contrary to 42 U.S.C. § 1983, by removing Plaintiff's Bill of Rights display from the Texas State Capitol.

### BRIEF IN SUPPORT OF MOTION

## I.      INTRODUCTION.

A Christian advocacy group showcases a nativity scene in the Texas State Capitol for the express purpose of "citizens exercise of free speech rights." (Grover Decl., ¶55 and Exhibits 12-13.)  No media headlines appear in such case announcing that Texas Governor Greg Abbott has ordered the nativity scene removed as being offensive to, or exclusionary of, non-believers, agnostics, atheists, and non-Christians. Instead, Governor Abbott has no objection to this "exercise of free speech," as demanded by the advocates of Christianity.  The nativity scene is allowed without interference.

The Freedom From Religion Foundation ("FFRF"), by contrast, cannot display a Bill of Rights and Winter Solstice exhibit without interference because Governor Greg Abbott considers that display offensive. Acting with autocratic impunity, the Governor ordered FFRF's exhibit immediately removed from the Capitol, despite preapproval without concern by the Texas State Preservation Board. This the Governor cannot do.

This is not a case about the Government's right to control its own message. There is no message of its own that the Government wishes to state. Instead, this case is about censorship and exclusion of viewpoints from a public forum based on the personal disapproval of individual government officials. This case is foremost about the conceit of the censor and the braying of a bully.

Until brought to court, the Defendants agreed that viewpoints displayed in the State Capitol constitute private speech. Governor Abbott, in fact, previously justified removal of FFRF's Bill of Rights display on his mistaken view that the First Amendment does not protect private speech on government property if the Governor considers it to be offensive to the sensibilities of Christians. The Governor was right in his view that FFRF's display represents private speech, but wrong in his understanding of the First Amendment. FFRF's Bill of Rights display is undeniably the protected speech of a private party.

The Defendants, Governor Abbott and John Sneed, misread the Supreme Court's recent decision in *Walker v. Texas Division, Sons Of Confederate Veterans, Inc.*, _____ U.S. _____, 135 S. Ct. 2239 (2015). That decision does not support the Governor's unilateral decision to censor any speech that he finds offensive. According to Governor Abbott, after *Walker*, any speech allowed by the Government on public property constitutes Government speech, virtually subject to his whim. The Supreme Court, however, has not repudiated the public forum

principles whereby speech may not be excluded based on the viewpoint discrimination of individual government officials.  Viewpoint and content restrictions on speech allowed on public properties are presumptively unconstitutional.   Here, Governor Abbott undeniably censored FFRF based on his personal disapproval of FFRF's supposedly blasphemous message.

Governor Abbott's viewpoint discrimination against FFRF's display is not disputable, nor are the applicable constitutional principles to this case new or unclear.  Government officials may not censor speech in public forums based on disapproval of the speaker's viewpoint. Neutrality has long been the law in such circumstances, while here the Defendants undeniably acted with abject viewpoint hostility.

## II.      STATEMENT OF FACTS.

Plaintiff's proposed Findings of Facts are included in FFRF's Appendix as Exhibit 1. The parties Joint Proposed Stipulated Facts are included in FFRF's Appendix as Exhibit 2.

## III.     SUMMARY JUDGEMENT STANDARD.

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1996).  A fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party.  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

Summary judgment in FFRF's favor is proper in this case based on FFRF's First Amendment, Establishment Clause, and Equal Protection claims, brought under 42 U.S.C. §1983.  While § 1983 is not itself a source of substantive rights, it provides a method for vindicating rights otherwise conferred by federal law.  *Bauer v. Texas,* 341 F.3d 352, 357 (5th

Cir. 2003).   To establish a claim under § 1983, therefore, a plaintiff must:   (1) establish a violation of a right secured by the Constitution or laws of the United States; and (2) demonstrate that the alleged deprivation was committed by person(s) acting under color of law.   *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013).

Here, the Defendants undisputedly are government officials who were acting under color of law when ordering and implementing the censorship of FFRF's Bill of Rights display in the State Capitol.   The evidence also is undisputed that the Defendants removed FFRF's display from the State Capitol based upon objection to the display's content and viewpoint.   The First Amendment to the United States Constitution, moreover, undeniably prohibits content and viewpoint discrimination by government officials, except as to the government's own speech.   If all the many exhibitors in the State Capitol are deemed to be private speakers in a public forum, then FFRF clearly is entitled to summary judgment against each of the Defendants.   Even if all these varied displays were deemed government speech, however, the Defendants still would be guilty of showing hostility to non-believers and preference for religious speech, in violation of the Establishment Clause of the First Amendment.

## IV.    CENSORSHIP OF FFRF'S DISPLAY VIOLATES FFRF'S CONSTITUTIONAL RIGHTS.

### A.    Coordinating And Scheduling Displays On Government Property Does Not Transform Them Into Government Speech.

The Defendants incorrectly argue that essentially all speech on public property is now deemed government speech if a permit or license is required.   The Supreme Court's decision in *Walker*, however, did not effect any such sea change in First Amendment law.   The Supreme Court addressed the unique issue of government-issued license plates in *Walker*.   The Court did

not purport to adopt new rules for determining government speech, but instead applied the recognized principles applied in *Pleasant Grove v. Summum*, 555 U.S. 460 (2009).

In *Walker*, the Supreme Court deemed a Texas specialty license plate to be government speech, relying on *Summum*, a case dealing with privately donated permanent monuments in public parks.  The Court held in *Summum* that the various monuments in a public park were a form of government speech, reasoning that "permanent monuments displayed on public property typically represent government speech."  The Court explained that "it certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated."  *Id.* at 471.  Based on such permanency, and the resulting public identification of the government as speaker, the Court concluded that permanent monuments in a public park necessarily constitutes government speech, in part because such permanency is logistically inconsistent with treating them as private speech.

Forum analysis, as the Supreme Court noted in *Summum*, has usually been applied "in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program."  *Id.* at 478.  Speakers and parades are temporary additions to a park.  *Id.* At some point "speakers, no matter how long-winded, eventually come to the end of their remarks;" the last parade float will eventually go by.  *Id.* at 479.  Monuments, by contrast, are permanent additions to a park, and a park can accommodate only a limited number of monuments.  To require a city to be viewpoint neutral in accepting monuments for a park, therefore, would likely require the city to overload the park with permanent structures.  *Id.* at 479-80.

The Supreme Court did not conclude in *Summum* and *Walker* that all private speech that occurs on government property is government speech.  To the contrary, courts have routinely found that making government property accessible to private speakers may result in protected speech under the First Amendment.  The Supreme Court's decision in *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U. S. 753 (1995), is most instructive on this principle.  In *Pinette*, the Supreme Court concluded that a religious display next to the State House in Columbus, Ohio, constituted private expression despite the fact that private parties need to apply for permission to display their messages.  The State's policy in that case permitted a private party to display an unattended religious symbol in a public forum located next to the State Seat of Government.

Administrative regulations made the Square available in *Pinette* "for use by the public . . . or free discussion of public questions, or for activities of a broad public purpose," and gave the Capitol Square Review and Advisory Board responsibility for regulating public access.  To use the Square, a group had to fill out an official application form and meet several criteria, which concerned primarily safety, sanitation, and noninterference with other uses of the public forum. *Id.* at 757-58.  Significantly, in *Pinette*, the Court expressly recognized the difference between government speech and private speech, yet concluded that the religious display at issue did not constitute government speech merely because conducted on or close to the symbols of government.  *Id*. at 765-66.

In *Summum*, the Supreme Court again recognized that temporary displays, such as in *Pinette*, may constitute private speech, because of their temporary nature, while permanent monuments yield a completely different conclusion.  The Court explained the distinction as follows:

> Respondent compares the present case to *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 115 S. Ct. 2440, 132 L. Ed.2d 650 (1995), but that case involved a very different situation--a request by a private group, the Ku Klux Klan, to erect a cross for a period of 16 days on public property that had been opened up for similar temporary displays, including a Christmas tree and a menorah. *See Id.*, at 758, 115 S. Ct. 2440, 132 L. Ed.2d 650. Although some public parks can accommodate and may be made generally available for temporary private displays, the same is rarely true for permanent monuments.

*Summum,* 555 U.S. 460 at 480.

Requiring a license or permit to use government property is fully consistent with public forum principles. It is not transformative of all private discourse into government speech. In *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), for example, the Supreme Court ruled that a park-permitting ordinance constituted a content-neutral time, place, and manner regulation of the use of a public forum as long as applied in a content-neutral manner subject to definite standards. "A licensing standard which gives an official authority to censor the content of a speech differs *toto coelo* from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like." *Id.* at 322-23. Significantly, the Court in *Thomas* concluded that a permitting process did not convert private speakers into government speakers, and noted further that "even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." 534 U.S. at 323 (citing *Forsyth County v. Nationalist Movement*, 505 U. S. 123, 131(1992)). The Supreme Court has thus "required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review. *Id.*

The decision in *Arkansas Society of Freethinkers v. Daniels*, 2009 U.S. Dist. LEXIS 116982 (E.D. Ark. 2009), applies the relevant principles in a case closely analogous to the present one.  Arkansas had a policy that permitted private parties to place temporary displays on the Capitol grounds, including an annual nativity scene, but the State nonetheless excluded a Winter Solstice display that the Arkansas Society of Freethinkers wished to exhibit.   In evaluating the claims, the court concluded that the Government violated the First Amendment rights of the Arkansas Society of Freethinkers and enjoined the Secretary of State from continuing to deny the Freethinkers the right to display their proposed Winter Solstice display on the Capitol grounds.

Before reaching its holding in *Society of Freethinkers*, the Court first concluded that the case did not involve government speech, but rather, by "issuing a policy that permits private parties to install temporary displays on the Capitol grounds, the State intentionally created a forum for private speech."  *Id.* at *9.  As such, according to the Court, "the State may enforce only content-neutral, narrowly-drawn restrictions that are necessary to serve a significant government interest."  *Id.*

Finally, the Court explained that "if the display of the nativity scene and the exclusion of other holiday displays could be construed as government speech or a state-sponsored message, it would more likely than not amount to a violation of the Establishment Clause under controlling case law."  *Id.* at **9-10.

The Capitol displays at issue in the present case clearly constitute private speech rather than government speech.  In the first place, Governor Abbott and the State Preservation Board have themselves recognized an intent to create a public forum, which is perceived as such by the public.  (Grover Decl., at ¶¶7-18, and 55.) The Preservation Board has actually allowed nativity

displays in the State Capitol by the Thomas More Society for the express purpose of "Citizens exercise of free speech rights."   (Grover Decl., at ¶55 and Exhibits 12-13.)   In addition, the Government has no discrete government message that it seeks to convey by opening up the Capitol for temporary exhibits.   Literally hundreds of displays have been scheduled in the Capitol since January 1, 2013, apparently without any control exercised by the Preservation Board over substantive content.   Exhibits in the State Capitol also do not interfere with any Government function, nor are they incompatible with the use of Capitol space designated for displays.   Displays in the State Capitol also are not permanent, and innumerable and varied displays have been allowed.   The messages conveyed by these displays have not been determined in practice or in the abstract by Government officials, but rather by individual private speakers.   Finally, Texas Government officials have no long-established policy or practice of treating temporary displays in the State Capitol as government speech, but on the contrary have treated such displays as private speech.

The lynchpin of the Defendants' defense in this case fails at the threshold.   The Defendants' claimed justification for censoring FFRF hinges on their argument that all displays permitted in the Capitol constitute government speech, rather than private speech.   The Defendants' argument is disingenuous given the Defendants' own prior understanding and recognition of the public forum created in the Capitol.   Their argument is also belied by the known historical record.   Finally, the Defendants' rationale fails as a matter of law based on the overwhelming weight of authority.

### B. Content and Viewpoint Discrimination In A Public Forum Undeniably Violates The First Amendment.

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints."   *Citizens United v. Federal Election*

*Commission*, 558 U.S. 310, 340 (2010).  Chief amongst the evils the First Amendment prohibits are government "restrictions distinguishing among different speakers, allowing speech by some but not others." *Id.*  Indeed, the Supreme Court has called viewpoint discrimination "an egregious form of content discrimination" and has held that "the Government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1995).

### 1.        The State Capitol constitutes a public forum.

The Supreme Court has identified "three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985), *citing Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 45 (1983). For free speech purposes, the most accessible of these is the traditional public forum where any content-based prohibition on communicative activity receives strict scrutiny review: any exclusion based on content must be "necessary [and narrowly drawn] to serve a compelling state interest." *Perry*, 460 U.S. at 45. Such "quintessential public forums" include streets and parks, which have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* Notably, the state-owned plaza at the Ohio capitol building is also a traditional public forum. *Pinette*, 515 U.S. at 761, as is the capitol ground in Arkansas. *Soc'y of Freethinkers*, at *12.

Nonpublic forums lie at the other end of the spectrum, where, "[i]n addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort

to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. Examples of nonpublic fora include airport terminals, *Intl. Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992), a military installation devoted to basic training, *Greer v. Spock*, 424 U.S. 828, 837–38 (1976), and a public school's internal mail system, *Perry*, 460 U.S. at 46.

Lying between these two extremes are "designated public forums," which include areas that are not quintessentially public forums, but which the state has nevertheless "opened for use by the public as a place for expressive activity." *Id.* at 45. In a designated public forum, the Government "is bound by the same standards as apply in a traditional public forum." *Id.* at 46. This means that content-based restrictions on speech by the Government receive strict scrutiny review. Examples include university facilities subject to an established reservation policy, *Widmar*, 454 U.S. at 267–68, and school board meetings where the board retains "broad authority to structure the discussion," *City of Madison v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 177, 178–79 (1976).

Here, the Texas Capitol undisputedly qualifies as either a traditional public forum or a designated public forum. Like the Capitol Square Review and Advisory Board in *Pinette*, the Texas State Preservation Board has a policy and practice of permitting "a variety of unattended displays" in certain areas of the Capitol for those who have "fill[ed] out an official application form and [met] several criteria." *Pinette*, 515 U.S. at 757–58.  The Preservation Board has allowed hundreds of disparate displays in just the last three years, without denying a single known application.  (Grover Decl., at ¶¶57-58.)  The Board even allowed the Thomas More Society's nativity scene for the express purpose of exercising citizens' "free speech rights." (Grover Decl., at ¶55 and Exhibits 12-13.)  Governor Abbott, himself, has stated that the

Preservation Board "has allowed and should continue to allow diverse viewpoints to be exercised in Capitol displays."  (Grover Decl., at ¶43 and Exhibit 11.)

At the very least, areas of the Texas Capitol have been *designated* as a public forum for the display of private exhibits. Like the university facilities in *Widmar*, areas of the Texas capitol are subject to reservation by private groups and, as with the school board meetings in *City of Madison*, the Government's broad authority to regulate the time, place, and manner of that speech is consistent with the designated public forum analysis.

The court ultimately need not determine precisely whether the Texas State Capitol is a traditional or a designated public forum because content or viewpoint censorship are precluded in both. *See Kissick v. Huebsch*, 956 F.Supp.2d 981, 999 (W.D. Wisc. 2013) (holding that the Wisconsin State Capitol "may be thought of as either a traditional or a designated public forum"). In *Kissick*, the court declined to decide which of the two types of forum applied to the Wisconsin State Capitol since "[i]n either type of forum, content-based discrimination against speech is subject to strict scrutiny." *Id.*

Private groups have long understood that areas of the Texas Capitol are treated like a "public square" and that displays in the Capitol "represent constitutionally protected expression by private citizens in traditional or designated public forums." (Grover Decl., at ¶¶15 and 17, and Exhibits 2 and 5.)  The State Preservation Board also has traditionally recognized and treated exhibits in the Capitol as private speech, and, in fact, explicitly requested FFRF to include a disclaimer with its display indicating that "it was privately funded and displayed." (Grover Decl., at ¶18 and Exhibit 6.)  FFRF's Bill of Rights display, in short, constitutes private speech in a public forum that is subject only to neutral content and viewpoint regulation.  Here, removal of FFRF's Bill of Rights display was not the product of viewpoint neutrality.

### 2.    FFRF's display was censored due to its content and viewpoint.

Neutral regulation of a public forum must be accomplished without reference to the content of a speaker's message.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (2015) (finding that municipal code regulating the display of signs based on the type of information they convey imposed content-based restrictions on private speech and did not survive strict scrutiny review). Content-based regulations include laws regulating speech "by particular subject matter" or "by its function or purpose." *Id.* "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Id.* at 2230, *citing Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

In a designated public forum, "[r]easonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry*, 460 U.S. at 46, *citing Widmar v. Vincent*, 454 U.S. 263, 269-70 (1981). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional . . . ." *Reed*, 135 S.Ct. at 2226.

"Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U. S. 123, 134, (1992); *see also Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005). "Speech cannot be . . . punished or banned, simply because it might offend" those who hear it. *Forsyth County*, 505 U. S. at 134-35.

FFRF's Bill of Rights display undisputedly was banished from the Capitol due to its content and viewpoint. In his letter demanding the removal of FFRF's display, Governor Abbott

criticized its viewpoint in great detail, calling FFRF's message "tasteless sarcasm," and claimed that it "promotes ignorance and falsehood." Defendant's Motion to Dismiss, moreover, supports the conclusion that FFRF was censored based on its viewpoint. The Defendants characterized the censorship of FFRF's display as a "value judgment," Motion to Dismiss at 11, and conceded that it was "the Exhibit's disrespectful speech towards those of a different view—Christians in particular—which triggered its removal." *Id.* at 7.

This is not a case that involves any uncertainty or ambiguity as to the Defendants' reason for removing FFRF's Bill of Rights display from the Texas Capitol. Governor Abbott acted unequivocally on the basis of his disapproval of the content of FFRF's display, and Mr. Sneed acted on that disapproval without regard for constitutional obligations. In these circumstances, only a narrowly drawn regulation in support of a compelling interest would save the Defendants' actions from obviously violating FFRF's First Amendment rights. The Defendants, however, offer no such justification for their actions, which really amount to a fit of pique. The Defendants, instead, argue simply that FFRF's display is too offensive to Christian sensibilities to be protected speech under the First Amendment. This reasoning is wrong under long-established First Amendment law.

## C.   FFRF's Bill of Rights Display Constitutes Protected Speech Under the First Amendment.

The Defendants' claim that FFRF's Bill of Rights display constitutes unprotected speech is contradicted by basic First Amendment principles. The Defendants argue that FFRF's otherwise benign display is so offensive to Christians that it simply cannot be tolerated on government property, although such patronizing offense is apparently limited to Governor Abbott. Defendants received no complaints about FFRF's display other than Governor Abbott's own letter. (Grover Decl., at ¶¶35 and 57-59.) According to the Defendants, government

officials have every right to exclude displays that the Governor considers to be offensive.  Well-established First Amendment principles, however, dispel this misapprehension.

"The First Amendment generally prevents government from proscribing speech . . . or even expressive conduct . . . because of disapproval of the ideas expressed.  Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 382 (1992).  Restrictions upon the content of speech have been allowed only in a few limited areas, "which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.* at 382-83.  These limited areas include obscenity, defamation, fraud, incitement, and speech integral to criminal conduct.  *United States v. Stevens*, 559, U.S. 460, 468 (2010); *United States v. Richards*, 755 F.3d 269, 273-74 (5th Cir. 2014).  FFRF's Bill of Rights and Winter Solstice display does not fit into any of these categories.  With respect to speech that can be regulated because of its constitutionally proscribable content, moreover, the government may not make a content-based distinction, such as by "proscribing only libel critical of the government." *Id.* at 383-84.

The sweeping protection that the First Amendment offers "may not be denied simply because of hostility or hostile audience reaction.  The First Amendment applies to even 'loathsome' and unpopular speech with the same force as it does to speech that is celebrated and widely accepted." *Bible Believers v. Wayne County, Michigan*, 805 F.3d 228, 243 (6th Cir. en banc 2015).  Thus, "listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 134 (1992).  "Simply stated, the First Amendment does not permit a heckler's [or Governor's] veto." *Bible Believers*, 805 F.3d at 252.

FFRF's Bill of Rights display undeniably is constitutionally protected speech.  The display is not obscene.  Nor is it defamatory or libelous.  The display does not advocate

imminent lawless action.  *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).  It does not include "fighting words" that would "tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).  In fact, contrary to the Governor's tirade, FFRF's Bill of Rights display does not mock or disparage Christian beliefs or religious convictions, though that would be permissible under relevant Supreme Court precedent.  FFRF's display alludes to the traditional nativity scene in order to emphasize the importance of the Bill of Rights as a foundational document.

Governor Abbott's contemporaneous justification for removing FFRF's display from the Capitol, in short, is unsupported by any known precedent and conflicts with basic tenets of the First Amendment.   In the first place, blasphemy or sacrilege, of which Governor Abbott essentially accuses FFRF, has long been deemed protected speech under the First Amendment. The Supreme Court, for example, held in *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 528-29 (1952), that a New York statute authorizing state officials to censor "sacrilegious" films unconstitutionally abridged the rights to free speech and free press.  The Court explained its reasoning as follows:

> New York's highest court says there is 'nothing mysterious' about the statutory provision applied in this case:  'It is simply this: that no religion, as that word is understood by the ordinary, reasonable person, shall be treated with contempt, mockery, scorn and ridicule. . .'  This is far from the kind of narrow exception to freedom of expression which a state may carve out to satisfy the adverse demands of other interests of society. In seeking to apply the broad and all-inclusive definition of 'sacrilegious' given by the New York courts, the censor is set adrift upon a boundless sea amid a myriad of conflicting currents of religious views, with no charts but those provided by the most vocal and powerful orthodoxies. New York cannot vest such unlimited restraining control over motion pictures in a censor. *Cf. Kunz v. New York*, 340 U. S. 290 (1951)  Under such a standard the most careful and tolerant censor would find it virtually impossible to avoid favoring one religion over another, and he would be subject to an inevitable

tendency to ban the expression of unpopular sentiments sacred to a religious minority. Application of the 'sacrilegious' test, in these or other respects, might raise substantial questions under the First Amendment's guaranty of separate church and state with freedom of worship for all. However, from the standpoint of freedom of speech and the press, it is enough to point out that the state has no legitimate interest in protecting any or all religions from views distasteful to them which is sufficient to justify prior restraints upon the expression of those views. It is not the business of government in our nation to suppress real or imagined attacks upon a particular religious doctrine, whether they appear in publications, speeches, or motion picture.

See also *Calman v. Cortes*, 723 F. Supp.2d 766, 786-789 (E.D. Penn. 2010) (Blasphemy Statute that required rejection of corporate name applications that were perceived to be irreverent or offensive to religious beliefs, while accepting applications that were respectful or reverent to religious beliefs, conveys a message of state endorsement of religion over non-religion).

The Supreme Court similarly has recognized satire as a protected form of speech under the First Amendment.  In *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988), the Supreme Court concluded that an "outrageousness" standard in the area of political and social discourse is too inherently subjective under the First Amendment to sustain a suit for damages.  "The fact that society may find speech offensive is not a sufficient reason for suppressing it."  *FCC v. Pacifica Foundation*, 438 U. S. 726, 745-746 (1978).  "Satire is a long-established artistic form that uses means such as 'ridicule, derision, burlesque, irony, parody, or caricature' to sensory the 'vices, follies, abuses, or shortcomings' of an individual or society."  *Farah v. Esquire Magazine*, 736 F.3d 528, 536 (D.C. Cir. 2013).  Not surprisingly, therefore, "satirical speech enjoys First Amendment protection."  *Id.*

Any government regulation that burdens speech based on disapproval of the message conveyed is subject to strict scrutiny, and content-based regulations are presumptively invalid. *In re Tam*, 808 F.3d 1321, 1334 (Fed. Cir. 2015).  "Viewpoint-based regulations, targeting the

substance of the viewpoint expressed, are even more suspect." *Id.* at 1335. Finally, "the legal significance of viewpoint discrimination is the same whether the government disapproves of the message or claims that some part of the populace will disapprove of the message." *Id.* at 1336.

Governor Abbott's actions, supposedly to protect Christian observers from offense, cannot be justified by denying that FFRF's display constitutes protected speech. The Governor's argument that speech offensive to him cannot be permitted on government property is contrary to the law, including the logic and rationale of the First Amendment.

### D.    The State Preservation Board's Formal Standards Also Give Unfettered And Arbitrary Discretion To Officials In Violation Of The First Amendment.

As a restraint on speech, any permitting scheme must meet certain constitutional requirements. In particular, such a scheme may not delegate overly broad discretion to government officials. "A Government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view. To curtail such risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth County,* 505 U.S. at 130-31. *See also Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002) ("[W]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content . . . ."); *Niemotko v. Maryland*, 340 U.S. at 268, 271-73 (1951) (licensing criteria must have definitive standards or other controlling guides to apply in granting or withholding a permit); and *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (permitting standard based upon "the general welfare of the citizens" impermissibly gives government officials uncontrolled discretion in violation of the First Amendment).

In the present case, the formal standards of the State Preservation Board for permitting displays in the Capitol include the requirement that a display "promote a public purpose." This, in turn, is further defined as meaning that "the public must have a direct interest in the purpose and the community at large must be benefitted." These standards, to the extent they constitute an identifiable standard, would appear to give government officials unfettered discretion to determine whether an exhibition should be allowed.

The present case exemplifies precisely the danger of such unfettered discretion, both facially and as applied. Governor Abbott purports to justify his censorship of FFRF on the basis that the Bill of Rights display does not promote a public purpose; the public supposedly does not have a direct interest in FFRF's purpose; and the community at large is not benefited. On the other hand, Governor Abbott has cheered the display of Christian nativity displays on government property, including in the State Capitol, despite no greater public purpose in which the public has a direct interest and that benefits the community at large. In fact, representative examples of displays approved by the State Preservation Board clearly show that the Board's criteria have not been applied prohibitively, except in the case of Governor Abbott's objection to FFRF's Bill of Rights display.

As a practical matter, the State Preservation Board apparently has not rigorously applied its formal standards, if at all. Other than FFRF's display, no other display has been interfered with based upon its content or viewpoint. (Grover Decl., at ¶59 and Exhibit 15.) In this case, however, Governor Abbott's purported application of the formal standards in order to censor FFRF illustrates precisely the danger of giving a licensor unfettered discretion to approve or deny the right to speak. Governor Abbott's arbitrary "application" of the formal standards of the

State Preservation Board to the Bill of Rights display clearly violated FFRF's First Amendment rights.

### E.       The Defendants' Actions Also Violated FFRF's Right To Equal Protection.

The Supreme Court has recognized a close relationship between Equal Protection and the First Amendment, as in *Police Department of Chicago v. Mosley*, 408 U.S. 92, 96 (1972):

> Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

"The right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has, therefore, a firmer foundation than the whims of personal opinions of a local governing body." *Niemotko v. Maryland*, 340 U. S. 268, 272 (1951).

Here, FFRF is similarly situated to other speakers who have applied for, and successfully displayed exhibits in the Capitol.  For example, FFRF is similarly situated to the exhibitors of the Christian nativity scene in the State Capitol, *i.e.*, the Thomas More Society and the Texas Nativity Scene Project.  Because that display admittedly espouses a distinctly Christian message, free of any interference by Governor Abbott, the censorship of FFRF's display because of its supposed offensiveness to Christians is precisely the arbitrary and differential treatment prohibited by both the First Amendment and Equal Protection Clause of the United States

Constitution.  The Defendants, moreover, discriminated against FFRF based on hostility to FFRF's own non-religious beliefs, which are protected under the Equal Protection Clause.  FFRF is, in fact, a member of a protected class, and the Defendants undisputedly violated FFRF's right to equal protection.

> **F.     The Defendants' Censorship Of FFRF Also Violated The Establishment Clause Of The First Amendment.**

Governor Abbott's preference for religious displays in the State Capitol also violates FFRF's rights under the Establishment Clause of the First Amendment.  As the Supreme Court recognized in *Pinette*, "giving sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter) would violate the Establishment Clause (as well as the Free Speech Clause, since it would involve content discrimination)."  *Pinette*, 515 U.S. at 766.  The Supreme Court further explained in *Pinette* that "one can conceive of a case in which a governmental entity manipulates its administration of a public forum close to the seat of government (or within a government building) in such a manner that only certain religious groups take advantage of it, creating an impression of endorsement that is in fact accurate."  *Id.*

The Supreme Court's suspicions are borne out in this case where the Defendants have unabashedly "manipulated" their administration of the State Capitol premises so as to exclude a speaker perceived to have a message hostile to Governor Abbott's own preference for Christian messaging in the Capitol.  The Defendants clearly took action that adversely affected FFRF's interests precisely because of FFRF's advocacy of non-religious positions.

The Defendants' exclusion of FFRF's display would violate the Establishment Clause even if exhibits in the Capitol were deemed government speech.  As the Supreme Court acknowledged in *Summum*, 555 U.S. at 468, "government speech remains constrained by the Establishment Clause of the First Amendment."  In fact, as Justice Stevens also observed in

*Summum*, 555 U.S. at 482, "even if the Free Speech Clause neither restricts nor protects government speech, government speakers are bound by the Constitution's other proscriptions, including those supplied by the Establishment and Equal Protection Clauses."  Favoring applications for display by religious adherents, while excluding messages associated with non-believers, therefore, would itself violate the Establishment Clause.  Just as government officials may not favor or endorse one religion over others, so too officials "may not favor or endorse religion generally over non-religion."  *Lee v. Weissman,* 505 U.S. 577, 627, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)(Souter, Justice, concurring)(citing *County of Allegheny v. ACLU,* 492 U.S. 573, 589-94, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)).

The Defendants clearly have allowed religious displays in the State Capitol, while excluding FFRF's display on the basis of Governor Abbott's hostility to any message of non-religion.  The evidence of such discriminatory treatment of FFRF's display is undisputed.  In fact, FFRF's exhibit is the only exhibit known to have been removed from the Capitol or otherwise had an application for display denied.  (Grover Decl., at ¶¶57-59 and Exhibit 15.)

### G.     Governor Abbott's Removal Mandate Constituted A Blatant And Egregious Form Of Content Discrimination In Violation Of FFRF's Constitutional Rights, Thereby Subjecting Him Personally Liable For Nominal Damages.

"To determine whether state officials had 'fair warning' that their conduct was unconstitutional, we consider the status of the law both in our circuit and in our sister circuits at the time of the defendants' actions." *Kovacic v. Villarreal*, 628 F.3d 209, 214 (5th Cir. 2010).  In this instance, it was well settled in the Fifth Circuit and nationally at the time that Defendants removed FFRF's display from the Capitol that government officials cannot censor a message in a public forum based on the content or viewpoint of that message.

The Supreme Court has characterized the principle that "the government may not regulate speech based on its substantive content or the message it conveys" as "axiomatic." *See Rosenberger*, 515 U.S. at 829.  In the case of a public forum, "a State's right to limit protected expressive activity is sharply circumscribed: It may impose reasonable, content-neutral time, place, and manner restrictions . . . but it may regulate expressive content only if such a restriction is necessary, and narrowly drawn, to serve a compelling state interest." *Pinette*, 515 U.S. 753, 761 (1995); *see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992); *Frisby v. Schultz*, 487 U.S. 474, 481 (1988); *Cornelius*, 473 U.S. 788, 800 (1985); *Perry*, 460 U.S. 37, 45 (1983); *Carey v. Brown*, 447 U.S. 455, 462 (1980); *cf. Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 101 (1972) ("The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives."); *Cantwell v. Connecticut*, 310 U.S. 296, 311 (1940) (statute must be "narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State").

 "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Reed*, 135 S.Ct. at 2230, *citing Rosenberger*, 515 U.S. at 829.  Viewpoint discrimination "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger*, 515 U.S. at 830.

Here, Governor Abbott was aware that the State had opened areas of the Capitol for speech, given that the State Preservation Board is tasked with scheduling use of that forum. Based on the state of the law, moreover, it would be clear to any reasonable government official tasked with regulating a forum that they cannot discriminate against speech on the basis of

content or viewpoint.  Governor Abbott's claim that the State Preservation Board "has no obligation to approve displays that purposefully mock the sincere religious beliefs of others," Motion to Dismiss at 7, simply has no legal support.  Though FFRF does not agree that its display mocked religion, the First Amendment clearly establishes that even undesirable viewpoints must be permitted in a public forum.  Governor Abbott's claim that FFRF's display constituted unprotected speech is contrary to the clearly established first principles of the First Amendment.  Adding to the offense, Governor Abbott patently acted out of spite and hostility toward FFRF because of FFRF's advocacy of state and church separation.

It was well established when the Governor acted that "under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Carey*, 447 U.S. at 463, *citing Mosley*, 408 U.S. at 96.  This is not an obscure point of law. To the contrary, the extreme similarity between this case and *Pinette* provides compelling proof of the clearly established state of the law.  FFRF's display, depicting three founding fathers and the Statue of Liberty gathered around the Bill of Rights and a sign wishing readers a "Happy Winter Solstice," cannot fairly be described as offensive, and it certainly is not in a league with plainly racist, unpatriotic, and bigoted speech that has been previously protected under the First Amendment.  Governor Abbott could not have reasonably believed that he was on solid constitutional grounds in censoring FFRF's speech based on its message.

Governor Abbott undeniably ordered FFRF's display removed from the Capitol's forum due to the display's content and the viewpoint expressed, contrary to law.  It is not only "clearly established," but *axiomatic* that the government may not censor speech based on its content or its

viewpoint.   In this case, Governor Abbott acted in open defiance of his clearly established constitutional duties and, therefore, he should be held accountable.  FFRF, accordingly, requests the court to award nominal damages against Governor Abbott, in his individual capacity, as the court deems appropriate.

      **H.**     **Conclusion.**

     The relevant evidence is undisputed and the law is clearly established that the Defendants violated FFRF's constitutional rights under the First Amendment and the Equal Protection and Establishment Clauses of the United States Constitution.   The Defendants, moreover, undisputedly were acting under color of law as state actors.  FFRF, accordingly, requests the Court to grant its Motion for Summary Judgment.

Dated this 19th day of August, 2016.

                             Respectfully submitted,

                             BOARDMAN AND CLARK, LLP
                             1 S. Pinckney St., Suite 410
                             Madison, Wisconsin  53703-4256
                             Telephone:  608-257-9521
                             Telecopier:  608-283-1709

                             BY:  */s/ Richard L. Bolton*_____
                             Richard L. Bolton
                             Wisconsin State Bar No. 1012552
                             Email:  rbolton@boardmanclark.com

                             Daniel H. Byrne
                             Texas State Bar No. 03565600
                             Email:  dbyrne@fbhf.com
                             Lessie G. Fitzpatrick
                             Texas State Bar No. 24012630
                             Email:  lfitzpatrick@fbhf.com
                             FRITZ, BYRNE, HEAD & FITZPATRICK, PLLC
                             221 West 6th Street, Suite 960
                             Austin, Texas  78701
                             Telephone:     (512) 476-2020
                             Facsimile:     (512) 477-5267

Sam Grover
Wisconsin State Bar No. 1096047
Email:  sgrover@ffrf.org
Patrick Elliott
Wisconsin State Bar No. 1074300
Email:  pelliott@ffrf.org
FREEDOM FROM RELIGION
FOUNDATION, INC.
P. O. Box 750
Madison, Wisconsin  53701
Telephone:  608-256-8900
Telecopier:  608-204-0422

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed electronically via the Court's CM/ECF system on this the 19th day of August, 2016, which will send notification to the following:

      Anna Marie Mackin
      Austin R. Nimocks
      Brantley Starr
      Office of the Attorney General
      P.O. Box 12548, Capitol Station
      Austin, TX 78701
      Telephone: (512) 475-4080
      Telecopier: (512) 320-0667
      Email: Anna.mackin@texasattorneygeneral.gov
      Email: Austin.nimocks@texasattorneygeneral.gov
      Email: Brantley.starr@texasattorneygeneral.gov

*/s/ Richard L. Bolton*
Richard L. Bolton

# PLAINTIFF'S APPENDIX

# EXHIBIT 1

## PLAINTIFF'S PROPOSED FINDINGS OF FACT

1.      FFRF is a non-profit membership organization that advocates for the separation of state and church and educates on matters of non-theism.  (Grover Decl., at ¶3.)

2.      FFRF has more than 23,500 members, with members in every state of the United States, including more than 1,000 members living in the State of Texas.  (Grover Decl., at ¶4.)

3.      The number of Americans who do not identify with any religion constitutes about 23% of the U.S. public, according to the Pew Research Center.  (Grover Decl., at ¶5.)

4.      In December of 2014, FFRF became aware that a Christian Nativity scene was being displayed in the Texas State Capitol. (Grover Decl., at ¶6.)

5.      Media reports about the nativity scene in the Texas State Capitol indicated that this was the first time such a religious display was exhibited in the Capitol, which piqued our interest in the possibility of our own display.  (*See, e.g.*, David Scott, *Nativity scene to be placed in Texas Capitol rotunda*, KXAN (Dec. 11, 2014) ("[N]o one KXAN checked with could remember such a display ever being placed in the rotunda at the Texas statehouse."); Angie Beavin, *Nativity scene on display inside Texas Capitol*, KXAN (Dec. 14, 2014) ("Such a display has never been put up in the Texas Capitol building."); Shannon Murray, *Nativity scene unveiled at Texas Capitol*, KVUE (Dec. 15, 2014) (noting that the religious display was going up "[f]or the first time").  (Grover Decl., at ¶7.)

6.      The display of a nativity scene in the Texas Capitol, and in other capitols as well, concerned FFRF because of the potential for government endorsement of religion, particularly Christianity.  (Grover Decl., at ¶8.)

7.      Media reports about the nativity scene at the Texas State Capitol, however, emphasized the private sponsorship of the display, including the motivation for the display to celebrate the birth of Christ.  (Grover Decl., at ¶9.)

8.      The Texas Nativity Scene Project, a private organization, reportedly sponsored the nativity scene in the Texas Capitol, looking to combat the "War on Christmas."  (Grover Decl., at ¶10.)

9.      The sponsor of the nativity scene reportedly intended by its exhibit to communicate a distinctly Christian message, according to the project's spokesperson.  This is an expression of the Christian community coming together and saying, 'we have a right to be in the public square and express our views as much as anyone else.'"  (Grover Decl., at ¶11.)

10.     In addition to sponsorship by the Texas Nativity Scene Project, the Thomas More Society, an advocacy law firm specializing in the promotion of nativity scenes in state capitols, claimed responsibility for the Nativity in the Texas State Capitol.  (Grover Decl., at ¶14.)

11.     According to the Thomas More Society, the display of nativity scenes in state capitols, including Texas, represents "constitutionally protected free speech and expression of religious faith by private citizens in a traditional public forum." (Grover Decl., at ¶15.)

12.     The fact that such a Christian display in the State Capitol was privately funded and sponsored, ostensibly without government aid or endorsement, was reportedly significant to the State Preservation Board's approval of a nativity display in the Texas State Capitol.  (Grover Decl., at ¶3.)

13.     The Thomas More Society further publically defended nativity displays in state capitals as "constitutionally protected expression by private citizens in traditional or designated

public forums, where the sole role of the government must be that of a viewpoint-neutral gatekeeper assuring open access for all citizens to have their 'say.'" (Grover Decl., at ¶17.)

14.     In a later communication regarding FFRF's own Bill of Rights exhibit, the Capitol Events and Exhibit Coordinator for the State Preservation Board, Robert Davis, expressly noted that the 2014 Christian nativity scene had included a disclaimer of state involvement and requested FFRF to "post a similarly worded sign accompanying your display, mentioning the sponsor, and that it was privately funded and displayed." (Grover Decl., at ¶18.)

15.     As FFRF considered its own display, therefore, public sources and characterizations indicated the State Preservation Board, considered displays in the State Capitol to be private speech. (Grover Decl., at ¶19.)

16.     The State Preservation Board, incidentally, also approved a stand-alone display of a Christian nativity scene in 2015, which was displayed without premature removal by the Board. (Grover Decl., at ¶20.)

17.     Thus, given the public characterizations of the nativity scene in the Texas State Capitol as being a purely private display, FFRF began in early 2015 to investigate the procedure by which FFRF might exhibit its own display at the Texas State Capitol. (Grover Decl., at ¶21.)

18.     FFRF ultimately submitted an exhibit application to the State Preservation Board on July 7, 2015, which the State Preservation Board approved after FFRF's voluntary revisions, without any editorial control or alteration of FFRF's substantive message. (Grover Decl., at ¶23.)

19.     FFRF later submitted revisions to its application at the request of Representative Donna Hurd, the State Official Sponsor for FFRF's display. (Grover Decl., at ¶24.)

20.     FFRF described its proposed display in its application as "Cutout figures celebrating the December 15 nativity of the Bill of Rights.  The figures will be self-standing and will be approximately life-sized." (Grover Decl., at ¶25.)

21.     FFRF's exhibit application also identified Texas Representative Donna Howard as our "State Official Sponsor."  (Grover Decl., at ¶26.)

22.     FFRF described its proposed exhibit, in a letter dated May 29, 2015, written to potential "State Official Sponsors," as "a temporary display in the Ground Floor Rotunda that celebrates freethought and the United States as the first among nations to formally embrace the separation of state and church."  (Grover Decl., at ¶27.)

23.     FFRF further explained its proposed exhibit as an effort "to celebrate the views of Texans who are part of a religious minority or have no religion at all."  (Grover Decl., at ¶28.)

24.     FFRF also sought to diversify the limited expression displayed in 2014, manifested by the stand-alone Christian nativity in the State Capitol.  (Grover Decl., at ¶29.)

25.     The stated purpose of FFRF's display further was, to "educate the public and celebrate the 224th anniversary of the ratification of the Bill of Rights on December 15, 1791. Also, to celebrate the Winter Solstice on December 22 and to educate the public about the religious and nonreligious diversity within the State."  (Grover Decl., at ¶30.)

26.     The State Preservation Board, by the Executive Director and his staff, officially approved FFRF's exhibit application on August 6, 2015.  (Grover Decl., at ¶31.)

27.     Texas members of FFRF then subsequently gathered in the Texas Capitol's Ground Floor Rotunda on December 18 and put FFRF's display in place.  (Grover Decl., at ¶32.)

28.      FFRF's display featured Benjamin Franklin, Thomas Jefferson, George Washington, and the Statue of Liberty gathered around the Bill of Rights, which was placed in a manger.  (Grover Decl., at ¶33.)

29.      Accompanying the display was a sign that read:  "Happy Winter Solstice/At this Season of the Winter Solstice, we honor reason and the Bill of Rights (adopted December 15, 1791)/Keep State & Church Separate/On behalf of Texas members of the Freedom From Religion Foundation."  (Grover Decl., at ¶34.)

30.      No known disruptions, incidents, controversy, or complaint ensued after FFRF's exhibit went on display in the State Capitol on December 18, 2015, except for the objection of Governor Abbott, described below.  (Grover Decl., at ¶35.)

31.      FFRF's display was at all times owned by FFRF, scheduled for a limited period of display, and FFRF was totally responsible for its message.  (Grover Decl., at ¶36.)

32.      All of FFRF's interactions with Robert Davis at the Texas State Preservation Board were mutually cordial, respectful, and cooperative.  (Grover Decl., at ¶37.)

33.      Similarly, all communications with the State Preservation Board regarding the actual placement and setting up of the display were friendly, helpful, and cooperative.  (Grover Decl., at ¶38.)

34.      In none of FFRF's interactions with the State Preservation Board was complaint or reservation ever expressed regarding the substance or viewpoint of FFRF's exhibit.  (Grover Decl., at ¶39.)

35.      The Preservation Board only asked that FFRF include a disclaimer of State sponsorship, similar to a disclaimer displayed with the nativity scene.  (Grover Decl., at ¶40.)

36.     After FFRF's exhibit went on display on December 18, 2015, however, FFRF learned that the staff of the State Preservation Board removed FFRF's exhibit, without any notice to me or anyone else at FFRF, and without opportunity to object by FFRF.  (Grover Decl., at ¶41.)

37.     FFRF learned that FFRF's exhibit was removed upon the demand of Governor Abbott.  (Grover Decl., at ¶42.)

38.     On or about December 22, 2015, Governor Abbott wrote to the Defendant, John Sneed, "as Chairman of the State Preservation Board," demanding that Sneed "remove [FFRF's] display from the Capitol immediately."  (Grover Decl., at ¶43.)

39.     In his letter, Governor Abbott claimed that FFRF's display failed to meet State Preservation Board criteria for approval, including because the display "does not educate," or promote public morals and the general welfare.  (Grover Decl., at ¶44.)

40.     Governor Abbott accused FFRF of "tasteless sarcasm," called its message "spiteful" and "intentionally designed to belittle and offend," and claimed that the display "undermines rather than promotes any public purpose."  (Grover Decl., at ¶45.)

41.     Governor Abbott, in his diatribe to the Executive Director of the State Preservation Board, concluded that "the general public does not have a 'direct interest' in the Freedom From Religion Foundation's purpose.  That organization is plainly hostile to religion and desires to mock it."  (Grover Decl., at ¶51.)

42.     Finally, Governor Abbott claimed that FFRF's exhibit was indecent ("it violates general standards of decency") and he compared it to a crucifix immersed in a jar of urine. (Grover Decl., at ¶52.)

43.     The Defendant Sneed, after receiving the Governor's demand, reportedly then consulted with State Preservation Board member Charlie Geren, who advised Sneed that if Governor Abbott wants the FFRF exhibit taken down, then he should do so.  (Grover Decl., at ¶53.)

44.     Prior to the present litigation, no one associated with the State Preservation Board, including Governor Abbott, had ever claimed that FFRF's Bill of Rights display, or the Thomas More nativity scene, constituted the State's own speech.  (Grover Decl., at ¶54.)

45.     In fact, the application and approval for the Christian nativity scene, in both 2014 and 2015, identified the purpose of that exhibit to simply be "Citizens exercise of free speech." (Grover Decl., at ¶55.)

46.     The State Preservation Board's approval of the nativity scene followed urging by the Thomas More Society that such a display constituted protected speech in a public forum. (Grover Decl., at ¶56.)

47.     Significantly, the State Preservation Board apparently has never denied any application for approval of a requested display at least between January 1, 2013, and the present. (Grover Decl., at ¶57.)

48.     In response to a Request for Production of "all documents relating to the denial by the State Preservation Board of any application to exhibit or display in the State Capitol between January 1, 2013, and the present," the Defendants responded "that they have no such documents in their possession, custody or control."  (Grover Decl., at ¶58.)

49.     The Defendants also stated that they have no documents in their possession, custody or control "relating to any exhibit or display prematurely removed by the State Preservation Board while approved for display or exhibit."  (Grover Decl., at ¶59.)

50.      Governor Abbott's claim that FFRF's Bill of Rights display does not educate or promote public morals and the general welfare, or represent a matter in which the general public has a "direct interest," is belied by review of other displays approved by the State Preservation Board without objection by Governor Abbott.  (Grover Decl., at ¶60.)

51.      The State Preservation Board, for example, approved a display by the Austin Jewish Academy for the purpose of "community outreach."  (Grover Decl., at ¶61.)

52.      The State Preservation Board also approved a display of student quilts on Catholic Advocacy Day.  (Grover Decl., at ¶62.)

53.      An application by the Young Conservatives of Texas was also approved by the State Preservation Board "to connect college students with established organizations that promote conservative values."  (Grover Decl., at ¶63.)

54.      Other applications approved by the State Preservation Board have a relationship to the "general welfare" and "direct interest" of the public that is far narrower than FFRF's display, which concerns the 23% of adult Americans who are nonreligious, the many others who value religious and nonreligious diversity, and anyone affected by the Bill of Rights. Examples include:

    a.      Approval of display "recognizing families and elementary students in District 46.";

    b.      Approval of display by Leading Age Texas showcasing works of art by "older Texans all over the state.";

    c.      Approval of Odyssey School Of Art "student annual exhibition.";

    d.      Approval of School District 75 Art Show.;

e.      Approval of exhibit by Texas Chiropractic Association "to give free massages to those who work at the Capitol.";

f.      Approval of exhibit by Texas State Florists' Association to promote "public awareness of agriculture floral items and Texas grown plants.";

g.      Approval of Arlington ISD art show.;

h.      Approval of display by Southlake Women's Club showcasing "a piece of student artwork from District 98.";

i.      Approval of calligraphy display by International Buddhist Progress Society of Austin.;

j.      Approval of exhibit by Art From The Streets to "increase awareness about street art.";

k.      Approval of student art exhibit by Austin Jewish Academy.;

l.      Approval of display by School District 98/Southlake Women's Club to "highlight a talented high school artist from the 98th District of Texas.";

m.      Approval of display by Illustrative Preservation "to promote interest in Texas (and outside our state) of statuary structures and signage.";

n.      Approval of display by King Ranch Main House "to educate the public about the 100th anniversary of the King Ranch Main House.";

o.      Approval of display by Texas Association of Interior Design "to educate the public that state registered interior designers are educated to protect health, safety, and welfare in the built environment."; and

p.      Approval of application by Texas NORML "to educate citizens and legislature on cannabis issues."  (Grover Decl., at ¶64.)

55.     These examples are not exclusive, as review of all applications approved by the State Preservation Board since January 1, 2013, revealed no such restrictions being required by the Board as Governor Abbott cited as justification for removing FFRF's display.  (Grover Decl., at ¶65.)

56.     FFRF's Bill of Rights display seemingly had greater educational value and more direct public interest than a whole host of displays approved by the State Preservation Board, as indicated by the examples shown above.  (Grover Decl., at ¶67.)

57.     In approving FFRF's Bill of Rights display, the State Preservation Board, including Robert Davis, never questioned anything about FFRF's exhibit, but merely asked for, and received, a disclaimer of State sponsorship, fully consistent with a public forum open to "citizens exercise of free speech."  (Grover Decl., at ¶68.)

58.     FFRF's Bill of Rights display was treated by the State Preservation Board as FFRF's own speech, prior to this suit, just as the State Preservation Board considered that "the Thomas More Society is the organization responsible for this [nativity scene] exhibit," in a statement made to a reporter at the Dallas News.  (Grover Decl., at ¶69.)

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **FREEDOM FROM RELIGION** | § | |
| **FOUNDATION, INC.** | § | |
|     **Plaintiff,** | § | |
| | § | |
| **-vs-** | § | **CASE NO. 1:16-CV-00233-SS** |
| | § | |
| **GOVERNOR GREG ABBOTT, in his** | § | |
| **official and individual capacities, and** | § | |
| **JOHN SNEED, Executive Director of the** | § | |
| **Texas State Preservation Board, in his** | § | |
| **official and individual capacities,** | § | |
|     **Defendants.** | § | |

**PROPOSED STIPULATED FACTS**

1.      The Plaintiff, Freedom From Religion Foundation, Inc. ("FFRF"), is a non-profit membership organization that advocates for the separation of state and church and educates on matters of nontheism.

2.      FFRF has more than 23,000 members, with members in every state of the United States, including nearly 1,000 members living in the State of Texas.

3.      Defendant Greg Abbott is the Governor of Texas. As Governor, he also serves as Chairman of Texas's State Preservation Board.

4.      The State Preservation Board is an agency of the State of Texas established by the 68th Legislature in 1983. TEX. GOV'T CODE §443.001.

5.      The duties of the State Preservation Board are to, among other things, "preserve, maintain, and restore the Capitol, the General Land Office Building, their contents, and their grounds[,] approve all changes to the buildings and their grounds, including usual maintenance and any transfers or loans of objects under the curator of the Capitol's care[, and] define and

identify all significant aspects of the buildings and their grounds[,] " TEX. GOV'T CODE §443.007(a). "The [B]oard may adopt rules concerning the buildings, their contents, and their grounds." *Id*. §443.007(b).

6.      Defendant John Sneed is the Executive Director of the State Preservation Board.

7.      The "executive director [] serves under the sole direction of the board." TEX. GOV'T CODE §443.0051(a).

8.      The duties of the Executive Director include "direct[ing] and coordinat[ing] the activities of the architect of the Capitol, the curator of the Capitol, and other [State Preservation B]oard employees[.]" TEX. GOV'T CODE §443.0051(b)(2).

9.      Three specified areas inside the Texas State Capitol building can be used for exhibits, subject to the State Preservation Board Policy for Exhibits in the Ground Floor Rotunda and the Capitol Extension and applicable law. These three areas are the Ground Floor Rotunda in the Capitol basement, and the South Central Gallery and North Central Gallery in the Capitol Extension.

10.     The State Preservation Board consists of the Governor, Lieutenant Governor, Speaker of the House of Representatives, one State senator appointed by the Lieutenant Governor, one State representative appointed by the Speaker of the House of Representatives, and one member of the general public appointed by the Governor. TEX. GOV'T CODE §443.003(a).

11.     The functions of the Executive Director and staff of the State Preservation Board include scheduling displays in the three designated exhibit areas of the Capitol, upon receiving an exhibit application from a "Sponsor Organization" with the signed recommendation of a "State Official Sponsor." The state officials who may act as a State Official Sponsor are the

Governor, the Lieutenant Governor, the Speaker of the House, a State Senator, or a State Representative.

12.     The formal criteria for exhibit approval require that exhibits be for a "public purpose," as defined the Texas Administrative Code.

13.     The "public purpose" requirement requires, *inter alia*, that exhibits promote "the public health, education, safety, morals, general welfare, security, and prosperity of all of the inhabitants or residents within the state, the sovereign powers of which are exercised to promote such public purpose or public business." 13 TEX. ADMIN. CODE §111.13

14.     In 2014, the State Preservation Board approved the display of a Christian nativity scene in the Capitol's Ground Floor Rotunda, sponsored by the Thomas Moore Society, a private organization. The exhibit's State Official Sponsor was Rep. John Frullo.

15.     Since the State Preservation Board has been responsible for scheduling exhibits in the Capitol, it has scheduled privately-funded exhibits on a variety of topics, including the 2014 Christian nativity scene, and a 2006 exhibit educating viewers about the Muslim faith, funded by the Aga Khan Foundation.

16.     The 2014 Christian nativity scene was unveiled in the front of the Texas Capitol building, where a menorah was also displayed the following day.

17.     After it was unveiled in front of the Capitol, the Christian nativity scene was exhibited in the Ground Floor Rotunda of the Capitol for one week in December of 2014.

18.     FFRF did not seek to unveil its Bill of Rights "nativity" exhibit in front of the Capitol before it went on display it in the Capitol Ground Floor Rotunda.

19.     The Executive Director of the State Preservation Board and his staff approved an exhibit for display by FFRF for 6 days in December of 2015.

20.     FFRF submitted an exhibit application to the State Preservation Board on July 7, 2015.

21.     FFRF made revisions to its July 7, 2015 application at the request of Representative Donna Howard, the State Official Sponsor for FFRF's display.

22.     In its revised application, FFRF described the exhibit that was ultimately placed on display as "[c]utout figures celebrating the December 15 nativity of the Bill of Rights. The figures will be self-standing and will be between 4 and 6 feet tall."

23.     The purpose of FFRF's exhibit, as stated on the application, was "[t]o educate the public and celebrate the 224th anniversary of the ratification of the Bill of Rights on December 15, 1791. Also, to celebrate the Winter Solstice on December 22 and to educate the public about the religious and nonreligious diversity within the State."

24.     The Executive Director and his staff approved FFRF's revised exhibit application on August 6, 2015.

25.     On December 18, 2015, Texas members of FFRF gathered in the Texas Capitol's Ground Floor Rotunda and put FFRF's exhibit in place.

26.     FFRF's exhibit featured Benjamin Franklin, Thomas Jefferson, George Washington, and the Statue of Liberty gathered around the Bill of Rights, which was placed in a manger.

27.     Accompanying the exhibit was a sign that read: "Happy Winter Solstice At this Season of the Winter Solstice, we honor reason and the Bill of Rights (adopted December 15, 1791) Keep State & Church Separate Placed by the Freedom From Religion Foundation on behalf of its state members FFRF.ORG[.]"

28.     FFRF's exhibit was scheduled for display from December 18, 2015 at 9 AM through December 23, 2015 at 5 PM.

29.     Governor Abbott wrote to Executive Director Sneed on December 21, 2015, "as Chairman of the State Preservation Board," urging Sneed to "remove [FFRF's] display from the Capitol immediately."

30.     After receiving <u>Exhibit A</u>, Defendant Sneed informed State Preservation Board member Charlie Geren.

31.     On December 21, 2015, Sneed directed that FFRF's exhibit be removed from display in the Capitol. No member of State Preservation Board staff notified FFRF before the exhibit was removed.

**Agreed as to form and substance this 19th day of August, 2016.**

**/s/ Richard L. Bolton**                                    **/s/Anne Marie Mackin**

**COUNSEL FOR PLAINTIFF**                         **COUNSEL FOR DEFENDANTS**

f:\docs\wd\26318\34\a2543840.docx