IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., | § § | |
| *Plaintiff*, | § § | |
| v. | § § | NO. 1-16:CV-00233-SS |
| GOVERNOR GREG ABBOTT AND ROD WELSH,[1] EXECUTIVE DIRECTOR OF TEXAS STATE PRESERVATION BOARD, | § § § | |
| *Defendants*. | § | |

_____

## GOVERNOR ABBOTT'S MOTION FOR JUDGMENT AND QUALIFIED IMMUNITY ON THE PLEADINGS

_____

Under the Court's scheduling order, the time for filing or amending the pleadings expired on April 27, 2017. *See* Doc. 39, ¶ 4. Governor Abbott now moves for judgment and qualified immunity on the pleadings. *See* FED. R. CIV. P. 12(c) ("After the pleadings are closed—but within such time as not to delay the trial—a party may move for judgment on the pleadings.").

### INTRODUCTION

In its December 20, 2016, order, the Court declined to decide whether Governor Abbott is entitled to qualified immunity: "Because genuine issues of material fact exist regarding whether Defendants violated the First Amendment and/or Fourteenth Amendment, the Court declines to

---

[1] John Sneed, who was Executive Director of the Preservation Board when this lawsuit was filed, was initially named as a defendant in this lawsuit, along with Governor Abbott. The individual capacity claims against Director Sneed were dismissed by the Court on June 21, 2016 (Doc. 28). Pursuant to Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name[.]" Because Rod Welsh is now Executive Director of the State Preservation Board, he takes Director Sneed's place as an official capacity defendant in this cause.

address Defendants' qualified immunity argument regarding the individual claims against Governor Abbott at this time." Doc. 38, at 24 n.7. Governor Abbott respectfully requests that the Court grant him qualified immunity at this time.

Now is an appropriate time to address the Governor's qualified immunity for three reasons. First, qualified immunity is an immunity from suit—that is, it is an immunity from the burdens associated with litigation and trial. To give that immunity its intended effect, the Court should dismiss the individual-capacity claims against the Governor at the earliest possible moment. The importance of ruling on the Governor's qualified immunity now is heightened by the fact that the Freedom from Religion Foundation ("FFRF") has insisted on deposing the Governor. *See* Doc. 41. Second, as explained in the balance of this motion, the Governor meets the legal standards for qualified immunity. And third, even if this Court disagrees, qualified immunity is such an important doctrine that the Governor is entitled to an interlocutory appeal to get the Fifth Circuit's guidance on the question. For all of these reasons, Governor Abbott urges the Court to address the Governor's invocation of qualified immunity and to dismiss him from this suit.

## BACKGROUND

In December 2015, FFRF placed an exhibit in the Texas Capitol that mocked Christians and the Christian faith. On December 22, 2015, Governor Abbott sent a letter to the executive director of the State Preservation Board and explained that FFRF's exhibit did not satisfy the "public purpose" requirement for Capitol exhibits. *See* Doc. 31-2, Ex. 24. The letter explained that, "far from promoting morals and the general welfare, [FFRF's] exhibit deliberately mocks Christians and Christianity." *Id.* at 1. The letter further explained that the FFRF exhibit "denigrates religious views held by others" and "mock[s] others' religious beliefs." *Id.* at 2, 3. This Court already "agree[d]" that the points made in Governor Abbott's letter were reasonable,

and that they constituted "reasonable grounds . . . for Defendants' exclusion of FFRF's exhibit." Doc. 38, at 16-17.  The Court nonetheless declined to decide whether Governor Abbott was entitled to qualified immunity because there was a factual dispute about whether Defendants were actually motivated by Governor Abbott's letter or were instead motivated by a purpose to discriminate against FFRF.  *Id.* at 24 n.7.

## ARGUMENT & AUTHORITIES

Governor Abbott is entitled to qualified immunity for at least three reasons.  First, the Supreme Court has emphasized that a complainant must allege more than merely conclusory facts to overcome qualified immunity.  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  In this case, however, FFRF has done nothing more than (1) conclusorily allege that Defendants discriminated against them, and (2) point to previous examples where Defendants opposed FFRF's efforts to bully government entities into removing Christian nativity scenes.  The first category of allegations fails as a matter of law under *Iqbal*.  And the second category alleges *nothing* about discriminatory motives.

Second, a defendant must be granted immunity unless Plaintiff was deprived of a *clearly established* constitutional right.  This means that Plaintiff must point to a judicial decision whose law and facts are so on the nose that it renders any constitutional questions "beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  No such precedent exists here.  The absence of precedent is of particular note in a First Amendment case, where the doctrine sometimes obscures.  The qualified immunity doctrine requires federal courts to excuse government officials from personal financial liability when they apply First Amendment doctrine in the line of duty.

Third, qualified immunity is an objective rather than subjective inquiry. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982). As this Court already has determined, the Defendants had an objectively reasonable reason for removing FFRF's exhibit—namely, because it mocked Christians and the Christian faith. Plaintiff's only basis for continuing this litigation is its belief that Defendants nonetheless had impure *subjective* motivations. Under *Harlow* and its progeny, however, subjective motivations are irrelevant as a matter of law.

## I.    GOVERNOR ABBOTT IS ENTITLED TO QUALIFIED IMMUNITY UNDER *IQBAL*.

The Supreme Court of the United States has imposed a high pleading standard for plaintiffs—like FFRF—that want to overcome the qualified immunity of high-ranking government officials. In *Ashcroft v. Iqbal*, the plaintiff alleged that the Attorney General, the Director of the FBI, and other high-ranking government officials personally acted to violate his rights under, among other things, the First Amendment. The Supreme Court held that Iqbal failed "state a claim of unconstitutional discrimination against officials entitled to assert the defense of qualified immunity." *Id.* at 675.

Three aspects of the *Iqbal* Court's analysis are dispositive here. First, the Court emphasized that, where a plaintiff alleges "invidious discrimination in contravention of the First [Amendment], our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose." 556 U.S. at 676. That means the plaintiff must plead that the decisionmaker took "a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Id.* at 677. "It follows that, to state a claim based on a violation of a clearly established right, [the plaintiff] must plead sufficient factual matter to show that [defendant acted] not for a neutral . . . reason but for the purpose of discriminating" against the plaintiff. *Id.*

4

Second, the *Iqbal* Court held that a plaintiff cannot conclusorily allege that the defendant acted with a discriminatory purpose. The Court emphasized that the complaint must include more than an "unadorned, the-defendant-unlawfully-harmed-me accusation" because "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." 556 U.S. at 678 (internal quotation marks omitted). Thus, the *Iqbal* Court held, a district court's first task in a case like this one is to "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.

Third, the *Iqbal* Court held that the complaint must do more than merely allege facts that are "consistent with" a finding of unlawful purpose. *Id.* at 678. Rather, the complaint must allege facts that are sufficient to "plausibly" create a "reasonable inference" that the defendant acted with an unlawful purpose instead of a lawful one. *Id.* The Court acknowledged that Iqbal *did* plead facts sufficient to suggest that the government discriminated against him on the basis of his religion. *Id.* at 681. The Court nonetheless held that dismissal was necessary because the allegations also were consistent with the inference that the government acted lawfully. *Id.*

In this case, FFRF's factual allegations likewise can be placed in two categories, and both fail to survive dismissal. First, FFRF includes the following conclusory allegations that, under *Iqbal*, are not entitled to the presumption of truth:

- 88. Governor Abbott has a history of hostility directed against FFRF.

- 103. Governor Abbott has consistently advocated for displays of religion in the public sphere, while actively opposing any expression of nonreligious principles.

- 105. The Defendants engaged in unambiguous viewpoint discrimination by removing FFRF's exhibit for reasons that were not viewpoint neutral or reasonable.

- 106. In silencing FFRF, the Defendants also applied standards and procedures not utilized in cases involving other Capitol displays, including by purportedly applying formal criteria that the State Preservation Board has not considered for other exhibitors.

- 108. The Defendants violated the Plaintiff's First Amendment rights by basing their conduct on disagreement with the message that they concluded that FFRF's display conveyed.

- 109. The Defendants' actions also were viewpoint-based because they distinguished favored speech from disfavored speech on the basis of the ideas or views expressed.

*See* FAC (Doc. 15). All of those allegations merely assert the elements of Plaintiff's legal theory; they are not well-pleaded under *Iqbal* and therefore must be ignored.

Second, Plaintiff does allege some facts that suggest Governor Abbott previously opposed FFRF's efforts to force governments to remove their nativity scenes. *See id.* ¶¶ 89, 91-92, 94-96, 101-102. But none of those allegations reasonably give rise to an inference that the Governor opposes FFRF's secular message; to the contrary, they merely allege that the Governor opposed FFRF's attempts to impose its views to the exclusion of someone else's. And even if the complaint could be read to allege that the Governor opposed FFRF's viewpoint, which it cannot, the complaint nonetheless *also* gives rise to the inference that the Governor supports public forums that are respectful of all viewpoints. Indeed, the Governor's December 2015 letter recognized that FFRF could use a public forum—respectfully—to "spread[] a secular message," "to educate the public about nonreligious viewpoints," or "to promote the Bill of Rights." Doc. 31-2, Ex. 24 at 1, 2. And this Court already has found that the Governor's actions in this case were facially valid and reasonable. *See* Doc. 38, at 16-17. Under *Iqbal*, the plausibility of the Governor's lawful purpose commands dismissal and a finding of qualified immunity.

II.    **GOVERNOR ABBOTT IS ENTITLED TO QUALIFIED IMMUNITY BECAUSE NO FACTUALLY ANALOGOUS PRECEDENT PLACED THE CONSTITUTIONALITY OF HIS ACTIONS "BEYOND DEBATE."**

A public official is entitled to qualified immunity unless a plaintiff demonstrates (1) a violation of a constitutional right *and* (2) that the right at issue was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32 (2009). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 132 S. Ct. at 2093 (*citing al-Kidd*, 563 U.S. at 735) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (quotation marks and alterations omitted). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle*, 132 S. Ct. at 2093 (quoting *al-Kidd*, 563 U.S. at 741).

While summarily reversing the Fifth Circuit, the Supreme Court cautioned that it has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *al-Kidd*, 563 U.S. at 742). The Court directed judges to look to the "nature of *particular* conduct is clearly established" and to undertake this inquiry "in light of the *specific* context of the case, not as a broad general proposition." *Id.* ((emphases added; quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (quotation marks omitted).

A.    The Fifth Circuit's decision in *Morgan v. Swanson* shows what "clearly established" means in the First Amendment context. 659 F.3d 359 (5th Cir. 2011) (*en banc*). In *Morgan*, the Fifth Circuit reviewed the district court's denial of qualified immunity for a public-school principal who prohibited students from distributing candy-cane pens with written religious materials while at school. 659 F.3d. at 365-71. The Fifth Circuit held that the principal had engaged in unconstitutional viewpoint discrimination, but nevertheless granted her qualified immunity. *Id.* 412.

The facts were largely undisputed: plaintiff Jonathan Morgan, a third grader, asked to give out candy-cane pens to his classmates at the school's winter party.  Attached to each pen was a bookmark containing "the Legend of the Candy Cane," which listed several ways in which the candy cane "was a witness to Christ."  *Id.* at 366.  Morgan's parents met with school Principal Swanson, suspecting that Jonathan might not be allowed to distribute the bookmarks.  Principal Swanson said no to the bookmarks, though she offered to allow Jonathan to distribute a nonreligious gift during the party and to share the "Legend of the Candy Cane" at a table in the school library. Attorneys for the school informed the Morgans that the school's written policy prohibited student distribution of written media without school approval.  *Id.* at 367.

The Morgans arrived at the winter party with the candy-cane pens, and confronted Principal Swanson. Swanson again offered to allow Jonathan to place the pens on a table in the library, where his classmates could collect them. The Morgans complained that other students were bringing gifts into the classroom for distribution. Principal Swanson went to her office and made an announcement to the entire school that students were not permitted to bring outside materials into their classrooms for distribution during the winter parties.  The Morgans sued, asserting claims under the free speech and Establishment Clauses of the First Amendment, claiming that "although district officials offered a viewpoint-neutral explanation . . . Jonathan was the only student forbidden from distributing his chosen gift" at the party.  *Id.* at 368 (citation omitted).

The district court denied the principal's motion for qualified immunity.  *Id.* at 370.  After exploring the body of First Amendment law applicable to student speech in public elementary schools, the Fifth Circuit offered a substantial discussion of "what it means for the law to be 'clearly established'" for qualified immunity purposes.  *Id.* at 372 (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).  Much of this discussion bears direct transcription:

When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that every reasonable official would understand that what he is doing violates the law. To answer that question in the affirmative, **we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity**. [. . .]

Further, the Supreme Court has held that generalizations and abstract propositions are not capable of clearly establishing the law. The Supreme Court recently—and forcefully—underscored this point in *Ashcroft v. al-Kidd*, where it noted, with some exasperation, that it has repeatedly told courts...not to define clearly established law at a high level of generality. This rule is eminently sensible, of course, as the Court has explained: The right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause...violates a clearly established right....But **if the test of clearly established law were to be applied at this level of generality, it would bear no relationship to the objective legal reasonableness that is the touchstone of qualified immunity**.

*Morgan*, 659 F.3d at 371-72 (citations, brackets, and quotation marks omitted) (emphasis added). In short, the Court concluded, "we must ask 'not only whether courts have recognized the existence of a particular constitutional right, but also . . . whether that right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct.' " *Id.* at 372 (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 331 (5th Cir. 2002)) (alterations in *Morgan*).

The Fifth Circuit of course agreed that there is a clearly established "First Amendment rule disfavoring viewpoint discrimination." *Id.* at 378. But that is far too generalized to overcome qualified immunity; were it otherwise, *no one* would be immune to an allegation of viewpoint discrimination. *See id.* Instead, the en banc Fifth Circuit demanded that the plaintiffs point to a specific case involving specific facts that would have put the principal on clear notice that her specific conduct violated the First Amendment. And this Morgan could not do: "Factually analogous precedent failed to prohibit Principal Swanson's conduct (restricting the distribution of religious materials at a classroom party), as did the general bodies of law" relevant to the case. *Id.* at 382 (alteration original). The court held that Principal Swanson was entitled to qualified

immunity, even though she violated the student's constitutional rights, because "clearly established law did not put the constitutionality of [the] actions beyond debate." *Id.* at 371.

This Court should reach a similar result with respect to Governor Abbott. After exhaustive briefing in this case, we have uncovered no "factually analogous precedent" that "put the constitutionality of [the Governor's] actions beyond debate." *Id.* at 382, 371. We are unaware of a single reported decision holding that a government official violates the Establishment Clause by refusing to let someone speak in a limited public forum. On the Speech claim, we have not found a factually analogous precedent even regarding what type of First Amendment analysis applies to the facts alleged here—which involve exhibit areas within the State Capitol, set aside for private exhibits sponsored by public officials that promote a "public purpose." *See, e.g.*, Doc. 31 at 8-16 (discussing government speech and public fora precedents). And on both claims, we have found no cases setting the substantive standard for removing offensive exhibits from a public forum. Let alone have we found no cases that establish these propositions "beyond debate." Even the government speech cases, which, we content are more on point, do not present a situation analogous to the one here.[2]

Thus, even if the Court finds that Governor Abbott violated the Constitution, he would still be entitled to qualified immunity under *Morgan*. That is because there exists no "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." 659 F.3d at 371-72 (citations and quotation marks omitted). The cases Plaintiff cites all are factually mismatched.[3]

---

[2] We respect the Court's summary judgment ruling, though we continue to believe that the more-factually analogous cases are those concerning "government speech," where the government is allowed to engage in viewpoint discrimination. We re-urge that argument here and incorporate it by reference for the sake of preservation on appeal. Doc. 31, 36.

[3] *See* Doc. 33 (citing *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 757 (1995) (considering First Amendment analysis applicable to a 10-acre, outdoor square surrounding the Ohio statehouse, which "[f]or over a

**B.**      The Governor's case for qualified immunity is bolstered because this is a dispute

about the First Amendment, where the law is seldom clearly established.  *See, e.g.*, *Mullenix*, 136

S. Ct. at 308 ("Such specificity is especially important in the Fourth Amendment context, where

. . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here

excessive force, will apply to the factual situation the officer confronts.").

"The Establishment Clause . . . is not a precise, detailed provision in a legal code capable

of ready application." *Lynch*, 465 U.S. at 678.  Instead it is "a blurred, indistinct, and variable

barrier depending on all the circumstances of a particular relationship," *Lemon*, 403 U.S. at 614,

where "each case . . .  calls for line drawing" and "no fixed, per se rule can be framed," *Lynch*, 465

U.S. at 678.

"[T]he very 'flexibility' of this Court's Establishment Clause precedent leaves it incapable

of consistent application." *Van Orden v. Perry*, 545 U.S. 677, 697 (2005) (Thomas, J., concurring);

*see also Edwards v. Aguillard*, 482 U.S. 578, 640 (1987) (Scalia, J., dissenting) (criticizing the

*Lemon* test's "flexibility" as "the absence of any principled rationale" (internal quotation marks

omitted)); *Van Orden*, 545 U.S. at 697 (Thomas, J., concurring) (emphasizing the "unintelligibility

of this Court's precedent" and arguing the outcomes of the cases turn on nothing more "than the

personal preferences of judges"); *Harris v. Zion*, 927 F.2d 1401, 1425 (7th Cir. 1991)

(Easterbrook, J., dissenting) ("Line drawing in this area will be erratic and heavily influenced by

the personal views of the judges.").

---

century…ha[d] been used for public speeches, gatherings, and festivals advocating and celebrating a variety of causes…."); *Arkansas Society of Freethinkers v. Daniels*, 2009 U.S. Dist. LEXIS 116982 at *12 (E.D. Ark. 2009) (considering what First Amendment analysis applied when the state permitted private parties to place displays on grounds outside the Arkansas capitol building, and the "written policy permitting temporary displays on the Capitol grounds [was] void of any content-based requirements limiting displays to particular subjects or events."); *Widmar v. Vincent*, 454 U.S. 263, 267–68 (1981) (considering restrictions on a designated public forum); *City of Madison v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 177, 178–79 (1976) (same)).

The Establishment Clause is especially difficult to pin down in the context of holiday

displays.  Justice Kennedy described its application to holiday displays as "appalling":

> This [endorsement] test could provide workable guidance to the lower courts, if
> ever, only after this Court has decided a long series of holiday display cases, using
> little more than intuition and a tape measure. Deciding cases on the basis of such
> an unguided examination of marginalia is irreconcilable with the imperative of
> applying neutral principles in constitutional adjudication. 'It would be appalling to
> conduct litigation under the Establishment Clause as if it were a trademark case,
> with experts testifying about whether one display is really like another, and
> witnesses testifying they were offended—but would have been less so were the
> crèche five feet closer to the jumbo candy cane.'

*County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 675-

76 (1989) (Kennedy, J., dissenting) (quoting *American Jewish Congress v. Chicago*, 827 F.2d 120,

130 (7th Cir. 1987) (Easterbrook, J., dissenting)); *see also Allegheny*, 492 U.S. at 580-81 (holding

unconstitutional under the Establishment Clause a crèche display because it did not contain some

unidentified number of the features approved in *Lynch v. Donnelly*, such as "a Santa Claus house,

reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures

representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights,

[and] a large banner that reads 'SEASONS GREETINGS,'" 465 U.S. 668, 671 (1984)); *id.* at 668

(Kennedy, J., dissenting) (referring to "our tangled Establishment Clause jurisprudence").  And

Judge Easterbrook says that the doctrine is so ill-defined that it gives even federal judges the "fits":

> [Lynch v. Donnelly], like others requiring multi-factor balances, gives judges of
> the inferior federal courts fits. The Court avoided creating a rule about the treatment
> of religious symbols and instead announced that judges should examine each
> symbol's context. But which items of the context matter? If different elements cut
> in different directions, what is to be done? It is discomfiting to think that our
> fundamental charter of government distinguishes between painted and white
> figures—a subject the parties have debated—and governs the interaction of
> elements of a display, thus requiring scrutiny more commonly associated with
> interior decorators than with the judiciary. When everything matters, when nothing
> is dispositive, when we must juggle incommensurable factors, a judge can do little
> but announce his gestalt.

*American Jewish Congress*, 827 F.2d at 128-29 (Easterbrook, J., dissenting).

For the en banc Fifth Circuit in *Morgan*, the fact that the Establishment Clause presents "the thorniest of constitutional thickets" provided a powerful justification to give the school principal qualified immunity, even while announcing in the same breath that she had violated her student's constitutional rights. *Morgan*, 659 F.3d at 380 (citing *Peck ex rel. Peck v. Baldwinsville Cent. School Dist.*, 426 F.3d 617, 620 (2d Cir. 2005)). Governor Abbott should receive the same solicitude here.

### III. GOVERNOR ABBOTT IS ENTITLED TO QUALIFIED IMMUNITY BECAUSE THE LEGAL STANDARD IS AN OBJECTIVE ONE.

Governor Abbott is entitled to dismissal because qualified immunity is an objective standard, and Plaintiff failed to allege objective facts supporting the bare allegations of malice in its complaint.[4]

A. It was long ago true that a government official had to show both "an 'objective' and a 'subjective' aspect" to establish qualified immunity. *Harlow*, 457 U.S. at 815. "The objective element," which remains the bedrock of the qualified immunity analysis, "involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.'" *Id.* (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)). "The subjective component," on the other hand, "refers to 'permissible intentions.'" *Id.* Under the old two-pronged test, "qualified immunity would be defeated if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury." *Id.* (citations omitted) (emphasis added).

---

[4] *See also Kovacic*, 628 F. 3d at 213 (citing *Pearson v. Callahan*) (Courts "are permitted to consider the question of whether a defendant is entitled to qualified immunity without determining whether or not the plaintiff's constitutional rights were violated.").

But in its 1982 *Harlow* decision, the Supreme Court swept away the subjective component of the qualified immunity analysis—for the very reason that it would allow cases like FFRF's to survive a motion for summary judgment.  As the Court explained, "an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury."  *Id.* at 816.  The Court contemplated the consequences of this as follows:

> [I]t now is clear that substantial costs attend the litigation of the subjective good faith of government officials. Not only are there the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to "subjective" inquiries of this kind. Immunity generally is available only to officials performing discretionary functions. In contrast with the thought processes accompanying "ministerial" tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment. Yet they also frame a background in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government.

457 U.S. at 817-18.

For these reasons, Plaintiffs cannot compel a government official, sued in his personal capacity, to deposition (or trial) on nothing but unsubstantiated allegations of subjective malice. *Harlow*, 457 U.S. at 817-18 ("[B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery.").  Otherwise, it would be nearly impossible for officials to vindicate their qualified immunity so long as any question of "subjective motivation" were lurking in the pleadings.

In ruling upon the parties' cross-motions for summary judgment, this Court concluded that "FFRF has established genuine issues of material fact with regard to its freedom of speech claim

and claim under the Establishment Clause." Doc. 38 at 24. Given this question of fact, "the Court decline[d] to address Defendants' qualified immunity argument regarding the individual claims against Governor Abbott[.]" *Id.* at 24 n.7. The Court defined the question of fact thus: "because the Board initially found FFRF's exhibit had a 'public purpose' and only excluded the exhibit when Governor Abbott sent his letter of criticisms, a genuine issue of material fact exists regarding whether Defendants engaged in viewpoint discrimination." Doc. 38 at 18.

FFRF's does not allege with particularity any objective facts supporting its bare allegation that the Governor intended to discriminate against FFRF's atheist viewpoint. FFRF does not allege, for example, that the Defendants ever have allowed an exhibit that taunts other people, in contravention of the Board's viewpoint-neutral policy insisting that exhibits should educate the public and promote the general welfare. As discussed above, the complaint alleges only that Governor Abbott and FFRF have a longstanding legal disagreement over the scope and application of the First Amendment. It does not allege with any particularity that Governor Abbott opposes FFRF's atheist message. Indeed, the Board has welcomed Plaintiff to display an exhibit in the Capitol celebrating FFRF's atheist viewpoint, so long as the exhibit did not communicate its message by mocking the faith of other visitors to the Capitol, but Plaintiff refused. Plaintiff complaint includes a bare allegation that it was singled out for viewpoint discrimination, but none of its allegations suggest anything more than that Plaintiff's exhibit was rejected for facially violating a reasonable, viewpoint-neutral policy.

**B.**     Plaintiff's Establishment Clause and Free Speech claims both hinge on whether the Governor harbored an illicit motive while applying a neutral policy. As explained above, the Court already has determined that the Governor's stated reasons for removing the FFRF display were reasonable; the only question left open was whether the Governor acted based on unstated reasons.

15

But First Amendment doctrine, like the qualified immunity decisions addressed above, requires Plaintiff to prove illicit motive by reference to objective evidence alone. So Plaintiff cannot survive dismissal unless it alleges some particularized objective facts supporting its claim of malice and viewpoint discrimination. Because Plaintiff has failed to do so, its claims should be dismissed.

      **1.**      The Establishment Clause's "secular purpose" inquiry, *see Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971), is an inquiry into the mind of an objective observer, not into the subjective motives of a government official. *See McCreary County*, 545 U.S. at 862-63 (explaining that "[t]he eyes that look to purpose belong to an objective observer" so courts should avoid "judicial psychoanalysis" of government officials). Even where a plaintiff alleges that the stated purpose is a "sham" covering for a sectarian cause, the plaintiff must prove the sham by objective indicia of illicit motive, not by putting a government official on under oath:

> Even if every member of the Fiscal Court personally and privately wanted to ensure that the Ten Commandments were placed on the walls of the courthouse for religious reasons, and later admitted as much, the Court would be required to ignore these personal views unless they were somehow made available to the 'objective observer' through some type of official act or when the individual was speaking in his or her official capacity.

*Am. Civil Liberties Union of Kentucky v. Rowan Cty., Ky.*, 513 F. Supp. 2d 889, 902 (E.D. Ky. 2007).

      **2.**      Free Speech doctrine likewise does not concern itself with subjective evidence of official motive. *United States v. O'Brien*, 391 U.S. 367, 383 (1968) (quoting *McCray v. United States*, 195 U.S. 27, 56 (1904)). In *O'Brien*, the United States argued that a federal statute prohibiting the willful destruction of draft cards was merely a viewpoint neutral expression of the federal bureaucracy's concern for document retention. When David O'Brien was arrested and charged with a federal crime for burning his draft card on the steps of the South Boston Courthouse,

he argued that the United States' stated concern for document retention was a sham, and he pointed to subjective statements of legislators announcing that the law instead was motivated by a subjective desire to suppress anti-war viewpoints. *Id.* The Supreme Court refused to consider these subjective statements, however, explaining that "[t]he decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." *O'Brien*, 391 U.S. at 383, 385.

*O'Brien* does not mean that personal motives always are irrelevant. Motive is sometimes relevant, but under *O'Brien*, it must be alleged and then proved by objective evidence only, things like government records, documents, or other objective proxies for subjective motivation. *See* Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. CHI. L. REV. 413, 414 (1996) ("*O'Brien* stated not that motive was irrelevant, but only that it could not be proved by traditional methods . . . . [E]ven the attentive observer [of First Amendment law] rarely catches a glimpse of the Court inquiring *directly* into governmental purpose.") (emphasis added). As then-Professor Kagan observed: "Through use of these objective tests and rules, some rough sorting out takes place: between laws tainted by ideological motives and those not so blemished." *Id.* at 441-42; *see also Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 100 F.3d 1287, 1293 (7th Cir.1996) ("Just as we would never uphold a law with unconstitutional effect because its enactors were benignly motivated, an illicit intent behind an otherwise valid government action indicates nothing more than a failed attempt to violate the Constitution.").

3.      These doctrinal features of the Establishment and Speech Clauses represent particular instances of a broader principle:  absent "extraordinary circumstances," civil litigants

must prove "purpose" or "motive" by reference to the public record, not by putting office holders under oath:

> The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.  In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege.

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 268 (1977); *see also id.* at 267 n.18 ("This Court has recognized, ever since *Fletcher v. Peck*, 6 Cranch 87, 130-31 (1810), that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government.  Placing a decisionmaker on the stand is therefore usually to be avoided.").

There are no "extraordinary circumstances" here.  As discussed above, FFRF speculative allegation of malice stands alone and unsupported.  Because FFRF has not alleged any particularized, objective facts supporting illicit motives harbored by the Governor, its individual-capacity claims against the Governor should be dismissed.

## CONCLUSION

For the foregoing reasons, Governor Abbott is entitled to qualified immunity.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

18

/s/  Angela V. Colmenero
ANGELA V. COLMENERO
Texas Bar No. 24048399
Chief, General Litigation Division

ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
General Litigation Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4080
(512) 320-0667 FAX
anna.mackin@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that, on this the 28th day of April, 2017, a true and correct copy of the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

<u>/s/Anne Marie Mackin</u>
Assistant Attorney General

20