Robert Davis

1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FREEDOM FROM RELIGION §
FOUNDATION, INC., §
    Plaintiff, §
 §
vs. §   CASE NO. 1-16:CV-00233
 §
GOVERNOR GREG ABBOTT, in §
his official and individual §
capacities, and JOHN SNEED, §
Executive Director of the §
Texas State Preservation §
Board, in his official §
capacity, §
    Defendants. §

**EXHIBIT A**

**************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

ROBERT DAVIS

APRIL 24, 2017

**************************************************

      ORAL AND VIDEOTAPED DEPOSITION OF ROBERT

DAVIS, produced as a witness at the instance of the

Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 24th of April,

2017, from 10:08 a.m. to 1:33 p.m., before Shelly M.

Tucker, CSR in and for the State of Texas, reported by

machine shorthand at the offices of the State

Preservation Board, 201 East 14th Street, Suite 950,

Austin, Texas, pursuant to the Federal Rules of Civil

Procedure and/or the provisions stated on the record.

2

APPEARANCES

FOR THE PLAINTIFF:

 Richard L. Bolton
 BOARDMAN AND CLARK, LLP
 1 South Pinckney Street, Suite 410
 Madison, Wisconsin  53703-4256
 Telephone:  608-283-1789
 Fax:  608-283-1709
 Email:  rbolton@boardmanclark.com


FOR THE DEFENDANTS:

 Anne Marie Mackin
 OFFICE OF THE ATTORNEY GENERAL
 General Litigation Division
 Post Office Box 12548
 Austin, Texas  78711-2548
 Telephone:  512-475-4074
 Fax:  512-320-0667
 Email:  anna.mackin@oag.texas.gov

ALSO PRESENT:
 Al Rodriguez, Videographer
 Leslie Pawelka

Robert Davis

3

```
 1                            INDEX
 2                                                      PAGE
 3   Appearances.......................................    2
 4   ROBERT DAVIS
 5        Examination by Mr. Bolton....................    5
          Examination by Ms. Mackin....................  100
 6        Further Examination by Mr. Bolton............  114
 7   Changes and Corrections..........................   117
 8   Signature........................................   118
 9   Reporter's Certificate...........................   119
10                           EXHIBITS
11   NUMBER   DESCRIPTION                               PAGE
12   Exhibit 1........................................    13
             State Preservation Board Request for
13           Exhibits application
     Exhibit 2........................................    40
14           July 21, 2015 email to Grover from Davis
     Exhibit 3........................................    42
15           December 22, 2015 letter to Sneed from
             Abbott
16   Exhibit 4........................................    53
             State Preservation Board Request for
17           Exhibits application - Bill of Rights
             nativity and Winter Solstice display
18   Exhibit 5........................................    54
             State Preservation Board Event & Exhibit
19           Sponsorship - Bill of Rights nativity and
             Winter Solstice display
20   Exhibit 6........................................    57
             Greg Abbott tweets
21   Exhibit 7........................................    61
             April 18, 2016 letter to Daigle from
22           Sneed
     Exhibit 8........................................    62
23           Photograph
     Exhibit 9........................................    65
24           October 3, 2014 email to Ellars, Davis,
             and Currens from Davis
25
```

Robert Davis

4

```
1                         EXHIBITS (continued)
2     NUMBER    DESCRIPTION                             PAGE
3     Exhibit 10.......................................   68
                State Preservation Board Request for
4               Exhibits application - Christmas Nativity
      Exhibit 11.......................................   70
5               Internal Request Form - Thomas More
                Society
6     Exhibit 12.......................................   71
                State Preservation Board Event & Exhibit
7               Sponsorship - Christmas Nativity
      Exhibit 13.......................................   72
8               December 7, 2015 email to Martin from
                Currens
9     Exhibit 14.......................................   79
                Internal Request Form - Event/Exhibit
10              Summary sheet, with attachments
                Our Lady Queen of Peace
11    Exhibit 15.......................................   82
                State Preservation Board Request for
12              Exhibits application - Young
                Conservatives of Texas Foundation
13    Exhibit 16.......................................   85
                Internal Request Form - Event/Exhibit
14              Summary sheet, with attachments
                Texas Chiropractic Association
15    Exhibit 17.......................................   87
                Internal Request Form - Texas Association
16              of Interior Design
      Exhibit 18.......................................   90
17              State Preservation Board Request for
                Exhibits application - Texans for
18              Responsible Marijuana Policy Educational
                Display
19    Exhibit 19.......................................   93
                Photograph
20    Exhibit 20.......................................  100
                State Preservation Board Request for
21              Exhibits application - Bill of Rights
                nativity and Winter Solstice Display
22              (Sponsor Naishtat)
      Exhibit 21.......................................  105
23              State Preservation Board Request for
                Exhibits application - Bill of Rights
24              nativity and Winter Solstice Display
                (Sponsor Howard)
25
```

Robert Davis

5

1          THE VIDEOGRAPHER:  Today's date is April

2    24th, 2017.  The approximate time is 10:08 a.m.

3    Beginning tape number 1, we're on the record.

4                    ROBERT DAVIS,

5    having been first duly sworn, testified as follows:

6                    EXAMINATION

7    BY MR. BOLTON:

8        Q.   Would you state your name for the record,

9    please.

10       A.   Robert Davis.

11       Q.   And how are you employed?

12       A.   I am the events and exhibits coordinator for

13   the State Preservation Board.

14       Q.   Events and exhibits coordinator?

15       A.   Yes, sir.

16       Q.   How long have you held that position?

17       A.   About four and a half years.

18       Q.   Prior to holding that position, what did you

19   do for a living?

20       A.   I was a technician in the media services

21   department with the Texas Senate, so still in the

22   building.

23       Q.   So you're employed by the State Preservation

24   Board, then?

25       A.   That's correct.

Robert Davis

6

1    Q.   Do you know approximately how many employees
2    there are with the preservation board?
3    A.   Approximately 170, 150.
4    Q.   And in terms of -- as -- as the events and
5    exhibits coordinator, are there people that report to
6    you?
7    A.   No.
8    Q.   Okay.
9    A.   I don't have any.
10   Q.   Is there -- are there -- is there anybody else
11   with sort of a lateral position similar to yours?
12   A.   Sort of.  I mean, if I missed time, if I took
13   a month off from work, somebody would cover for me.
14   But there's no position.
15   Q.   They don't let you do that, do they?
16   A.   Not very often.
17   Q.   As the events and exhibits coordinator, then,
18   can you -- can you describe for us what your duties
19   include?
20   A.   Well, I -- I schedule the event and exhibit
21   spaces.  It's a lot of communication with potential
22   event holders and exhibit holders to make sure they
23   understand the rules and policies for such in the State
24   Capitol.
25   Q.   And then do you -- and describe the process,

Robert Davis

**7**

1    then, if somebody wants to display an exhibit in the

2    Capitol.

3        A.    Typically there's a phone call or first

4    contact.  It might be an email, but it's typically a

5    phone call.  And someone wants to know how they can do

6    that, and I'll kind of get some information from them

7    about what they're trying to do.  You know, if it's

8    something that's completely -- you know, completely

9    commercial, I'll tell them right there, you know, it's

10   not -- it's not going to work if you're trying to do a

11   Snickers display or something.

12              So it becomes a casual conversation.

13   Then I'll send them the paperwork or refer them to our

14   website where they can find it, blank copies of our

15   paperwork, and then they can apply.

16       Q.    And what does the paperwork consist of to

17   initiate the process?

18       A.    It's a two-page application.  It's a lot of

19   particulars: who, what, when, where, which exhibit

20   space they're applying for, a list of -- the

21   description of the exhibit, and a list to -- a question

22   to list the public purpose of the exhibit, and then

23   signature, date.

24       Q.    And then when that paperwork to initiate the

25   process is -- is filed, then, are -- in terms of events

Robert Davis

8

1    and exhibits, are you basically, other than time off

2    and whatnot, the only person at the preservation board,

3    then, who will be involved in processing that

4    application?

5         A.   Not necessarily.  If it's -- let me go back.

6    You asked about the application.  That -- that's the

7    application.  There's also a sponsorship form component

8    where a member of the legislature should sponsor --

9    would need to sponsor the event.  That, together with

10   the application -- once I've received both of those,

11   that's when I'll review for approval.  As far as giving

12   approval, if it's a school district doing student art

13   contest winners, that's kind of a slam-dunk.  I would

14   just --

15        Q.   That's what?

16        A.   That's kind of a slam-dunk.  I would just

17   approve that.  It -- you know, that would qualify.  If

18   it's something that might be sensitive, then I would

19   definitely run it up the flagpole to my superiors here

20   at the preservation board.

21        Q.   And the -- that second category, how did you

22   describe it in terms of where you would go up?

23        A.    If it's sensitive, if it seems like something

24   that might be potentially damaging to the historic --

25   integrity of the Capitol, or if it's something that,

Robert Davis

9

1  you know, just might be a little bit more of a

2  sensitive issue or if it, you know, toes the line of

3  public purpose, something like that so . . .

4      Q.    In terms of -- and when you say you -- you

5  would -- you would go, in -- in that second category,

6  might go up the chain to the people that you report to,

7  who would that -- if you were to involve somebody else

8  in the approval process for a sensitive display, who --

9  who might -- who would you be involving?

10     A.    Anybody in the agency that I felt needed to

11 have input, if the -- usually I would go to my

12 supervisor, who is the director of administration.

13 But, you know, quite often that would also include the

14 public information officer, director of facilities,

15 curatorial director, staff attorney, and the executive

16 director.

17     Q.    And the current executive director is whom?

18     A.    Rod Welsh.

19     Q.    And prior to that?

20     A.    John Sneed.

21     Q.    And how long -- was he the executor director

22 when you began?

23     A.    Yes.

24     Q.    And Mr. Sneed retired.  Is that correct?

25     A.    That's my understanding.

Robert Davis

10

1    Q.   Is he -- do you know if he retired from all

2    forms of gainful employment or --

3    A.   I don't know.

4    Q.   Do you know about how old he is?

5    A.   About 60- --

6    Q.   Pardon me?

7    A.   62, 63.  I don't know.

8    Q.   In terms of what you described as -- if it was

9    a sensitive display or exhibit, during the time that

10   you've been the coordinator for events and exhibits,

11   about how many times have -- have you dealt with what

12   you thought was a sensitive application?

13   A.   Ballpark figure, 20, 25 times.  Could be more,

14   could be less.  I don't know.

15   Q.   And did any of those involve applications that

16   you considered to involve some sort of sensitive or

17   controversial subject matter?

18   A.   That would probably be just about all of them.

19   Q.   Okay.  The reason I ask is you said that

20   one -- one situation would be if you're concerned about

21   damage to the Capitol, you -- you might involve others.

22   The -- the 20 that you referenced, you're not

23   including, then, that type of oversight, where you'd

24   get some -- some input?

25   A.   I mean, I -- I'd be guessing.  I don't really

Robert Davis

**11**

1    remember how many had that . . .

2        Q.    Can you recall any instances in which you went

3    up the chain of command to involve somebody where --

4    where the exhibit or the event involved what you

5    thought was a controversial matter?

6        A.    I mean, I can probably recall a couple.  But,

7    you know, the ones that come to mind are the Freedom

8    From Religion display and the Thomas More Society.

9        Q.    And the what?

10       A.    The Thomas More Society.

11       Q.    The nativity?

12       A.    Yes, sir.

13       Q.    Do you recall any other applications for event

14   or exhibit approval that you can recall that involved a

15   controversial subject?

16       A.    I mean, we've had some, maybe, where they were

17   one side or the other of a -- of the abortion debate,

18   and that's something where I'm going to, you know --

19   like I said, it's a sensitive issue.  I'm going to ask

20   other people about it.

21             The majority of the exhibits, like I

22   said, I -- I called it a slam-dunk earlier, where it's

23   like district student artwork or something like that.

24   That's typically what we see here.

25       Q.    Who was the events and exhibits coordinator

Robert Davis

**12**

1  prior to you?

2      A.    I believe her name is Mindy Eppler.

3      Q.    E-p-p-l-e-r?

4      A.    I think so.

5      Q.    And did you receive any -- any training from

6  Ms. Eppler when you began?

7      A.    No.

8      Q.    Did you receive any training to perform your

9  duties as the events and exhibits coordinator?

10      A.    Sure.  I was kind of given the -- the ropes by

11  our director of administration.

12      Q.    And at that time -- is it the same -- same

13  person?

14      A.    Yes.

15      Q.    When you began as now?

16      A.    Yes.

17      Q.    And -- and who is that person?

18      A.    Her name is Linda Gaby.

19      Q.    Linda what?

20      A.    Gaby, G-a-b-y.

21      Q.    And what -- what do you recall in terms of

22  being shown the ropes by -- by Ms. Gaby?

23      A.    We had a few conversations about exhibits, but

24  mostly it was showing me the exhibit spaces where

25  things would be properly displayed.  The rest is kind

Robert Davis

**13**

1   of in our policies.  And if -- you know, I don't

2   remember, but if I had any questions about it, any of

3   our policies, I would have asked her to clarify them

4   for me but . . .

5       Q.   And in terms of policies, what are you

6   referring to?

7       A.   Our exhibit -- we have a set of exhibit

8   policies for a display in the State Capitol.

9                   (Exhibit 1 marked)

10      Q.   Mr. Davis, we marked as Exhibit 1 to your

11  deposition a four-page document.  Are you familiar with

12  that document?

13      A.   Yes.

14      Q.   Are the first two pages of that document

15  the -- the application form that you were describing?

16      A.   It looks to me like an older version of it,

17  but yes.

18      Q.   Okay.

19      A.   This is an application for exhibits.

20      Q.   The current version that you're using, is it

21  any -- as far as you know, is it substantively

22  different than --

23      A.   No.  We just cleaned up some of the contact

24  information.  I don't think we're requiring people to

25  give us their fax number anymore.

Robert Davis

**14**

1    Q.   And then --

2    A.   But . . .

3    Q.   The third and fourth page -- pages of

4    Exhibit 1, are you familiar with those?

5    A.   Yes, sir.  Exhibit policies.

6    Q.   And a moment ago you were referring to

7    policies in terms of the application process and -- and

8    your duties.  Are these the policies that you're

9    referring to?

10   A.   Yes.

11   Q.   Now, are these policies currently in effect?

12   A.   I believe so, yes.

13   Q.   And were they in effect when you began as the

14   coordinator?

15   A.   Yeah.  I don't recall if we've had any policy

16   updates since I've been here.  And this one says May

17   2012, so that would include the time --

18   Q.   When you --

19   A.   -- that I've been here.

20   Q.   When you began as the coordinator to events

21   and exhibits, then, did you have an opportunity at the

22   beginning of your employment, then, to review pages 3

23   and 4 of Exhibit 1, the -- the policies that you've

24   described?

25   A.   Yes.

Robert Davis

**15**

1    Q.   And did you -- did you discuss them with

2    Ms. Gaby?

3    A.   I'm sure I did, because, you know, we have

4    policies for exhibit spaces and event spaces.  I'm sure

5    I asked her questions about it at the time.

6    Q.   Do you recall whether you had any questions

7    when you began?

8    A.   I don't remember what I would have had

9    questions about.  I don't -- I don't really remember

10   what I would have had questions about at that time.

11   Q.   Did you receive any -- any specific training

12   in the application of these policies?

13   A.   Not -- I mean, no, I don't think I received --

14   I don't -- I don't think I received any training in

15   that, in the application of these policies, that I

16   recall.  I mean, it's -- they're -- they're pretty

17   clearly written, and I would have asked if -- if

18   something didn't seem clear to me, I would have asked

19   at that time.

20   Q.   In the -- and I'm looking at page 3 of

21   Exhibit 1 and the subsection C entitled Criteria for

22   Exhibit Approval.  Do you see that?

23   A.   Uh-huh.

24   Q.   And the second bullet point there says,

25   "Exhibits must be for a public purpose as defined in

Robert Davis

**16**

1   subsection (A)(3)" --

2        A.    Correct.

3        Q.    -- of the policy above.

4              And looking back there, then, it says,

5   "The chief test of what constitutes a public purpose is

6   that the public generally must have a direct interest

7   in the purpose and the community at large is to be

8   benefited."

9              Do you see that?

10       A.    Yes, sir.

11       Q.    Did you have -- when you began your employment

12  as the exhibits and events coordinator, did you have

13  any instruction as to what that -- what that meant or

14  what you were to be looking for?

15       A.    I don't think I had a -- I -- I feel like that

16  was pretty clearly written to me, and I -- I felt like

17  I understood that so . . .

18       Q.    And has -- has your understanding of -- of

19  that -- the public purpose, as you construe it and

20  apply it in your job, has that changed since you began?

21       A.    No.

22       Q.    Okay.  Where it says the public generally must

23  have a direct interest and a purpose of -- of the

24  exhibit, what did you understand -- or what do you

25  understand that to mean?

Robert Davis

**17**

1    A.   Can you ask -- can you say that again?

2              MR. BOLTON:  Can you read the question

3    back?

4              (Requested portion was read)

5    A.   It means that the public must generally have a

6    direct interest in the purpose of the exhibit.

7    Q.   And what would constitute, as you apply

8    that -- that term, a direct interest?

9              MS. MACKIN:  Objection, form.

10              MR. BOLTON:  Pardon?

11              MS. MACKIN:  Objection, form.

12    Q.   You can answer that.

13    A.   Oh.

14              MS. MACKIN:  Go ahead and answer.

15    A.   I mean, something that is student artwork or

16    an exhibit about conservation of water in the state of

17    Texas.  Both of those seem pretty direct.

18    Q.   So for instance, with regard to student

19    artwork, you indicate that that would be a pretty

20    straightforward example of something that the public

21    has a direct interest in.  Why -- why do you say that?

22    A.   Well, it wouldn't be -- I mean, if the

23    students -- student art, we would keep them from

24    selling it or advertising it as being for sale, so it

25    couldn't be gallery space.  But if they just want to

Robert Davis

**18**

1   display, you know, artwork from a particular school

2   district, that qualifies in that, you know, the public

3   may want to see that.

4        Q.   And when you -- when you say the public would

5   want to see that, how do you define public, then?

6        A.   Visitors to the Capitol.

7        Q.   Would --

8        A.   Staff.

9        Q.   Would it be everybody?

10        A.   Sure.

11        Q.   So you -- but you're -- I don't think you're

12   saying that everybody must have --

13        A.   Well, I can't speculate as to what anybody --

14   what people want to see, but if it -- if it's not --

15   you know, in speaking about the artwork, if it's not

16   for sale or, you know, doesn't violate any other rules

17   in that they hang it on the walls or something like

18   that, then that -- that to me seems like it fits within

19   our rules pretty well.

20        Q.   Is there any sort of numerosity test that you

21   use to determine whether or not the public would have a

22   direct interest in the purpose of an exhibit?

23        A.   Numerosity?

24        Q.   Number of people -- I mean, presumably -- and

25   maybe -- maybe I'm misunderstanding you.  But are you

Robert Davis

**19**

1   saying, then, that the public generally must have a

2   direct interest in the purpose of the exhibit, that

3   everybody must be interested in it or -- and if it's

4   not everybody, then my question is, is there some

5   threshold of -- of public interest that you use?

6         A.   Well, it says here "community at large is to

7   be benefited," so that's -- that's kind of the

8   barometer that we look at for . . .

9         Q.   Okay.  Now, I read that as -- to be

10   conjunctive, that the -- that the public generally must

11   have a direct interest and the community at large is to

12   be benefited.  Do you -- I construed those as two --

13   two separate criteria.

14         A.   Hmm.  I don't -- I don't, really.

15         Q.   Okay.

16         A.   I don't -- I don't always think of that as two

17   separate criteria.

18         Q.   So in terms of "the community at large is to

19   be benefited," then, you basically would construe that

20   as not really being substantively different than the

21   public having a direct interest in the purpose of the

22   exhibit?

23                 MS. MACKIN:  Objection, form.  You can

24   answer.

25         A.   I'm sorry.  Can you say that again?

Robert Davis

20

1    Q.   Do you construe the requirement that the

2    public generally have a -- the public generally must

3    have a direct interest in the purpose of the exhibit,

4    on the one hand, and that the community at large is to

5    be benefited as essentially restatements of the same

6    thing?

7    A.   I -- I think so.  That's kind of how I look at

8    it.

9    Q.   And so when I asked in terms of numerosity, in

10   terms of defining how much public interest is

11   necessary, you -- you then said, well, the criteria

12   that we use is "community at large is to be benefited."

13   How do you -- how do you then determine whether the

14   community at large is to be benefited by an exhibit?

15   A.   Well, they would state their public purpose on

16   the application, so I would look at what they read

17   and -- or what they wrote.  Excuse me.  And, you know,

18   if they state in their application that "We believe the

19   public needs to see this," that --

20   Q.   That the public what?

21   A.   "That the public needs to see our student

22   artwork" -- you know, I'm -- I'm not a sensor, so I'm

23   not -- I'm not a barometer of good art.

24   Q.   Probably none of us in this room are.  We

25   won't -- we won't poll others.

Robert Davis

**21**

1      So if the -- if the applicant indicates

2  why they think the public needs to see an exhibit,

3  basically you -- you accept that, then, as -- as

4  sufficient?

5      A.   Not just because they say so.  But -- but in

6  the case of student artwork, I mean, that -- that seems

7  pretty clear to me, that it's -- it's a reasonable

8  expectation that visitors to the Capitol might want to

9  see artwork from students from Texas.

10      Q.   But in terms of what gets displays -- you're

11  not necessarily responding to public demand, then, in

12  terms of what gets displayed, and what -- what people

13  apply for is -- is self-selected by the exhibitors.

14  Correct?

15      A.   We don't -- we don't solicit people to come

16  display here at the Capitol.  They have to apply for

17  it.  Much as I'd like to take credit for some of these,

18  they -- they come to me.

19      Q.   In terms of how you construe and apply the --

20  the public purpose test, then, in (A)(3) of the

21  policies, have -- is there anything -- is there

22  anything else that -- that you -- any other factors,

23  criteria, whatever, that you utilize in -- in

24  determining whether or not an exhibit satisfies the

25  public purpose requirement?

Robert Davis

22

1    A.    No.   I mean, as far as the public purpose

2    requirement, that's -- that's all we look at, is the --

3    what's in the policies.

4    Q.    Then in the -- in -- on page 4 of Exhibit 1 --

5    and I'm again looking in the -- under the criteria for

6    exhibit approval.

7    A.    Uh-huh.

8    Q.    Subsection 10 talks about exhibits will not be

9    considered for display if they --

10   A.    Yeah.   That's part -- I guess I consider that

11   to be included along with the public purpose.   Because

12   we do sometimes receive applications where it seems

13   like it's, as I said before, someone looking for free

14   gallery space to display their own artwork for their

15   own promotion or commercial advancement.

16   Q.    And that's what you referred to earlier

17   that -- one of the criteria that proposed exhibits not

18   basically have a commercial underpinning.   Is that

19   correct?

20   A.    Uh-huh.

21   Q.    Subsection 10 also says "will not be

22   considered for display if they have no obvious public

23   purpose."   Now, in terms of what you've already

24   described as -- in regard to your application of the

25   public purpose requirement, does that particular

Robert Davis

**23**

provision, no obvious public purpose, add to your

answer in any way?

    A.    No.

    Q.    In terms of determining whether something

that -- lacks any obvious public purpose, is there

anything -- any specific -- anything specific that you

look for in that regard?

    A.    I mean, I -- I just -- mostly if I'm trying to

determine or get a gauge of someone's public purpose,

it's typically the first two criteria under item 10

that I'm looking at.

    Q.    Have you ever --

    A.    And it doesn't usually get to C or D.

    Q.    Okay.

    A.    But those would apply -- if someone, you know,

applied and had an illegal purpose for something, then

that would be one I would probably have a discussion

with my supervisors with.

    Q.    Have you ever rejected an application on the

grounds that it had no obvious public purpose?

    A.    I don't recall ever doing that.  Like I said

earlier, we -- the first point of contact, someone will

usually kind of talk to me and give me information

about what they're trying to do.  And if I tell them at

that time that I'm not sure if it's going to fly, a lot

Robert Davis

**24**

1  of times they'll decide to go elsewhere to display it.

2      Q.   And is that discussion generally focused on

3  the commercial aspect of it that you -- you've talked

4  about?

5      A.   Or like if it's campaign related, we won't

6  allow that either.  So that's typically where we're

7  going at the first point of contact.

8      Q.   Okay.  In other words, no -- no campaigning as

9  part of this process.  Is that correct?

10      A.   Uh-huh.

11      Q.   Have you ever removed an exhibit after it was

12  approved but then for whatever reason -- have you been

13  involved in making a decision to have an exhibit

14  removed?

15      A.   I have not been involved in the decision for

16  removing any exhibits.

17      Q.   Have you been involved in the mechanics or

18  logistics of having a display removed?

19      A.   Yes.

20      Q.   And when?

21      A.   The FFRF display.

22      Q.   And that was a display that you had approved.

23  Correct?

24      A.   Yes.

25      Q.   And then -- and in fact that display was put

Robert Davis

**25**

1   in place in the Capitol.  Is that correct?

2        A.    Yes.

3        Q.    And in terms of damage to property or location

4   or obstruction or anything like that, there was no

5   problem with the -- with the FFRF exhibit.  Correct?

6        A.    No, not that I recall.

7        Q.    Now, you were not involved in the decision to

8   remove that exhibit, but you said you were involved in

9   the mechanics or logistics of having it actually

10  removed.  Is that correct?

11       A.    That's true.

12       Q.    How did that come about?

13       A.    I was told by our executor director to go

14  remove the exhibit.

15       Q.    And that would have been Mr. Sneed?

16       A.    Yes.

17       Q.    Had he ever asked you to remove an exhibit

18  prior to that?

19       A.    No.

20       Q.    Subsequent to that --

21       A.    No.

22       Q.    -- any other?

23       A.    (Moving head side to side.)

24       Q.    And did he -- how did he communicate that to

25  you, that -- with regard to the FFRF display?

Robert Davis

26

1    A.   I -- I remember that it was on the phone.  He

2  had called me.  But he may have walked by my office and

3  told me in person.  I really don't remember.

4    Q.   And what do you recall that he said?

5    A.   He said, "I need you to take the exhibit

6  down."

7    Q.   And did he say why?

8    A.   No.

9    Q.   Did you ask -- did you ask why?

10   A.   No, I didn't ask him why.

11   Q.   And did he tell you that the -- that Governor

12 Abbott had requested that it be removed?

13   A.   After the fact, yeah.

14   Q.   When Mr. Sneed communicated that he needs you

15 to take the exhibit down, did that -- did he express

16 that that should be done with some degree of urgency?

17   A.   Uh-huh, yes.

18   Q.   How did he -- what did he say?

19   A.   I think he said "right now" or "as fast as you

20 can."  I don't remember his wording, but it was --

21 urgency was expressed.

22   Q.   And then what did you do?

23   A.   I went with our public information officer and

24 removed the exhibit.

25   Q.   Who was the public information -- I'm sorry.

Robert Davis

**27**

1   What was the position?

2        A.   Public information officer.

3        Q.   Okay.  Was that Mr. Caslins?

4        A.   No.  His name is Christopher Currens.

5        Q.   Christopher what?

6        A.   Currens.

7        Q.   Oh, yeah.  I said the wrong name.

8        A.   Yeah.

9        Q.   That's what I meant.

10       A.   Okay.

11       Q.   There are multiple consonants in it, at least.

12            The public information officer, what is

13   the -- what does that person do with regard to the

14   preservation board?  What's his job?

15       A.   You're going to have to ask him.  I don't know

16   the details of his job.

17       Q.   Pardon?

18       A.   I don't know the details of his job.

19       Q.   Okay.

20       A.   Besides a vague understanding.

21       Q.   Now, why did you involve him when you went to

22   remove the FFRF exhibit?

23       A.   I -- what I recall is that he offered to go

24   with me.

25       Q.   Was he in your office when Mr. -- when

Robert Davis

**28**

1   Mr. Sneed asked you to remove it?

2       A.   Or I was in his.  I don't remember.  But we

3   were -- yeah, we were together.

4       Q.   Had Mr. Sneed asked you two to get together to

5   meet with him?

6       A.   No.  I don't -- I don't remember.  I

7   don't . . .

8       Q.   And then Mr. Currens, what did -- what did the

9   two of you do then?

10      A.   We went and removed the exhibit.

11      Q.   And did you have any discussion between

12  yourselves as you -- as you undertook that task?

13      A.   I'm sure we talked about how we were going to

14  do it or where we were going to place the exhibit.

15      Q.   Was there any discussion about why you were

16  being asked to remove that exhibit?

17      A.   (Moving head side to side.)

18      Q.   At the time that you were -- and you shook

19  your head, and I --

20      A.   I mean, I don't remember --

21      Q.   You know --

22      A.   -- talking about that.

23      Q.   And I was -- I was letting you get away with

24  it.  The reason I -- the reason I do that is because in

25  terms of -- particularly with the court reporter,

Robert Davis

**29**

1  getting the transcript, the head nods are --

2       A.   Right.  I understand.

3       Q.   -- very difficult.

4       A.   Yeah.

5       Q.   And I was going along with you.  I was

6  sleeping as well.  So don't worry about it.

7              You said subsequently or after the fact

8  you had some discussion with Mr. Sneed about the FFRF

9  exhibit?

10      A.   Uh-huh.

11      Q.   Prior to that discussion when you -- when you

12 were in the process of removing it with Mr. Currens --

13      A.   Currens.

14      Q.   -- did you -- did you have any thoughts about

15 why -- did you have thoughts about why it was being

16 removed?

17      A.   I think I -- I think I understood that the

18 governor's office was not favorable to the exhibit

19 and -- but I don't -- you know, any conversations like

20 that would have happened well over my head.

21      Q.   Would have happened what?

22      A.   Well over my head.

23      Q.   Now, the governor, with regard to the

24 preservation board, what is his position?

25      A.   He's the chairman of the board.

Robert Davis

30

1    Q.   How many persons are on the board, if you

2    know?

3    A.   I think six, but I'm not -- I'm not completely

4    certain.  I've never attended a board meeting or seen

5    one so . . .

6    Q.   You've never attended a board meeting?

7    A.   No.

8    Q.   With regard to Governor Abbott as the -- being

9    the chair -- chairman of the preservation board, do you

10   know what his role is in regard to the operation of the

11   preservation board?

12   A.   No.

13   Q.   Has he, to your understanding, been directly

14   involved on any sort of regular basis in terms of --

15   A.   I wouldn't know.

16   Q.   Let me finish.

17   A.   Okay.

18   Q.   -- in terms of approving exhibits or displays?

19   A.   I wouldn't -- I wouldn't know.  I don't -- I

20   don't have contact with the governor's office outside

21   of -- if he's going to attend an event that I'm

22   scheduling, then I would coordinate with his advance

23   staff about his movements.

24   Q.   But in terms of the governor, as far as you

25   know, providing input into the approval process, you --

Robert Davis

31

1   you're not aware of him doing that.  Is that correct?

2       A.   I don't know.  I -- I don't know who -- if

3   I -- if I give an application to my executive director

4   and say, "Hey, I would like some feedback or input on

5   this," I don't know who he shows it to.

6       Q.   To your knowledge has the governor ever asked

7   to have any other display or exhibit removed from the

8   Capitol?

9             MS. MACKIN:  Objection, form.  You can

10  answer.

11      A.   To my knowledge, no.

12      Q.   Now, in terms of -- by the way, you're also

13  the coordinator for events.  Is that correct?

14      A.   That's correct.

15      Q.   And then is there a similar process that you

16  go through, then, for event approval?

17      A.   Yes.

18      Q.   And are there certain -- what -- what public

19  spaces, basically, are you responsible for coordinating

20  events for?

21      A.   Capitol grounds, Capitol rotunda.

22      Q.   Is the process similar in terms of getting

23  approval for an event?

24      A.   Yes, it's similar.

25      Q.   Similar to what you go through with regard to

Robert Davis

**32**

exhibits?

    A.   Yes, as far as an application, sponsorship,
policy -- set of policies.

    Q.   Do you have any rough estimate of how many
applications for exhibit displays that you have
reviewed and approved during your time as the
coordinator?

    A.   During my entire career as the coordinator,
I -- I don't know.

    Q.   Do you know on an annual basis about how many
applications you receive?

    A.   For total events and exhibits, it's about a
thousand every year.

    Q.   In terms of -- in terms of just exhibits, do
you know -- first of all, are there more events or
exhibits?

    A.   There's more events.

    Q.   Okay.  And in terms of exhibits, on an annual
basis do you have a -- can you estimate how many
applications that you would approve?

    A.   On average I would say maybe 50, 40, something
like that.  It's going to be a lot more in a session
year than an interim time.

    Q.   Going back to the FFRF exhibit, you said after
the fact you did discuss that removal with Mr. Sneed?

Robert Davis

**33**

1    A.    Yes.

2    Q.    Is that correct?

3          And in relationship -- how many times

4    have you discussed that with Mr. Sneed?

5    A.    I don't remember how many times.

6    Q.    More than once?

7    A.    I -- I would say so, yeah.

8    Q.    And the first time that you would have

9    discussed it with him, then, in relationship to the

10   actual removal, when was that?

11   A.    That day, the day that it was removed.

12   Q.    Okay.  So did he ask you -- was it that

13   morning or afternoon that he asked you to get it out?

14   A.    I think it was in the afternoon.

15   Q.    And then you -- you and Mr. Currens got it

16   removed --

17   A.    That's --

18   Q.    -- quite quick?

19   A.    That's how I remember it, yes.

20   Q.    And then did you go back to Mr. Sneed's office

21   to talk with him?

22   A.    I seem to remember going back to Christopher

23   Currens' office, and we both spoke to John Sneed by

24   speakerphone.

25   Q.    Did you initiate contact with Mr. Sneed?

Robert Davis

**34**

1    A.   I don't think I did.

2    Q.   Okay.  Were you in Mr. Currens' office, you

3  said?

4    A.   I think so.  I mean, it might have been my

5  office.

6    Q.   Okay.

7    A.   It's been --

8    Q.   Well, my question --

9    A.   -- a couple years.

10    Q.   -- is, did Mr. Sneed initiate contact with you

11  and Mr. Currens, or vice versa?

12    A.   No.  I think he -- I think Mr. Sneed called

13  us.

14    Q.   Okay.  And -- and what did he say?  What was

15  the nature of that -- or what did you guys talk about?

16    A.   From what I recall it was -- he said something

17  about there was a letter that had been drafted or was

18  being drafted by the governor's office about the

19  exhibit.

20    Q.   And -- and did he tell you the nature of the

21  letter?

22    A.   Not -- not other than just a vague, you know,

23  the governor want -- wanted the exhibit taken down

24  and . . .

25    Q.   Did Mr. Sneed say why?

Robert Davis

1    A.   I don't -- I mean, I think he might have said

2 that he felt like it was mocking or something, but I

3 really don't remember.

4    Q.   And then did you say anything to Mr. Sneed at

5 that time about the FFRF display?

6    A.   Would have just been nuts-and-bolts details

7 about, you know -- I mean, he and I had discussed the

8 application, so we didn't -- I didn't really need to

9 give him a whole lot of background about the FFRF.

10    Q.   So in terms of the approval process, then,

11 initially was -- Mr. Sneed was -- was involved in that?

12    A.   Yes.

13    Q.   And -- and why did -- why was he involved

14 in -- in the approval process?

15    A.   Because it was a -- as I saw it, a sensitive

16 display application, and I wanted some additional input

17 from him as well as others.

18    Q.   And what -- what input did you get from

19 Mr. Sneed?

20    A.   On the application --

21    Q.   On the application, yes.

22    A.   -- prior to approval?  I don't really remember

23 at the time.  I don't remember.  But it was -- you

24 know, it was that it -- you know, part of it seemed

25 fine, but, you know, we were going to wait and see --

Robert Davis

36

1    at the time when the application came in it was not

2    sponsored, so we were going to wait and see what was

3    sponsored.

4          Q.    What was what?

5          A.    We were going to wait and see if it got

6    sponsored.

7          Q.    Okay.  And it was properly sponsored.

8    Correct?

9          A.    Yes, as I recall.

10         Q.    And then once it was sponsored did you -- I

11   mean, did you -- did you personally talk with Mr. Sneed

12   about the application, then?

13         A.    No.  I think -- because when it was sponsored,

14   it came with a second -- it was applied for, a new

15   application came in different from the very first one.

16   So looking at that second application with the

17   sponsorship, I -- I would have talked with John Sneed.

18         Q.    Okay.

19         A.    And possibly others about it.

20         Q.    And you would have -- you would have talked

21   with him directly, then --

22         A.    Yes.

23         Q.    -- about the FFRF, that second application?

24         A.    (Moving head up and down.)

25         Q.    And the second application basically differed

Robert Davis

**37**

```
1    from the first one in terms of the sponsorship?

2         A.   The sponsorship.  The first application, I

3    think there was a different -- there was a different

4    sign -- banner that came with it.

5         Q.   And that second application, then, did -- as

6    it came in, what -- do you recall what you discussed

7    with Mr. Sneed about that application?

8         A.   Just would have been standard, just how does

9    this look, does this seem like something that we're --

10   you know, fits our public purpose criteria, fits all of

11   our other criteria.

12        Q.   Did Mr. Sneed indicate that you should not

13   approve it?

14        A.   No, not that I recall.

15        Q.   Did he express any reservations about it?

16        A.   I -- I mean --

17        Q.   If you recall.

18        A.   I recall -- well, I recall a reservation I

19   think probably between both of us in that, you know,

20   this is something that's, you know, controversial.  But

21   as far as, you know, do we -- do we or do we not want

22   to approve it, I think that was pretty clear.

23        Q.   Did you -- did you ask them to put some sort

24   of a disclaimer with their display?

25        A.   I had suggested that a -- there was a previous
```

Robert Davis

**38**

1 exhibit that had done a -- on their own they had done a

2 sign that said this -- I'm paraphrasing, but, you know,

3 it said, "We'd like to thank our sponsor" and "This

4 exhibit was not paid for by state funds.  It was put up

5 blah-blah-blah-blah."

6     Q.   And had you -- had you requested that type of

7 disclaimer?

8     A.   I -- I thought it was a good -- I thought it

9 was a good complementary sign to go along with that

10 previous exhibit.  And so since this one was similar, I

11 suggested it.

12     Q.   And that previous exhibit was the Thomas More

13 nativity.  Correct?

14     A.   Yes.

15     Q.   And with regard to the Thomas More nativity,

16 did you -- did you suggest some sort of a disclaimer to

17 them?

18     A.   No.  They offered it up, I think, at first --

19 first contact, I recall.  I didn't need to suggest

20 anything like that.

21     Q.   And you thought it was -- with regard to the

22 nativity display, you thought -- did you -- did you

23 think that that -- that that was a good complement to

24 the exhibit?

25     A.   Sure.  I -- I don't -- it's not something we

Robert Davis

**39**

1   would require, but I -- you know, I'd like to see more

2   exhibitors do that, where they mention their sponsor

3   and mention that it's not the State Preservation

4   Board's exhibit; it's a public exhibit.

5       Q.   Is that why you recommended it or suggested it

6   with regard to the FFRF display?

7       A.   As I recall, that's why I did it, yeah.

8            I had -- you might not have been in the

9   room, but I had asked if we could take a break at 11:00

10  so I could go check on some events.

11      Q.   Absolutely, yeah.

12      A.   Okay.

13      Q.   Yeah.

14      A.   I may only need about 20 or 30 minutes but --

15      Q.   That's fine.

16      A.   Okay.

17      Q.   That's fine.

18      A.   It may be less than that too, but I've got

19  student performances that I need to go check on

20  so . . .

21      Q.   Okay.  That's not a problem.

22      A.   Okay.

23           THE VIDEOGRAPHER:  It's 10:56, we're off

24  the record.  End of tape 1.

25           (Recess)

Robert Davis

**40**

1      THE VIDEOGRAPHER:  It's 11:37, beginning

2  tape number 2.  We're on the record.

3      Q.   Mr. Davis, when we took the break we were

4  just -- we were talking a little bit about what I

5  referred to as the disclaimer with regard to the FFRF

6  display, which you said you suggested and thought it

7  was a good idea.  Is that --

8      A.   Uh-huh.

9      Q.   -- correct?

10           (Exhibit 2 marked)

11      Q.   And I'm showing you what's marked as

12  Exhibit 2.  And Exhibit 2 is an email to you -- by you

13  to Sam Grover at FFRF.  Is that correct?

14      A.   Uh-huh.

15      Q.   And then in this email you indicate that -- in

16  the second paragraph, that you would be requesting

17  additional signage stating who the sponsor was as well

18  as that no state funds went into the facilitation of

19  the event -- or of the exhibit.

20      A.   Uh-huh.

21      Q.   Do you see that?

22           And you indicated that was in keeping

23  with what was required of the nativity scene.  Correct?

24      A.   Uh-huh.

25      Q.   So you actually did request, then, that

Robert Davis

41

1   that -- that a disclaimer be included with the FFRF

2   display.  Correct?

3        A.   Yes.

4        Q.   And -- and was FFRF agreeable to that?

5        A.   Yes, as I recall.

6        Q.   Is it -- is it fair to say that in terms of

7   how you approached your job as the coordinator for

8   events and exhibits, that -- that the preservation

9   board follows a policy of allowing diverse viewpoints

10  to be expressed in Capitol displays?

11       A.   I'm sorry.  Can you --

12       Q.   As you -- as you've applied and utilized the

13  standards that you use to process and approve displays,

14  do you follow a policy of allowing diverse viewpoints

15  to be expressed in Capitol displays?

16       A.   I -- I believe that we do.

17       Q.   Did you request any substantive changes to the

18  FFRF display before approving it?

19       A.   Not that I recall.

20       Q.   We talked about -- earlier about your

21  conversation with Mr. Sneed after you removed the FFRF

22  display, which you thought was probably on the same day

23  as you and Mr. Currens removed it.  Correct?

24       A.   I think so.

25       Q.   Did you have any subsequent discussions with

Robert Davis

**42**

1    Mr. Sneed about the FFRF display?

2        A.    I'm sure in passing.

3        Q.    Do you recall anything specific?

4        A.    No.

5        Q.    Has there been -- and in terms of how you

6    approach applications for events or displays, have

7    there been any change in -- in your -- in the policy or

8    practices that you follow?

9        A.    Not -- not particularly, no.

10                    (Exhibit 3 marked)

11                    MR. BOLTON:  And I apologize.  I didn't

12    bring an extra one here.

13        Q.    Exhibit 3 is a letter dated December 22, 2015

14    by Governor Abbott to Mr. Sneed.  Have you seen that --

15    have you seen that letter before?

16        A.    I have seen this before.

17        Q.    When was the first time that you saw it?

18        A.    I don't really recall.  Must have been a

19    couple of days after.  I don't really recall, though.

20        Q.    Okay.  Do you recall how it -- how you -- how

21    it came to you?

22        A.    The -- the recollection I have is that John

23    Sneed's assistant brought it to my office, a hard copy.

24        Q.    Okay.  And did you know about the letter prior

25    to the assistant bringing it?

Robert Davis

**43**

1    A.    Yes.   I think I had said earlier that -- that

2  day that John Sneed had mentioned to me that there was

3  either a letter that had been drafted or was being sent

4  out or something, that there was a letter, was what was

5  my understanding.   So I believe I heard about it, but I

6  didn't see it --

7    Q.    Okay.

8    A.    -- immediately.

9    Q.    Did you ever discuss the letter specifically

10  with anybody at the preservation board?

11    A.    If I did at all, it would have been just in

12  passing, you know.   Somebody maybe saying, "I heard

13  about that" or something.   I don't know.   But I

14  didn't -- we didn't have an internal meeting about this

15  letter, that I recall.

16    Q.    Did you -- did you read the letter?

17    A.    I have read it, yes.

18    Q.    Okay.   And this was the letter in which

19  Governor Abbott requested that the display be removed.

20  Is that correct?

21    A.    Yes.

22    Q.    And in the letter he cites -- quotes some

23  administration code section.   Are you familiar with the

24  code section that he quotes in the first page of this

25  letter?

Robert Davis

**44**

1    A.   I'm familiar with some of it, yes.  Our

2    policies come from the administrative code so . . .

3    Q.   And the section that he -- that he quotes

4    deals with the public purpose requirement.

5    A.   Uh-huh.

6    Q.   Correct?

7    A.   Yes.

8    Q.   And the first sentence of the -- of the

9    administrative code section that says, "The promotion

10   of the public health, education, safety, morals,

11   general welfare, security, and prosperity of all of the

12   inhabitants or residents within the state" is -- is

13   identified as the standard for promoting a public

14   purpose.  Is that correct?

15   A.   Yes.

16   Q.   In terms of -- well, does that -- has that

17   language -- have you utilized that language or

18   interpreted that language at all in terms of how you

19   approach the -- the process for approving applications

20   for events or display?

21   A.   This language?  I mean, I don't regularly

22   review that section of the administrative code --

23   Q.   Okay.

24   A.   -- to implement that language.  I -- I stick

25   with what's in our policies.

Robert Davis

**45**

1    Q.   Okay.  Where it says -- in terms of promoting

2    morals or general welfare, is that a -- is that a

3    factor that -- that you utilize in making decisions?

4    A.   No.  I usually use what's in our policies,

5    which is direct interest, community at large to be

6    benefited.

7    Q.   Okay.  In his -- in his letter, Governor

8    Abbott indicates that the FFRF display does not promote

9    morals and the general -- general welfare.  Do you see

10   that language?

11   A.   Uh-huh.

12   Q.   Do you know -- in terms of whether a display

13   promotes morals and general welfare, is that a -- is

14   that a criteria or factor that you specifically utilize

15   in your decision-making?

16   A.   No.

17   Q.   So for instance, in terms of the defining

18   morals that would be promoted, that's not something

19   that -- that you think about or try to apply in your

20   decision-making?

21   A.   Not particularly.  I don't -- you know, if it

22   was -- like I said, if it's a sensitive enough

23   application, then I'll -- I will request some

24   additional input from others within our agency.

25   Q.   Do you have any -- any working definition of

Robert Davis

**46**

morals?

    A.    No.

    Q.    How about general welfare?

    A.    No.

    Q.    In the second page of Governor Abbott's letter he indicates that the exhibit does not educate.

    A.    Uh-huh.

    Q.    Do you see that?

    A.    Uh-huh.

    Q.    And when you process applications for events or display, is -- is that a criteria that you utilize in your decision-making, whether a -- whether a display educates?

    A.    No.  I don't believe that's one of our -- that's in our policies.

    Q.    Toward the bottom of the second page of Governor Abbott's letter he states that the general public does not have a direct interest in the Freedom From Religion Foundation's purpose.  He indicates that the organization is plainly hostile to religion and desires to mock it or, more accurately, to mock our nation's Judeo -- Judeo-Christian heritage.  He goes on to say, "But it is erroneous to conflate the foundation's private purpose with the public's purpose."  Do you see that language?

Robert Davis

**47**

1    A.    Uh-huh.

2    Q.    When you -- when you evaluate applications

for -- for displays, frequently the purpose is a

purpose that is unique to the applicant.  Isn't that

true?

6              MS. MACKIN:  Objection, form.  You can

answer.

8    A.    I mean, a lot of times, the -- I wouldn't say

the purpose is unique to the applicant.  A lot of times

they -- these exhibits -- they're all pretty uniform in

their public purpose.  I referenced student art.  You

know, that's so that the community can see what

students from District XYZ are doing these days in

their schools.  Or the exhibit I have now is from the

Historical Commission about the Nimitz Museum.

That's --

17   Q.    About the what?

18   A.    The Nimitz Museum.  Their public purpose would

just be to, you know, inform the public about, you

know, what --

21   Q.    With regard to the nativity scene --

22   A.    Yes.

23   Q.    Is it your understanding, then, that --

that -- I mean, my understanding is that the nativity

that was approved was not part of a large secular

display.  Is that correct?

    A.    You're talk -- you're speaking about the
Thomas More exhibit?

    Q.    Yes, sir.

    A.    Yes.  It was its own --

    Q.    Stand-alone --

    A.    -- display, yes.

    Q.    And did you understand that -- that the
purpose of the -- of the applicant was to promote the
Christian aspect of -- of Christmas?

    A.    I'd have to go back and look at what their
application says.

    Q.    You have no recollection?

    A.    I don't remember exactly what language they
said, if they said they were just displaying it for
those -- for people to see, or if they were displaying
it to further any kind of message.

    Q.    Would you equate, then -- and we'll go --
we'll -- we'll go and look at it.  But would you --
would you equate the applicant's purpose with the --
with the nativity to basically the general public's
purpose, that basically all -- everybody would have a
similar interest in -- in the nativity?

    A.    Oh, I wouldn't say everybody.  But our
language says community at large so . . .

Robert Davis

**49**

1   Q.   And again I go back, then.  When you say

2   community at large, is there some sort of numerosity or

3   percentage test that you use to determine whether or

4   not the community at large would -- there would be a

5   sufficient --

6   A.   No, I don't.  But the governor might.  He's a

7   statewide affected -- elected official.  He might have

8   a finger more on the pulse of what the public

9   determines to be . . .

10   Q.   Okay.  And in terms of that finger on the

11   pulse and that determination of -- of the public

12   purpose, is it your understanding, then, that that is

13   the governor's role in terms of the preservation board

14   and the approval process, that basically it's -- it's

15   his perception or perspectives as to exhibits that

16   determines?

17   A.   I don't -- I don't know if that's understood

18   within our policies, but he is the chairman of the

19   board.  It seems like it's something that's his

20   prerogative if he disagrees with an exhibit having been

21   approved.

22   Q.   Did -- did Mr. Sneed ever then subsequently

23   criticize you for having approved the FFRF display?

24   A.   No.  Because I wasn't alone in approving it.

25   Our agency approved it.

Robert Davis

50

1    Q.   And specifically Mr. Sneed?

2    A.   I mean, no -- there's no -- there's no one's

3  name signed on an approval sheet or anything, but we

4  had internal meetings about it.

5    Q.   You had what?

6    A.   We had internal meetings about the FFRF

7  application.  And the agency decided to approve it.

8    Q.   And who would have been involved in the

9  decision-making, then?

10    A.   Within our agency?

11    Q.   Yes.

12    A.   It was myself, our staff attorney, public

13  information officer, Mr. Sneed.  There may have been

14  some others, but that's --

15    Q.   How many --

16    A.   -- that's who --

17    Q.   How many meetings do you recall?

18    A.   I don't recall how many.

19    Q.   And were these meetings before or after FFRF

20  submitted a second application with a different

21  sponsor?

22    A.   I don't remember.  I think largely they were

23  after the second application.  Because if something

24  hasn't been sponsored, we don't -- I don't make a point

25  to review applications that haven't been sponsored

Robert Davis

**51**

1  because it's incomplete at that point.

2      Q.   Okay.  And what was the nature of the

3  discussion in these -- these meetings that you're

4  talking -- that you reference?

5              MS. MACKIN:  To the extent that this was

6  receiving advice from your staff attorney as the

7  preservation board, I'm going to instruct you not to

8  answer based on the attorney-client privilege.

9              THE WITNESS:  Okay.

10              MS. MACKIN:  To the extent you can answer

11  outside of that, please do answer the question.

12      A.   Okay.  Could you ask again?

13              MR. BOLTON:  Can you read the question

14  back?

15              (Requested portion was read)

16      A.   The nature was just whether or not it flew

17  within our policies and, you know, size restrictions,

18  you know, the typical logistical details, and dates

19  available.

20      Q.   And what?

21      A.   And dates available.

22      Q.   Was there anything else that you recall being

23  discussed in particular about the FFRF display, then?

24      A.   No.

25      Q.   And a decision was made, then, by the

Robert Davis

**52**

1  decision-makers involved to approve that application.

2  Is that correct?

3       A.   I don't know if it was made immediately at

4  that point, but at some point soon after, John Sneed

5  told me, "Good to go.  We can approve that one."

6       Q.   Who did?

7       A.   John Sneed.

8       Q.   Has Mr. Sneed ever subsequently expressed any

9  remorse as to his decision to okay that display?

10      A.   Not to me particularly.

11      Q.   Are you aware from any -- from any other

12  source that he's expressed any -- any remorse?

13      A.   I'm not aware.

14      Q.   Now, FFRF indicated that the purpose of -- of

15  their display was to educate the public and celebrate

16  the 224th anniversary of the ratification of the Bill

17  of Rights on December 15, 1791, and also to celebrate

18  the winter solstice on December 22nd and to educate the

19  public about the religious and nonreligious diversity

20  within the state.

21            Is that -- is that a purpose that fits

22  within your guidelines?

23      A.   May I see it so I know which --

24      Q.   Yeah.

25      A.   We approved it, so I -- I think that sounds

Robert Davis

**53**

1   like a good public purpose.  I don't know if it really

2   educates.  There wasn't a whole lot of information

3   about -- I mean, it was just a standing and then the

4   complementary sign so . . .

5       Q.   But that's not pretty unique to the FFRF

6   display, is it, in terms of the educational aspect?

7       A.   Yeah.

8       Q.   Because for instance, the slam-dunk approvals

9   for art displays, for instance, those wouldn't have any

10  clearly defined educational purpose.  Right?

11              MS. MACKIN:  Objection, form.  You can

12  answer.

13      A.   I -- I don't know.  If you're an art student,

14  you might glean some kind of technical details off of

15  that.  But oftentimes the art displays are not -- they

16  don't define their public purpose as to educate.

17      Q.   How about with regard to the nativity?  Can

18  you -- is there an educational purpose for that that

19  you can discern?

20      A.   Which nativity?  The --

21      Q.   The Thomas More nativity.

22      A.   I guess if someone was religious, maybe.  But

23  I don't -- I don't know if I necessarily see an

24  educational purpose.

25              (Exhibit 4 marked)

Robert Davis

**54**

1    Q.   With regard to what we marked as Exhibit 4,

2  does that appear to be the application by FFRF?

3    A.   Yes.  This is what I recognize as the second

4  application that came in.  But there's no sponsorship

5  form with this one, with this particular --

6    Q.   Was Donna -- Donna Howard, is that --

7    A.   Yes.

8    Q.   She was the ultimate sponsor, though.

9    A.   Yes.

10   Q.   Correct?

11        And on the second page of Exhibit 4,

12  then, there's a statement of purpose, as I -- as we

13  were just discussing.  Is that correct?

14   A.   Uh-huh.

15   Q.   And that would seem to fit within the agency's

16  or the board's -- the preservation board's guidelines.

17  Is that --

18   A.   Yes.

19   Q.   -- correct?

20        (Exhibit 5 marked)

21   Q.   And then is Exhibit 5 the sponsorship by

22  Donna --

23   A.   It appears to be, yes.

24   Q.   Okay.

25        MR. BOLTON:  Did I give everybody the

Robert Davis

55

1    same thing?

2              MS. MACKIN:  I'm just wondering why

3    they're not -- it appears that this -- that the

4    sponsorship page would have been attached to a

5    different application, since this is labeled page 22 of

6    83, and then the application that Mr. Davis is looking

7    at is labeled page 23 through 25 of 83.  I just know

8    that there were a lot of --

9              MR. BOLTON:  Right.

10             MS. MACKIN:  -- several iterations of

11   this, so I want to make sure we're . . .

12       A.    Yeah.  I think this is maybe the difference

13   here, this notation that I made.

14       Q.    When I -- when I was going through -- I know

15   there was an earlier application of July 7th of 2015.

16   And I think the one that I gave you, Mr. Davis, is July

17   20th, if I'm not mistaken.

18       A.    Yes.

19       Q.    Correct?

20             And it's your recollection that -- that

21   Ms. Howard was actually the sponsor?

22       A.    Yes.  There was a second application that was

23   submitted with the sponsorship, but they included dates

24   which we did not have available.

25       Q.    There was no question, though, that the

Robert Davis

56

1   application that you finally evaluated included an

2   appropriate sponsorship.  Is that correct?

3        A.   Yes.  That's correct.

4        Q.   Did you -- how long was the FFRF display

5   actually up in the Capitol before -- before you took it

6   down?

7        A.   I believe it was installed on December 18th,

8   and I believe it would have come down on this date,

9   December 22nd.

10       Q.   Do you --

11       A.   That's my recollection.

12       Q.   Okay.

13       A.   I'd have to go to notes to see when it was

14   actually --

15       Q.   While it -- while it was up, prior to it

16   coming down, did you receive any complaints or comments

17   or anything at all about that display?

18       A.   Not about the substantive nature of it.

19       Q.   Okay.  When you say --

20       A.   People said, "Oh, I thought it would be

21   taller" or, you know, something like that.

22       Q.   Okay.  In terms of the governor's objection to

23   the -- to the display, did you -- other than what

24   Mr. Sneed told you and the letter from the governor

25   that you saw, did you see any -- or were you aware of

Robert Davis

**57**

1   any other sources in which the governor expressed his

2   displeasure about the --

3        A.    No.

4        Q.    -- the display?

5        A.    I hadn't heard anything about it.

6                (Exhibit 6 marked)

7        Q.    Okay.  And with regard to Exhibit 6, have you

8   ever seen -- have you ever seen -- I believe these were

9   tweets by the -- by the governor regarding the -- the

10  display.

11                MS. MACKIN:  We're going to object to

12  this.  I have no way to verify authenticity.  Unless

13  the witness has seen it before.

14       A.    I don't recall seeing this --

15       Q.    Okay.

16       A.    -- before.  I don't have a Twitter account or

17  anything.

18       Q.    I thought I was the only one that didn't.

19                After -- well, after -- after you took it

20  down, the FFRF display, did -- did you or the -- the

21  agency receive any comments, criticisms, complaints, or

22  anything?

23       A.    Those would have gone to the public

24  information officer, not to -- I don't recall getting

25  anything specific about that.  You know, no voice

Robert Davis

**58**

1    messages or anything.

2        Q.   Is Mr. Currens still the public information

3    officer?

4        A.   I believe so.

5        Q.   Did Mr. Sneed, then, after -- after this

6    situation with the FFRF display, ever indicate that --

7    that you should follow any different policy -- or that

8    the agency should follow any different policy or

9    practice in regard to evaluating applications for

10   exhibits?

11       A.   I don't recall anything like that.

12               MR. BOLTON:  What are we up to?  7?

13               THE REPORTER:  Yeah, 7.

14       Q.   Now, FFRF subsequently submitted an

15   application for a display for 2016 as well.  Is that

16   correct?

17       A.   Yes.

18       Q.   And were you at all involved in the processing

19   of that application?

20       A.   Yes.

21       Q.   And how did that -- how did that go about,

22   then?

23       A.   I received it without any kind of first

24   contact.  Like I said, a lot of times someone will call

25   me and we'll discuss what's even available before they

Robert Davis

**59**

1   get too far along in the process.  It just was an email

2   to me by a woman with FFRF.  I think her last name was

3   Gaylor.  And I printed it and I went and talked to our

4   staff counsel about it, staff attorney.

5       Q.   Staff attorney?

6       A.   Yes.

7       Q.   Okay.  And did you talk with Mr. Sneed about

8   it?

9       A.   I think my -- my -- the first -- I might have

10  gone to him, but I don't -- he might not have been

11  here, so I think I went down to the staff attorney

12  first.

13      Q.   And what was your reason for going to the

14  staff attorney?

15      A.   Just, you know, here -- here -- here we are

16  again.  You know, we'll -- "I'll need some guidance on

17  what to -- to do moving forward on this."

18              I probably would have mentioned at that

19  time that those -- the dates applied for in that 2016

20  application weren't available.

21      Q.   Was that your only concern?

22      A.   Well, at that point if it's not available, I

23  don't need to be concerned about what's in the

24  application --

25      Q.   Okay.

Robert Davis

60

1    A.    -- if the dates aren't available.

2    Q.    Fair enough.

3    A.    So . . .

4    Q.    Okay.  And if a date's not available, do you

5    generally talk with the agency counsel?

6    A.    No.  But since this was FFRF, I didn't -- you

7    know, I wanted to make sure -- if I -- if I'm going to

8    go back to them and say, "Hey, dates aren't available,"

9    you know, "Is that what I need to say and do," you

10   know.

11   Q.    And then did you have any further involvement

12   in the processing of that application?

13   A.    I didn't see it again for some time, I -- or

14   hear about it.  I think John Sneed took it from -- from

15   there --

16   Q.    Okay.

17   A.    -- in a sense, yeah.

18   Q.    And what did -- what did Mr. Sneed do from

19   there?

20   A.    I don't know.

21   Q.    Did he ever tell you whether --

22   A.    No.  I mean, I -- I believe we -- I did send

23   an email back to them saying -- back to FFRF saying,

24   "These dates aren't available.  Thanks for your

25   application."  I don't remember exactly what I said

Robert Davis

**61**

1   but . . .

2                 (Exhibit 7 marked)

3      Q.   With regard to Exhibit 7, which appears to be

4   a letter by Mr. Sneed to Donna Howard dated August 18

5   of 2016 -- have you seen this letter before?

6      A.   I believe I have, yes.

7      Q.   And this was a letter by Mr. Sneed.  Correct?

8      A.   Yes.

9      Q.   And in addition to indicating that the -- the

10  dates aren't available, does Mr. Sneed also indicate

11  that -- that the preservation board will not approve a

12  display substantively that was the same as in 2015?

13     A.   I'm going to have to refresh my memory and

14  read it again here.  (Reviews document.)

15                 It looks like in paragraph 3 he says that

16  applications that do not promote a public purpose will

17  be rejected, and then he goes on to emphasize in the

18  fourth paragraph about the governor's viewpoint, from

19  his letter.

20     Q.   And in the last paragraph, then, of the letter

21  he says, "Our position in this matter has not changed

22  since the governor wrote to me," Mr. Sneed, "last

23  December, calling for the removal of FFRF's pejorative

24  exhibit."

25                 The -- the agency's position, then, in

Robert Davis

1    terms of -- I mean, your -- your position initially had

2    been to approve the -- the display.  Correct?

3         A.    Right.

4         Q.    So the agency's position did change, though,

5    after the governor wrote in -- in December of 2015?

6         A.    Well, he's the chairman of the board of the

7    agency so . . .

8         Q.    Did -- in terms of how you were directed to

9    process applications or how Mr. Sneed or the public

10   information officer or others were involved, were you

11   aware of any -- any -- any position change at that

12   level in terms of the criteria that would be applied to

13   applications for exhibits?

14        A.    Nothing as relates to our policies but . . .

15        Q.    When was the first time that the preservation

16   board approved a nativity scene display in the Capitol?

17   Was that the -- 2014?

18        A.    I -- I don't know about the first time ever,

19   but the first one since I had been here would -- would

20   have been the 2014 --

21        Q.    Okay.

22        A.    -- Thomas More Society.

23                   (Exhibit 8 marked)

24        Q.    And then -- and this isn't -- it's a smaller

25   picture than I would have liked, but do you recognize

Robert Davis

**63**

1    Exhibit 8 as the -- the Thomas More --

2        A.    Yes.

3        Q.    -- exhibit?

4        A.    Yes.

5        Q.    Was there any consideration with that

6    application of requiring that -- that it be included in

7    a larger, more secular holiday display?

8        A.    Not that I recall.

9        Q.    Has there ever -- have you had any discussion

10   at the preservation board in terms of how to handle

11   religious displays?

12       A.    Have I had what?

13       Q.    Within the -- within the people that you work

14   with at the preservation board, has there been any

15   discussions that you've been involved in about how to

16   handle applications for religious displays?

17       A.    Like as a new rule or --

18       Q.    Or application of existing rules or --

19             MS. MACKIN:  And I'm going to again

20   instruct you not to answer to the extent that those

21   discussions were had with the board's attorneys.

22             THE WITNESS:  Okay.

23             MS. MACKIN:  To the extent you can answer

24   outside of that context, please answer the question.

25       A.    I don't really recall that we've had any

Robert Davis

**64**

1   discussions about exhibit -- reviewing exhibit

2   applications in a new way moving forward.

3       Q.   Okay.  Have you seen holiday displays that

4   include a nativity or a menorah that are included as

5   part of a larger holiday display?

6       A.   I don't recall having a large secular exhibit

7   with different booths of different religions as one

8   display.  But we've had other religious --

9       Q.   And my question wasn't --

10      A.   Sorry.

11      Q.   -- necessarily limited to -- in terms of what

12  the preservation board has approved for Capitol

13  displays.  But just in -- in your own personal

14  experience --

15      A.   Oh.

16      Q.   -- have you seen such displays?

17      A.   No.  Or if I have seen them, I haven't paid

18  attention to them.

19      Q.   What do you recall about the Thomas More

20  application?

21      A.   I recall that we received an email, and I

22  believe it had -- did not have an application attached

23  to it but it was -- the body of the email had a request

24  that they be able to put the display up.  And there was

25  a -- attached was some supplemental PDFs of court cases

Robert Davis

1   and things that they had had in other states.  And I

2   didn't review those documents but . . .

3         Q.   And with regard to --

4         A.   Or it may have had the application attached to

5   it at that time as well.  I really don't remember.

6              (Exhibit 9 marked)

7         Q.   With regard to Exhibit 9, does that -- does

8   that appear to include the -- the email from 2014 that

9   you were describing?

10        A.   Yes.  And this -- yeah.  It appears that it

11  came to John Sneed and his assistant first, and then I

12  saw -- I was forwarded the email later.

13        Q.   And in that -- in Exhibit 9, there's --

14  Mr. Sneed indicates that he wants to have a meeting.

15        A.   Uh-huh.

16        Q.   What do you recall about that -- that meeting?

17             MS. MACKIN:  And I'm going to instruct

18  you, with respect to the attorney-client privilege to

19  the extent that the board's attorney was present and

20  you were receiving legal advice --

21             THE WITNESS:  Right.

22             MS. MACKIN:  -- to not the answer the

23  question.  To the extent you can answer --

24             THE WITNESS:  Okay.

25             MS. MACKIN:  -- without providing that

Robert Davis

**66**

information, please do so.

A.    What I recall about that meeting was I did a lot of listening and not a lot of talking.  I think John and the staff attorney mostly spoke.  I might have weighed in as to availability of dates or certain -- or particular spaces or, you know, a general history of, you know, had we had -- someone had asked me had we had this exhibit before, something like that, so . . .

Q.    Who -- who was at that meeting?

A.    I don't recall, but it says here he's asking to meet with Kasey Ellars, myself, and Christopher Currens.

Q.    And was this, in your experience, an unusual meeting?

A.    No.

Q.    And what was the -- what was the result of that meeting?  Any decisions made?

A.    I don't think -- at this first meeting, I don't think there were decisions made.  We might have met again.

Q.    Was there any discussion about whether or not it was appropriate or not to -- to approve a stand-alone nativity?

A.    I don't remember if there was a question as to appropriateness.

Robert Davis

67

1    Q.   Other than availability of dates,

2  substantively was there any discussion about the

3  appropriateness or otherwise, any other substantive

4  discussion regarding the exhibit?

5             MS. MACKIN:  And I'm just going to repeat

6  the attorney-client privilege instruction.

7             THE WITNESS:  Yeah.

8             MS. MACKIN:  To the extent you were

9  receiving the advice of your attorney, to not answer;

10  and to answer to the extent you recall other than that.

11             THE WITNESS:  Okay.

12    A.   I -- the first meeting all -- all I really

13  remember from it was we discussed do we have space

14  available and have they completed the application

15  requirements, which it doesn't -- I mean, this looks

16  like this is just a body of an email so they hadn't

17  actually applied yet --

18    Q.   Okay.

19    A.   -- if I'm remembering correctly.

20    Q.   Were there subsequent meetings, then, to

21  consider the Thomas More application?

22    A.   That -- there certainly would have been.

23    Q.   And do you remember how many meetings there

24  would have been before approval was granted?

25    A.   I don't remember how many.

Robert Davis

**68**

1   Q.   And was there discussion at the subsequent

2  meetings as to the substantive propriety of approving a

3  nativity display?

4            MS. MACKIN:  And I'm going to again

5  repeat the attorney-client instruction, which you know

6  by now.

7            THE WITNESS:  Yeah.

8   A.   I don't remember anything like that so . . .

9   Q.   Do you recall whether there was any discussion

10  as to whether the nativity satisfied the public purpose

11  requirement for a Capitol display?

12  A.   I -- I recall that I would have deferred to

13  John Sneed.

14  Q.   That what?

15  A.   That I would have deferred to John Sneed on

16  having that discussion.  I'm not religious so I

17  don't . . .

18  Q.   Were you party to any discussion, though,

19  within the agency as to whether or not the nativity

20  satisfied the public purpose?

21  A.   Not that I recall.

22            (Exhibit 10 marked)

23  Q.   Exhibit 10, does that appear to be the -- the

24  actual 2014 application, then?

25  A.   Without its sponsorship form, yes.

Robert Davis

69

1    Q.   And eventually there was a sponsorship

2    provided.  Correct?

3    A.   Yes.

4    Q.   And what did -- what did the Thomas More

5    Society indicate was the -- the public purpose?

6    A.   Citizen's exercise of free speech.

7    Q.   And was there any discussion within the agency

8    about that particular stated purpose?

9    A.   I'm sure there was, but I don't recall.  I

10   don't recall what was discussed.  And like I said, some

11   of this -- quite a bit of it probably went above my pay

12   grade, as they say.

13   Q.   When you were processing this application, did

14   you note that as -- that particular description of

15   purpose?

16   A.   Yes.

17   Q.   And in fact, the Thomas More Society was --

18   was actually lobbying for approval of their nativity

19   display on the basis that this was a First Amendment

20   right.  Correct?

21              MS. MACKIN:  Objection, form.

22   Q.   Is that correct?

23   A.   It seemed like it, yes.

24   Q.   And in terms of citizens' exercise of free

25   speech, what did -- did that mean anything to you as

Robert Davis

70

1   you processed this application?

2       A.    I mean, like I said, I'm not religious, so it

3   seems like somebody who, you know, believes they're

4   exercising their free speech by displaying a nativity

5   scene.  You know, I -- I'm not really sure.

6       Q.    Okay.  In terms of exercising citizens' rights

7   of free speech, in terms of the Capitol space that you

8   oversee, basically, was that consistent with your

9   understanding, then, of -- of the use of that space?

10      A.    Yeah.  We get a lot of exhibits that are --

11  that's -- that's their purpose.

12      Q.    That what?

13      A.    We have a lot of exhibits that that is their

14  purpose as well.

15                  (Exhibit 11 marked)

16      Q.    Exhibit 11, is that -- is that a document that

17  you're familiar with?

18      A.    Yes.

19      Q.    And can you identify it for us, tell us what

20  it is.

21      A.    It's an internal cover sheet that I put on

22  every event and/or exhibit application.  The

23  application that is sponsored and approved is stapled

24  to the back.  This cover sheet is usually color-coded.

25  In this instance for an exhibit it would be pink; that

Robert Davis

**71**

1  way, if I'm thumbing through the files, I get to the

2  pink ones for that date, and it helps me find them

3  easier.  And also obviously I write notes and things on

4  the front of it as well.

5       Q.   So Exhibit 11 includes a handwritten note that

6  says "signage."

7       A.   Uh-huh.

8       Q.   Do you see that?

9       A.   Yes.

10       Q.   And is that your handwriting?

11       A.   Yes.

12       Q.   And this relates to the disclaimer that you

13  were requesting from --

14       A.   I didn't request it from Thomas More Society.

15  I -- that's -- it wasn't mentioned on their application

16  that they were going to have a complementary sign, so I

17  put that as a note that that's just to remind me that,

18  hey, they're going to also have a sign with it.  But

19  that doesn't indicate that I'm requesting a sign from

20  them.  Because Thomas More, their sign, they -- they

21  came to me with that one, and I thought it was a dandy

22  idea.

23            (Exhibit 12 marked)

24       Q.   Is Exhibit 12 the sponsorship form for the

25  Thomas More exhibit?

Robert Davis

**72**

1    A.   It looks to be that.

2    Q.   And again, it states that the purpose of the

3    event is citizen exercise of free speech?

4    A.   Yes.

5    Q.   And again you consider that to be an

6    appropriate public purpose for --

7    A.   Our agency did.

8              MS. MACKIN:   Objection, form.

9              THE WITNESS:   Sorry.

10   A.   Our agency did.

11   Q.   Was there any -- do you recall any discussion,

12   then, with -- with John Sneed or anyone other than

13   counsel as to that -- that citizens' right of --

14   exercise of First Amendment rights?

15   A.   I don't recall anything.   I -- no.   It was --

16   no doubt it was talked about, but I don't recall.

17   Q.   And is it -- is it fair to say that with the

18   Thomas More display as well as other displays, that you

19   make a point that the sponsorship of the -- of the

20   display be separated from the agency itself; in other

21   words, the agency is not the sponsor of the displays?

22   A.   Right.

23   Q.   And that's true of all the displays.   Right?

24   A.   Yes.

25              (Exhibit 13 marked)

Robert Davis

73

Q.   And Exhibit 13 looks to be an email by
Mr. Currens to someone at the Dallas news.  Is that
correct?

A.   Uh-huh.

Q.   And was there -- do you know anything about
this particular follow-up with -- with the reporter?

A.   No.

Q.   Mr. Currens, though, notes that the Thomas
More Society is the organization responsible for this
exhibit.

        That's consistent with what we were just
talking about, though, that -- that the preservation
board is not the sponsor of any of these displays,
including the nativity?

A.   Any of these ones as applied for.  We do --
our curatorial staff does from time to time do exhibits
that are artifacts from the Capitol on display.  Those
are ours but . . .

Q.   Was there any -- in 2014 was there any -- did
you get any response from the public, from people
complaining or --

A.   I -- I --

Q.   -- complimenting?

A.   I think -- from which year?  2014?

Q.   Yeah, the first year.

Robert Davis

**74**

1    A.    I had a few phone calls.  I would have

2   forwarded those to Mr. Currens.  But they were mostly

3   people saying -- expressing that they were happy about

4   the Texas Capitol finally putting -- having a nativity

5   on display.  I don't recall anyone being outraged on my

6   voicemail.

7    Q.    And did they -- did they say why they were

8   pleased with -- with the display?

9    A.    I don't remember what -- what they said.  I

10   just remember that it was a couple that were pleased

11   about it.

12    Q.    Is it fair to say that -- well, do you -- in

13   terms of the governor's evaluation of the FFRF exhibit,

14   have you ever been -- has anyone ever asked you

15   whether -- whether or not you agree or disagree with

16   the governor's position?

17    A.    I'm sure -- anyone at the preservation board

18   or just my wife, for instance?

19    Q.    Well, how about your wife?

20    A.    Oh, she -- she definitely doesn't agree with

21   the governor's position on the nativity scene.  But

22   that doesn't affect my job.

23    Q.    I understand.

24    A.    Okay.

25    Q.    But with regard to your position at the

Robert Davis

**75**

1    preservation board, has -- has anyone asked you whether

2    you agree or disagree with the governor's position?

3         A.   No, I don't recall anyone asking me about

4    that.

5         Q.   Do you know whether -- has Mr. Sneed -- or did

6    Mr. Sneed ever indicate that he agreed or disagreed

7    with the governor's --

8         A.   I don't remember if he -- if he said that or

9    not --

10        Q.   Was --

11        A.   -- to me.

12        Q.   Go ahead.

13        A.   I don't remember if he had said that to me or

14   not.  I . . .

15        Q.   Was there any reaction to the removal of the

16   FFRF display that you became aware of?

17        A.   I -- I think there was an email or two that

18   came into the Capitol Events email repository and, you

19   know, some people expressing displeasure about that.

20        Q.   And there was a fair amount of media coverage

21   of the event -- of that action.  Correct?

22        A.   Of the --

23        Q.   Removal.

24        A.   -- exhibit being removed?  There was media

25   coverage.  I -- yeah.

Robert Davis

**76**

1    Q.    Was there media coverage of the -- the display

2    of the nativity scene in 2014?

3    A.    I believe there was.

4    Q.    And do you recall that the -- the sponsors of

5    the -- of the display indicated that their purpose was

6    to put Christ back in Christmas?

7              MS. MACKIN:  Objection, form.

8    A.    I didn't -- the purveyors of the display --

9    would they make that announcement to the media?  Is

10   that what you're --

11   Q.    Right.

12   A.    -- asking?

13   Q.    Yes.

14   A.    I don't know.  I --

15   Q.    Okay.

16   A.    -- don't watch the news very often.

17   Q.    What is your understanding of how the nativity

18   satisfies the public purpose requirement for the -- of

19   the preservation board?

20             MS. MACKIN:  Objection, form.

21             THE WITNESS:  I'm still answering this?

22             MS. MACKIN:  Yes.

23             THE WITNESS:  Okay.

24             MS. MACKIN:  I'm sorry.  Answer unless I

25   instruct you not to.

Robert Davis

77

1          THE WITNESS:  Okay.

2      A.    My understanding, apart from, you know, the

3  citizen exercise of free speech, it does seem like

4  there's a -- always seems to be a public conversation

5  about the role of religion or of the separation of

6  church and state on either side of that conversation.

7      Q.    And in terms of, you know, the general

8  public -- direct interest of the general public and

9  those types of considerations, how -- do you have any

10 understanding how -- how the nativity -- I mean, did

11 you consider any of those aspects when you and -- and

12 others at the agency decided to approve the nativity

13 display?

14          MS. MACKIN:  Objection, form.

15     A.    I -- I might have considered them.  But, you

16 know, my opinion about religion doesn't matter.  You

17 know, the -- as an agency we approved that display.

18     Q.    Okay.  But -- but certainly it's a -- it's a

19 Christian display, though.  Correct?

20     A.    I guess so, yeah.

21     Q.    Pardon?

22     A.    I think so, yes.

23     Q.    Okay.  With regard to artwork that's

24 displayed, you talked about schools.  And there are

25 other -- there are adult organizations that also

Robert Davis

78

1    have -- display artwork.  Is that correct?

2         A.    Yes.

3         Q.    And when -- when you approve that type of --

4    of display, do you review the artwork that's going to

5    be displayed before -- before it's approved?

6         A.    Sometimes.  But mostly I want to see samples

7    to gauge logistical details of --

8         Q.    What?

9         A.    Logistical details, if it's something that's

10   going to scratch the historic flooring or it doesn't

11   appear to be freestanding.  That's usually when I want

12   to see samples.  As far as their art, I don't -- I

13   don't ask -- really ask to see that.

14        Q.    Do any of the artists, as far as you know,

15   whether they be adults or students, ever include

16   sensitive or controversial subject matter?

17        A.    I suppose.  It -- but it depends on who -- I

18   can't be in everybody's head to try and figure out what

19   some member of the legislature who walks by would find

20   to be sensitive.  But we sometimes have things like

21   that, where if it's student art and if it's, you know,

22   a nude or something like that.

23        Q.    Have you ever rejected an application or asked

24   particular artwork not be included?

25        A.    No.  I mean, we're not -- we're not sensors

Robert Davis

**79**

1    so -- but they have to obtain sponsorship, and so

2    that's -- that's typically where they're going to have

3    that --

4        Q.    They're what?

5        A.    They have to obtain sponsorship, and that's

6    typically going to be where that conversation is had

7    about what's appropriate.  Because a member, by

8    sponsoring it, they're providing an additional measure

9    of accountability with their own name on it.

10                   MR. BOLTON:  What am I on?  14?

11                   THE REPORTER:  (Nods head.)

12                   (Exhibit 14 marked)

13       Q.    Do you recall Exhibit 14 as an application

14   that went through the channels of the preservation

15   board?

16       A.    Yes.

17       Q.    And this was -- who was the applicant?

18       A.    Oh, the applicant is the Our Lady Queen of

19   Peace school art department, roughly.

20       Q.    And --

21       A.    Queen of Peace Catholic school.

22       Q.    Is there a stated purpose for -- what -- first

23   of all, what were they going to be displaying?

24       A.    A quilt with squares created -- created by

25   first grade from van Gogh paintings.

Robert Davis

80

1   Q.   And is there a stated purpose in any of the

2  documents that you see with regard to that display?

3   A.   Not on this application.  They did not state a

4  public purpose.

5   Q.   Do any of the pages in that exhibit indicate a

6  public purpose?

7   A.   I -- I believe this here, in the

8  description -- I believe that suffices.  At least it

9  tells me that it's -- it's safe enough and that it's

10  student art.

11   Q.   On the second page of -- of that exhibit, of

12  Exhibit 14 --

13   A.   The second page?

14   Q.   I think so.

15   A.   Yeah.

16   Q.   Does it say -- is there -- for purpose of

17  event, is there -- does it say Catholic Advocacy Day?

18   A.   Uh-huh.

19   Q.   And did you -- do you consider that to be an

20  appropriate public purpose?

21   A.   They -- yes.  That is a -- it's a separate

22  event.  The -- I believe it's the Diocese of Texas do a

23  Catholic Advocacy Day every session, and this -- Our

24  Lady Queen of Peace school, they always line up a

25  student art display on the same day.

Robert Davis

1   Q.   In terms of Catholic advocacy as a general

2   public purpose, is that, again, something that would --

3   the general public, the public as a whole, would have a

4   direct interest in?

5                MS. MACKIN:   Objection, form.

6   A.   I don't really know general -- the public at a

7   whole.

8   Q.   And again, in terms of making that

9   determination, is it fair to say that you didn't

10  consider deciding that there wasn't -- that it didn't

11  have broad enough appeal -- you didn't consider that

12  was something that was part of your -- your job to

13  determine.  Is that correct?

14  A.   I'm sorry.  Can you say that again?

15  Q.   Well, did you consider deciding whether or not

16  Catholic advocacy has sufficiently broad enough direct

17  public interest, that that really wasn't something that

18  was within the purview of your job to determine?

19  A.   I don't -- I don't -- I don't really know.

20  Q.   Is it fair to say that it isn't something that

21  you regularly took into consideration in making

22  decisions?

23  A.   This was 2013.  I might not have made this

24  decision by myself.  I don't -- or as far as the -- as

25  far as the display, you know, I -- I may have made this

Robert Davis

82

1    decision to approve this one on my own.  But as far as

2    Catholic Advocacy Day as a whole, I mean, that's

3    something I'll generally talk to our superior --

4    supervisors about, executive staff.

5         Q.   With regard to the nativity scene, then, was

6    that -- was that handled as a -- in terms of the

7    approval process, a more complicated approval process

8    because of the substance of the -- of the display?

9         A.   I -- I think so.

10        Q.   Pardon?

11        A.   I think so.

12        Q.   What was the last one there?  14?

13        A.   14.

14                  (Exhibit 15 marked)

15        Q.   The -- Exhibit 15, then, is that -- do you

16   recognize that as --

17                  MR. BOLTON:  Did I give you one?

18                  MS. MACKIN:  (Moving head up and down.)

19                  MR. BOLTON:  Okay.

20        Q.   Do you recognize that as paperwork associated

21   with a display application?

22        A.   Yes.

23        Q.   And would you have been involved in -- would

24   you have been involved in this particular --

25        A.   I --

Robert Davis

83

1    Q.    -- approval?

2    A.    I don't recall this particular application.

3  But the -- well, I don't recall this particular

4  application, but if the install date was February 9th,

5  2013, I would have been involved.  If the install date

6  was 2012, as indicated on the second page here, then I

7  wouldn't have been.

8    Q.    Do you have any recollection of -- of this

9  particular display?

10   A.    I don't recollect this particular one.

11   Q.    It indicates on the -- on the second page of

12 the -- of the exhibit that the purpose of the exhibit

13 is to connect college students with established

14 organizations that promote conservative values.  Do you

15 see that?

16   A.    Uh-huh.

17   Q.    And the -- the exhibitor -- the exhibit's --

18 the sponsoring organization is the Young Conservatives

19 of Texas Foundation.  Do you see that?

20   A.    Uh-huh.

21   Q.    Is that -- in terms of promoting the -- the

22 public purpose, is that -- do you think that that

23 satisfies the criteria for the preservation board?

24   A.    Well, it's open to all the public so --

25   Q.    Okay.

Robert Davis

**84**

1    A.    -- yeah.

2    Q.    So in terms of having a direct public interest

3 in the matter and -- and, you know, benefiting the

4 public at large, in terms of how you would apply the

5 preservation board's rules, this would -- this would be

6 within the scope of their rules for approval?

7    A.    We approved it.  Do you have -- do you have

8 other -- I mean, we -- this wasn't one that we

9 approved.  Do you have documentation that shows that we

10 approved this?  I believe that we probably did but --

11    Q.    Well, let me ask this.  In terms of -- if --

12 if this application came to you now, I mean, and you

13 were dealing with it, would you -- I mean, as you apply

14 the rules and the criteria for the preservation board,

15 would you have any problem with this application?

16    A.    I mean, if it's -- you know, the gallery that

17 they're applying for is open to the public and it was

18 sponsored and the dates are available, the logistics

19 line up, then, yeah, I would say this would be

20 something we would approve.

21    Q.    And obviously not all members of the public --

22 well, would this be at all sensitive or controversial?

23    A.    I would consider this -- I would think this

24 would warrant me asking my direct supervisor about it,

25 possibly even going further.

Robert Davis

**85**

1    Q.   Certainly not -- not everybody in Texas is --

2    is -- is a conservative.

3    A.   Right.

4    Q.   Or -- I mean, in a sense the purpose here is

5    to -- to promote some -- there's a sense of

6    conservative advocacy involved with this application,

7    isn't there?

8    A.   Yes.

9         MS. MACKIN:  Objection, form.

10   Q.   I've got to -- I've got to tell you, though,

11   that in -- you know, sometimes -- sometimes I can be

12   too serious.  And I've got to tell you in advance that

13   this particular application brought a little bit of a

14   smile to my face, but I'll ask you about it as soon as

15   I get this sticker off here.  Let's see.

16        (Exhibit 16 marked)

17   Q.   Would you have been -- and what did I -- what

18   did we put on that one?  Exhibit --

19   A.   16.

20   Q.   -- 16?

21        Would you have been involved in the

22   approval of this particular --

23   A.   Yeah.

24   Q.   -- application?

25   A.   I remember this one.

Robert Davis

86

1    Q.    Pardon?

2    A.    I remember this one, yes.

3    Q.    And this was by what organization?

4    A.    Texas Chiropractic Association.

5    Q.    And what is the stated purpose of this

6    particular display?

7    A.    Their stated purpose is to give free massages

8    to those who work at the Capitol, but I distinctly

9    remember having a conversation with Mr. Darby that they

10   would have to have it open to everyone at the Capitol.

11   Q.    Okay.

12   A.    Yeah.

13   Q.    But again, there's a -- there's a certain

14   element of advocacy by the -- by chiropractors with

15   regard to this display.

16   A.    Uh-huh.

17   Q.    Is that correct?

18               And in fact --

19   A.    I would also add I think this is one where in

20   follow-up with some of my supervisors, we would

21   probably not approve this for that space in the north

22   gallery anymore.  It would be something we would steer

23   towards the conference center, just because it's a

24   little more private to give somebody a massage in a

25   room rather than in an exhibit space but --

Robert Davis

1      MS. MACKIN:  It's an art installation.

2      Q.   Is it fair to say, though, that a lot of these

3  applications relate to fairly specific interests in

4  terms of the chiropractors or Realtors or -- or

5  particular schools wanting to promote their students?

6      A.   Right.

7      Q.   And -- and as long as you can associate their

8  purpose as being some -- basically legitimate, you

9  associate that, then, with -- as long as the public

10 had -- with a broad public interest and benefit to the

11 public?

12     A.   Well, they're expressing themselves to the

13 public.  If the public doesn't hear them or want to

14 listen, that's not under my control but . . .

15             (Exhibit 17 marked)

16     Q.   Exhibit 17, is that an application that you --

17     A.   Uh-huh.

18     Q.   -- were involved with?

19     A.   Uh-huh.

20     Q.   And the applicant there was -- was what

21 organization?

22     A.   The Texas Association of Interior Design.

23     Q.   And what was their public purpose?

24     A.   It's to promote interior designers, but not

25 any particular firm, just promote the aspects of

Robert Davis

**88**

1   interior design.  To educate, if you will.

2   Q.   Okay.  Is it fair to say that -- that as you

3   go -- as this process has been implemented and applied

4   by the preservation board in terms of the -- the broad

5   public at large, public interest, and benefiting, you

6   know, the public at large, is it fair to say that the

7   preservation board has not really scrutinized

8   applications with a lot of detail in terms of whether

9   or not that criteria is satisfied?  If somebody --

10  if -- if an application seems to -- if you think it's a

11  good -- good purpose or -- or organization, you

12  approve.  Is that a fair statement?

13           MS. MACKIN:  Objection, form.

14  A.   If I think their -- if I think their

15  application complies with our rules, then, you know, it

16  would have my vote to approve.  It would be approved.

17  Q.   And at least prior to -- have you and

18  Mr. Sneed disagreed in the past on -- on applications?

19  A.   I'm sure we have.

20  Q.   Pardon?

21  A.   I'm sure we have.

22  Q.   Do you recall any in which -- I mean, you

23  can't recall any application that's actually been

24  denied, can you?

25  A.   Applications that have been denied?

Robert Davis

89

1      Q.   Yes.

2      A.   We've denied a couple, yeah.  Like I said,

3  though, usually, you know, the initial contact, if it's

4  a phone call, the -- the person who is inquiring will

5  receive information from me about, you know, our rules

6  up front, or they'll be frank with me about what

7  they're trying to do.  And, you know, they -- the

8  potential applicant will decide at that point if they

9  want to pursue it further.  So a lot of times by the

10  time they actually get to completing an application

11  and -- and obtaining sponsorship, you know, the writing

12  is on the wall that they're --

13      Q.   Is -- have you and Mr. -- well, can you recall

14  any -- any instance specifically where you and

15  Mr. Sneed disagreed on whether or not an application

16  should be approved or not?

17      A.   I don't -- I mean, I don't remember because,

18  you know, he's my executive -- or was my executive

19  director.  You know, if he said something, that's --

20  you know, he's the boss.  So I -- it's not like we

21  would have gone back and forth and I would have said,

22  "Oh, no, please, Mr. Sneed, I -- I really do think I

23  have a point on this one," or something.  I wouldn't --

24  that wouldn't happen.  He's the boss, right?

25      Q.   Right.  Your wife would not approve of that

Robert Davis

90

1    discussion.

2              With regard to Mr. Sneed's letter in

3    August of 2016 regarding FFR, did you -- did he discuss

4    that letter with you before he sent it out?

5        A.    No.

6        Q.    Did he ask for any input from you in terms of

7    the substantive part, other than the -- other than the

8    scheduling issues?

9        A.    That would have been -- that would have been

10   the extent of what he would have asked me about, what

11   actually is the availability.  But I didn't see the

12   letter or see any drafts of it or anything like that.

13              (Exhibit 18 marked)

14       Q.    And then Exhibit 18, is that an application

15   that you're -- that you're --

16       A.    Uh-huh.

17       Q.    -- familiar with?

18              And who was the sponsor or the

19   organization that was going to be displaying that?

20       A.    The organization displaying was the Texas For

21   Responsible Marijuana Policy Education -- or Texas For

22   Responsible Marijuana -- Texas NORML.  I'm -- I'm

23   flaking on what their acronym means but . . .

24       Q.    Is it fair to say that -- well, first of all,

25   not everyone's in favor of legalization of cannabis.

Robert Davis

**91**

1   Is that correct?

2        A.   I would say probably that's a -- yeah,

3   that's --

4        Q.   And this is an organization that advocates for

5   at least some forms of legalization of -- of marijuana.

6   Correct?

7        A.   Right.

8        Q.   And again, so it's -- it's essentially an

9   advocacy group.  Right?

10       A.   Uh-huh.

11       Q.   And did you -- did you approve that

12  application?

13       A.   I -- I'm sure I probably did.

14       Q.   Was that an application that was considered

15  controversial, if you recall?

16       A.   I mean, it's -- it's controversial.  I don't

17  remember the first time I saw an application from Texas

18  NORML.  They're here quite a bit.  But maybe the first

19  time that they applied I would have asked someone if

20  this -- you know, are we -- is this, you know, safe to

21  proceed or whatever.  But . . .

22       Q.   In terms of satisfying the public purpose

23  criteria that you apply, though, you don't have any --

24  any reservations about that particular application, did

25  you?

Robert Davis

92

1      A.   I don't think so.  I mean, there's a

2   discussion all -- everywhere all the time about this

3   issue, and -- and it's -- the public is aware of it, I

4   would say.

5      Q.   Do you recall any -- any displays other than

6   the FFRF display by atheists or agnostics or

7   free-thinkers?

8      A.   I don't think they've applied.  We have

9   approved Buddhist exhibits before.

10      Q.   You've what?

11      A.   Buddhist exhibits.

12      Q.   Uh-huh.

13      A.   I don't think I've had a Hindu exhibit, but we

14   have had events with the -- with the Hindu community

15   and other religions other than Christianity.

16      Q.   Did -- do you know how -- how the FFRF display

17   came to the governor's attention?

18      A.   I do not, no.

19      Q.   Does the governor's objection to the FFRF

20   display -- did that surprise you?

21      A.   Not -- not particularly.

22      Q.   Did the governor have -- why -- why not?

23      A.   I mean, just putting two and two together,

24   he's a conservative guy.  I mean, that's how he ran.  I

25   think he's probably also a pretty faithful religious

Robert Davis

93

1   person himself.  So I just imagine --

2       Q.   Were you --

3       A.   I imagine that's how it came to his attention.

4       Q.   Were you aware, at least from media sources,

5   that the governor has promoted and supported public

6   displays of -- religious displays, nativity displays,

7   not necessarily in the Capitol but in other --

8   courthouse displays and things like that?

9            MS. MACKIN:  Objection, form.

10      A.   I'm not really aware of any of that.

11      Q.   Has anybody -- and again, we'll exclude your

12  wife from this discussion.  Has anybody, whether

13  preservation board contact or just other -- other

14  people, indicated to you that -- that the governor's

15  objection to the FFRF display -- that that would be

16  something that they would expect, given the reputation

17  of the governor?

18      A.   I'm sure that I had those discussions with

19  friends or something.  But it didn't occupy a ton of my

20  time.

21      Q.   Pardon?

22      A.   It didn't occupy a ton of my time.

23           (Exhibit 19 marked)

24      Q.   Now, Exhibit Number 19 is a painting that has

25  not been displayed in the Capitol, but it's a painting

Robert Davis

**94**

1   by -- and I don't recall the specific artist now, but

2   by -- by a reputable artist.  If this applic -- if this

3   painting came to you or applicant -- person doing an

4   application for a display in the Capitol, in light of

5   the governor's objection to FFRF, would you consider

6   that this painting, Exhibit Number 19, would be

7   something that would be approved or not?

8                   MS. MACKIN:  I'm going to object to this

9   exhibit, if -- unless the witness has seen it before,

10  and also to the form of this question.  But you can

11  answer.

12       Q.   Have you seen it before?

13       A.   I've never seen this before.

14       Q.   Okay.  Can you look at it now?

15       A.   Yes.  I -- I couldn't speculate as to whether

16  we would approve this or not approve it.  They'd have

17  to fill out an application.

18       Q.   Pardon?

19       A.   They would have to fill out an application.

20       Q.   Okay.

21       A.   It could be 30 feet tall and wouldn't fit in

22  the Capitol.

23       Q.   Okay.  But just in terms of the subject -- the

24  subject matter, would you consider that this would be

25  objectionable?

Robert Davis

95

1    A.   You're asking my opinion about what I find

2  objectionable?

3    Q.   Well, your -- your opinion as someone -- as

4  the events and exhibits coordinator for the State

5  Preservation Board.

6    A.   I mean, if it were to receive sponsorship, we

7  might review it, but it would -- I mean, I would

8  consider it to be -- if an application like this hit my

9  desk, I would consider it to be sensitive enough to

10  warrant a discussion -- an internal discussion.

11    Q.   Are there any lessons or principles that

12  you've derived from the governor's objection to the

13  FFRF display that now inform how you approach

14  applications?

15    A.   Sure.  Any -- anything approaching religion or

16  freedom from that, I would consider -- I would want to

17  consider additional input from other sources within our

18  agency.

19    Q.   And --

20    A.   It's -- it's heightened my awareness about a

21  lot of applications since then.

22    Q.   Is there anything in -- I can't remember what

23  number -- one of the earlier exhibits, the -- the

24  rules, the applicant --

25    A.   Uh-huh.

Robert Davis

1    Q.   It was a four-page exhibit.  It had a two-page

2    application and then two pages of --

3    A.   Right.

4    Q.   -- of your rules.

5         Is there -- is there anything in those

6    rules that -- that you construe to prohibit humor or

7    satire?

8    A.   I mean, the closest thing I could see that

9    would prohibit humor or satire would be the public

10   purpose guideline.

11   Q.   And is there a -- now, the governor -- is it

12   fair to say that the governor -- that the governor

13   considered the FFRF display to be offensive?

14   A.   I don't --

15        MS. MACKIN:  Objection, form.

16   A.   Yeah, I don't know the governor.  Never met

17   him.  I don't know what he finds offensive.

18   Q.   Is there any sort of -- putting the -- the

19   governor aside, in terms of how the agency has

20   generally approached the application of -- or the

21   processing of applications, recognizing that you're not

22   a sensor and that you allow diverse viewpoints to be

23   expressed in -- in Capitol displays, is there any --

24   have you previously applied any sort of test for

25   offensiveness when evaluating applications?

Robert Davis

1    A.    I'm not recalling anyone getting that far with

2    an application.  Like I said, if it hasn't been

3    sponsored, there's no point in me looking at it to

4    review for approval.  So, you know, if somebody submits

5    something that's really offensive, they're probably not

6    going to get a sponsor because the members are trying

7    to, you know, keep a finger on the pulse of what

8    they're sponsoring from their constituents.

9    Q.    Certainly after this display was up in the

10   Capitol for four days or so, you were not bombarded

11   with complaints from the public that they were offended

12   by it.  Is that correct?

13   A.    I didn't hear word one about that display from

14   anybody.  I don't think there were headlines made

15   when -- the day it was installed, didn't get a pat on

16   the back from anybody saying thanks or didn't get an

17   angry phone call.

18   Q.    And finally, just in terms of how the process

19   went, you said that there were -- that there were

20   apparently meetings within the -- the preservation

21   board to consider that application.

22   A.    Uh-huh.

23   Q.    In terms of interaction with the FFRF people,

24   were you the sole contact with FFRF on that

25   application?

Robert Davis

1    A.   As far as I know, yeah.

2    Q.   And again, I'm talking about the --

3    A.   From our agency, yes.

4    Q.   Right.  I'm talking about the 2015 rather than

5    the 2016 application.

6    A.   Okay.  Yeah.

7    Q.   And a fellow by the name of Sam Grover was

8    your contact?

9    A.   Yes.

10   Q.   And my impression is that -- that you both

11   found each other easy to work with?

12   A.   Yeah.

13   Q.   I can tell you that he found you to be --

14   A.   I --

15   Q.   -- cooperative.

16   A.   I thought we had a very professional rapport.

17   I -- yeah, he -- he seemed to be very easy to work

18   with.

19   Q.   Okay.  That's all I have.  Okay?  And it's not

20   even 3 o'clock yet.  Thanks -- thanks for your patience

21   today.

22   A.   Okay.

23            THE WITNESS:  What do you want to do with

24   these?

25            MS. MACKIN:  I'm just going to have a

Robert Davis

**99**

1    couple --

2                    THE WITNESS:  Okay.

3                    MS. MACKIN:  -- questions for you.

4    But --

5                    MR. BOLTON:  I tried to get you out of

6    here.

7                    MS. MACKIN:  I won't be long, I promise.

8    Do you -- do you want to take a quick break --

9                    THE WITNESS:  No.

10                   MS. MACKIN:  -- before we --

11                   THE WITNESS:  No.

12                   MS. MACKIN:  -- get into it?  All right.

13                   THE WITNESS:  No.  Let's get it over

14   with.

15                   MS. MACKIN:  Get right into it.  I'd also

16   like to make sure we request our read and sign on the

17   record.

18                   MR. BOLTON:  And before you go, most --

19   most important -- because I'm the worst offender --

20   she's got to make sure she's got all the exhibits

21   before any of us leave this room.

22                   THE WITNESS:  Okay.  So I'm not keeping

23   these, I guess, then.

24                   MR. BOLTON:  They usually end up -- I'm

25   usually the problem.

Robert Davis

100

EXAMINATION

BY MS. MACKIN:

Q.   Okay.  So I just want to make sure we get the tail -- the timeline nailed down.

A.   Okay.

Q.   So the first time that you heard from the Freedom From Religion Foundation about displaying an exhibit in the Capitol was in 2015?

A.   Yes, I believe so.

Q.   Okay.  And that would have been an email, maybe?

A.   I thought -- my recollection -- and I -- I've had 1600 events or exhibits since then so I don't remember every detail.  But my recollection is that Sam Grover had called me first.

Q.   Okay.

A.   But I could be completely wrong.  I'm just speculating on my own memory.

Q.   Okay.  And then I'm going to go ahead and introduce a couple of exhibits.

A.   Okay.

          (Exhibit 20 marked)

Q.   So the first application --

A.   Okay.

Q.   Does that -- does that look like the first

Robert Davis

101

1   application that you received?

2       A.   It does look like the first application so far

3   that I received.

4       Q.   And how do you recognize it as such?

5       A.   The mention that they -- their intended

6   sponsor would be Representative Elliott Naishtat tells

7   me that this was the first application they had

8   submitted to our office.

9       Q.   And why is that significant of Representative

10  Naishtat?

11      A.   Because Representative Naishtat's office

12  called me and said that they -- they said, "Have you

13  seen the -- the display materials?"  And my

14  recollection is that I had not even seen the

15  application at all, because I believe I -- my first

16  contact had been a phone call with Sam Grover, is what

17  I recall.

18              And as is common, potential applicants

19  will send the application to a member of the

20  legislature before I see it.  They want to get their

21  sponsorship, everything tied up, before they send it

22  along to me.  So when Naishtat's office called me and

23  said, "We" -- she -- she said in a nutshell, "We're not

24  going to sponsor this."  And I said, "Well, I haven't

25  seen it yet."  And -- and so I -- I recall that she

Robert Davis

**102**

1  forwarded it on to me -- forwarded it on to me.

2      Q.  When you said she said, "We're not going to

3  sponsor this," who are you referring to?

4      A.  Judith Dale, who was his staffperson at that

5  time.

6      Q.  Did she say why?

7      A.  She and I would always speak very casually,

8  and I think she just said, "Elliott's not going to go

9  for this because of the sign," which is the -- the

10  original banner signage that they had accompany the

11  display.

12      Q.  And that would be the sign displayed on --

13      A.  It's on --

14      Q.  -- the fourth page of Exhibit 20?

15      A.  Yes.

16      Q.  Okay.  What does that sign say?

17      A.  "At this season of the Winter Solstice, let

18  reason prevail.  There are no gods, no devils, no

19  angels, no heaven or hell.  There is only our natural

20  world.  Religion is but myth & superstition that

21  hardens hearts and enslaves minds."  And then it says

22  "Freedom From Religion Foundation, FFRF.org."

23      Q.  And what are the dimensions?

24      A.  Seven feet wide by four feet tall.  Doesn't

25  give a width.

Robert Davis

**103**

1    Q.    Okay.  Had you ever in your time at the

2  preservation board seen an exhibit application like

3  this?

4    A.    Not -- no, not particularly.  I mean, the

5  closest to something like this would have been the

6  Thomas More one that came in a year before, just in a

7  sense of, you know, how sensitive it is.

8    Q.    Okay.  What --

9    A.    But I had never seen a Freedom From Religion

10  or atheist exhibit display application or anything like

11  that before.

12    Q.    Okay.  Had you ever seen an application that

13  referred to -- that used words like "enslaves" or

14  mentions superstition?

15    A.    No, I had not.

16    Q.    Now, we already looked at -- let's see -- the

17  application that I believe ultimately was approved.

18  And that would be Exhibit 4.  If I can turn you back to

19  that?

20    A.    Exhibit 4?  Sorry.

21    Q.    Yes, please.  That's all right.

22    A.    Just keep expecting people will hand me the

23  stuff and not have to go through my own pile.

24    Q.    You're getting spoiled.

25    A.    Okay.  Exhibit 4.

Robert Davis

**104**

1    Q.   And so down at the bottom of the first page it

2    says that the display will include a banner which will

3    read "Happy Winter Solstice.  At this season of the

4    Winter Solstice, we honor reason and the Bill of Rights

5    (adopted December 15, 1791).  Keep State & church

6    separate.  On behalf of Texas members of the Freedom

7    From Religion Foundation."

8              Is that -- did I read that correctly?

9    A.   Yes.

10   Q.   And is that the sign that ultimately

11   accompanied the exhibit that was displayed in the

12   Capitol?

13   A.   I believe so.  That's -- I believe that

14   language was included on that sign.

15   Q.   Okay.  So the revised application it looks

16   like was submitted on July 7th, 2015, and then it was

17   approved on July 20th, 2015?

18   A.   The submission date on this one signed by Sam

19   Grover is the July 20th.

20   Q.   Okay.

21   A.   It looks like I made -- I -- it looks like I

22   wouldn't have approved it until August 4th, based on my

23   little note here just cleaning up the dates.

24              MR. BOLTON:  Can you -- for purposes of

25   the record, can you give some sort of description

Robert Davis

**105**

1  where -- what you were referring to in terms of the

2  notation.

3       A.   I have -- I have -- the original dates they

4  had applied for were December 21st through December

5  25th.  And we -- the Capitol's closed on the 24th and

6  25th and we don't display on those days.  So I

7  articulated that to Mr. Grover and -- but then I said,

8  "Hey, I've got some dates on the front end so we'll --

9  we'll just push the whole thing forward by a few days."

10 He was agreeable to that, and I just made that change

11 with a pen here and initialed and dated that change.

12 So that looks to me like it says 8/4, August 4th, which

13 that would have probably been the date that it was

14 approved and put on our calendar.

15      Q.   Okay.  Thank you.

16           And then -- so you also received an

17 application in 2016 from the Freedom From Religion

18 Foundation.

19      A.   That's right.

20      Q.   Is that correct?

21      A.   Yes.

22      Q.   Is the document that I'm marking Exhibit 21 a

23 copy of that application?

24           (Exhibit 21 marked)

25           MR. BOLTON:  What number?

Robert Davis

**106**

1          MS. MACKIN:   21.   I'll give you a copy in

2     one second.   I thought we were going to take a break

3     and I could get all my documents organized.

4          A.   Yes.   This looks like the 2016 application.

5          Q.   Okay.   And you mentioned that you received

6     that, and then you went and talked to the board's

7     attorney?

8          A.   Yes.

9          Q.   And when you received Exhibit 21, had Freedom

10    From Religion Foundation already sued the board and

11    Governor Abbott?

12         A.   I believe that was the case, yes.

13         Q.   So is that why you would have gone to talk to

14    your attorney?

15         A.   Yes.

16         Q.   All right.   So Mr. Bolton asked you a bunch

17    about the public purpose requirement that is applicable

18    to Capitol exhibits and kind of the standards under

19    that public purpose requirement.   And if you would

20    refer back to Exhibit 1, please.

21         A.   Okay.

22         Q.   Which attaches, at the third and fourth pages,

23    at least the May 2012 version --

24         A.   Yes.

25         Q.   -- of the policy for exhibits in the ground

Robert Davis

**107**

1  floor rotunda and the Capitol extension.  Is that

2  right?

3      A.   Yes.

4      Q.   Okay.  So you testified that you focus on --

5  the first thing you do when an exhibit comes in is you

6  check whether the requested dates are available.

7      A.   Uh-huh.

8      Q.   Correct?

9           And then you mentioned that you also

10 check whether it promotes a commercial enterprise or

11 something like that.

12     A.   Correct.

13     Q.   Correct?

14          And then you mentioned that you also

15 focus on the logistical details.

16     A.   Right.

17     Q.   Is that right?  Okay.

18          So -- you also mentioned that sometimes

19 you'll have conversations with potential state official

20 sponsors if the -- if you have a question about what

21 the exhibit is discussing?

22     A.   I said I will talk to the state official

23 sponsor's office about that?

24     Q.   Uh-huh.

25     A.   Maybe just for clarification if I'm not

Robert Davis

**108**

1   getting enough information from the -- from the

2   applicant.

3        Q.   Okay.

4        A.   I might ask the -- the sponsoring office to

5   clarify.

6        Q.   You --

7        A.   But that's usually -- it -- still, that's

8   usually in -- you know, what I would call

9   nuts-and-bolts details about when they want to bring it

10  in, how big, you know, has this member's office seen

11  it, do they have any -- you know, pretty much purely

12  logistics.

13       Q.   So it sounds like, then, the -- the

14  conversation about whether an exhibit fulfills a public

15  purpose, as defined in the policy and the

16  administrative code, is usually had between the state

17  official sponsor and the exhibiting organization?

18       A.   A lot of times, yeah.

19       Q.   And that you'll kind of usually defer if a

20  state official sponsor has signed off on the exhibit?

21       A.   Yes.

22       Q.   But if you --

23       A.   As well as events.  Not just exhibits, yeah.

24       Q.   But if you get one that you believe is

25  sensitive, you'll flag it for further review?

Robert Davis

**109**

1    A.    Right, yeah.

2    Q.    So you in your role as the events and exhibits

3    coordinator, then, aren't heavily involved in kind

4    of -- you don't see an exhibit and say, "I'm applying

5    this public purpose requirement"?

6    A.    Yeah, yeah.

7    Q.    It's -- it's kind of -- the check is from the

8    state official sponsor requirement?

9    A.    Yes.

10   Q.    As well as an internal discussion if you

11   notice something?

12   A.    Yeah.

13   Q.    Okay.

14   A.    That's really the idea behind the sponsorship,

15   is that the members will help determine -- the members

16   who may or may not sponsor will help determine the

17   purpose, more streamlined.  I'm often just a

18   facilitator.

19   Q.    What?

20   A.    You laughed.  I thought maybe --

21   Q.    No, I sniffled.

22   A.    Okay.

23   Q.    Sorry.

24            Okay.  And then there was also a little

25   bit of discussion about -- Mr. Bolton showed you some

Robert Davis

110

1    exhibit applications from the chiropractors, the

2    interior designers, normal -- that kind of would

3    involve discussion of policy issues.  Right?

4        A.    Right.

5        Q.    And so there is an exclusion, though, from the

6    public purpose requirement for campaign activities and

7    such.  Right?

8        A.    That's like campaigning for public office.

9    You couldn't have a "vote for me" display.  That's how

10   I understood from day one here at the agency that

11   that's how that was implemented.  Now, we do sometimes

12   check -- with Texas NORML, if they were applying and

13   they had signage all throughout the hallway that said,

14   "Members vote yea on House Bill 1055" or something,

15   that would probably be something we would, you know,

16   try and curtail.  But if they're just raising awareness

17   about issues surrounding cannabis, that's a

18   conversation being had in the public -- within the

19   public, so to me that qualifies but . . .

20       Q.    Sure.  Would your -- okay.  I'd like to turn

21   your attention back to Exhibit 14.  I'd just like to

22   get something a little bit clarified because I wasn't

23   sure I quite understood your testimony.

24       A.    Okay.  Okay.  Exhibit 14?

25       Q.    Yes.  So we have the exhibit application for

Robert Davis

**111**

1   the quilts made with squares created by first grade

2   from van Gogh paintings.

3        A.   Uh-huh.

4        Q.   And the same by junior high.

5        A.   Uh-huh.

6        Q.   And then on page 2 it says Catholic Advocacy

7   Day, OLQP art exhibit.

8        A.   Yeah.

9        Q.   So is Catholic Advocacy Day an event?

10       A.   That is a -- they have a rally on the Capitol

11   grounds.  Like I said, the diocese from all over the

12   state come and they have a Catholic Advocacy Day and

13   they have a big rah-rah rally on the grounds and they

14   talk about issues that are important to the Catholic

15   community.  It's not something that happens, you know,

16   all throughout the building.

17       Q.   And so this application, then, that -- this --

18   what appears to be a Catholic school wanted to have

19   their van Gogh quilts on display on the same day that

20   that exhibit was happening?

21       A.   On the same day as that event, yeah.

22       Q.   But the exhibit itself was not Catholic

23   advocacy.

24       A.   Not -- right.  And they do a choir --

25   sometimes the -- Our Lady Queen of Peace will do a

Robert Davis

**112**

choir performance on the same day as Catholic Advocacy.

They just -- they're a Catholic school.  I guess they

want to be a part of it.  But it's -- if you ask the

people who put on the Catholic Advocacy Day, they'd

probably say, "We don't know those people.  We're not

affiliated with them."  So --

Q.   Okay.

A.   That's something that looks like

Representative Bonnen's office just wrote on there.

Q.   Okay.  I just wanted to clarify what the

actual exhibit was.

A.   Yeah.

Q.   And then you kind of touched on this, but

you -- you were asked about whether there had been

other exhibits like agnostic displays or large secular

displays.

A.   Uh-huh.

Q.   And you testified that there have not.  Is

that right?

A.   Yeah, I don't recall other agnostic displays.

I mean, there's a group that's had events before called

Secular Texas, but they've done like a rally or a press

conference or something.

Q.   Do you recall any applications for agnostic

displays --

Robert Davis

113

1     A.    I don't recall --

2     Q.    -- that --

3     A.    -- anything like that.

4     Q.    Okay.  And Mr. Davis, you're not an attorney.

5  Is that right?

6     A.    That's correct.

7     Q.    And have you attended any law school?

8     A.    No.

9     Q.    Congratulations.

10            You were asked about language on the

11  Thomas More exhibit application where the applicant

12  described the display as a citizen exercise of free

13  speech.

14     A.    Correct.

15     Q.    Do you remember that?

16     A.    Uh-huh.

17     Q.    Okay.  Would -- does that description mean

18  anything to you when you're evaluating the exhibit

19  application -- did it mean anything to you?

20     A.    I don't remember what it -- what it would have

21  meant to me.  I mean, the phrase "citizen exercise of

22  free speech," it sounds like somebody who's -- it

23  sounds like it's put on the application almost as in

24  they're not expecting a "no" answer for -- on approval

25  or not.

Robert Davis

**114**

1    Q.   But your -- your job duties as Capitol events

2    and exhibits coordinator don't involve determining

3    whether something is a citizen exercise of free speech,

4    do they?

5    A.   No.   I think that's usually on the part of the

6    sponsor, or it would be a conversation that would go

7    above my head to the executive director and beyond.

8    Q.   Well, and as a nonattorney, you wouldn't be

9    qualified to make that determination anyway.   Correct?

10   A.   I -- yeah, I would say so.

11   Q.   Okay.   That's all I have.

12   A.   Okay.

13   Q.   Thank you very much.

14            MS. MACKIN:   We'll pass the witness.

15            MR. BOLTON:   Let me just -- do I have

16   just a couple minutes?

17            THE VIDEOGRAPHER:   (Nods head.)

18            MR. BOLTON:   Okay.

19                 FURTHER EXAMINATION

20   BY MR. BOLTON:

21   Q.   To follow up, do I understand your testimony,

22   then, that the preservation board does not actually

23   apply the public purpose criteria in determining

24   whether to approve or -- or disapprove applications?

25   A.   Well, we do.   But as far as my -- as far as

Robert Davis

**115**

1    what I'm looking for when I see an application, it's

2    typically, you know, the commercial promotion or

3    campaign-related activities, something like that.  If

4    the Texas Association for Design says that they believe

5    the public has an interest in interior design, who am I

6    to contradict that.

7         Q.   Okay.  And -- and is it fair to say that you

8    didn't consider that to be your function or role, to

9    deny that?

10        A.   I mean, if I was going to deny an application,

11   I would definitely speak with some people within our

12   agency first.  Like I said, most of the time -- by the

13   time they get to the point in which they've completed

14   an application, they've obtained sponsorship, it's

15   on -- it's on cruise control to being approved in some

16   way, shape, or form except for aesthetic changes,

17   logistic details.

18        Q.   Certainly the government -- the governor

19   involving himself is unprecedented in your experience?

20        A.   It's -- it's not common.  I -- I'm not aware.

21   But he may do that.  You know, he may have done that,

22   or Governor Perry prior to him might have been

23   involved.  I like to think they're paying attention to

24   me.

25        Q.   Now, you said in terms of the exercise of free

Robert Davis

**116**

1   speech, citizens' exercise of free speech, whether that

2   meant anything to you as a -- as a -- as a lawyer.

3   You're not a lawyer, you said.

4       A.    Right.

5       Q.    But you also said that in terms of your role

6   and the role of the preservation board, that you're not

7   sensors.  Is that a -- is that certainly your

8   understanding of your role in the process?

9       A.    That's my understanding of my role in the

10  process.

11              MR. BOLTON:  That's all I have.

12              MS. MACKIN:  I think we made it.

13              THE VIDEOGRAPHER:  It's 1:33, end of tape

14  2.  We're off the record.

15              (DEPOSITION ADJOURNED)

16

17

18

19

20

21

22

23

24

25

Robert Davis

117

CHANGES AND CORRECTIONS

1

WITNESS NAME:  ROBERT DAVIS

2

DEPOSITION DATE:  APRIL 24, 2017

3

Reason Codes:  (1) to clarify the record; (2) to
conform to the facts; (3) to correct a transcription
error; (4) other (please explain).

4

5

6

PAGE   LINE    CHANGE            REASON CODE

7

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Robert Davis

**118**

SIGNATURE

   I, ROBERT DAVIS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page.

_____

ROBERT DAVIS

STATE OF _____

COUNTY OF _____

      Before me, _____, on this day personally appears ROBERT DAVIS, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

      Given under my hand and seal of office this _____ day of _____, 2017.

_____

NOTARY PUBLIC IN AND FOR
THE STATE OF _____

COMMISSION EXPIRES: _____

Robert Davis

119

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
FREEDOM FROM RELIGION           §
FOUNDATION, INC.,               §
     Plaintiff,                 §
                                §
vs.                             §    CASE NO. 1-16:CV-00233
                                §
GOVERNOR GREG ABBOTT, in        §
his official and individual     §
capacities, and JOHN SNEED,     §
Executive Director of the       §
Texas State Preservation        §
Board, in his official          §
capacity,                       §
     Defendants.                §
```

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF ROBERT DAVIS
APRIL 24, 2017

I, Shelly M. Tucker, Certified Shorthand

Reporter in and for the State of Texas, hereby certify

to the following:

That the witness, ROBERT DAVIS, was duly sworn

by the officer and that the transcript of the oral

deposition is a true record of the testimony given by

the witness;

That pursuant to FRCP Rule 30(e)(1) signature

of the deponent was requested by the deponent or a

party before the completion of the deposition;

That the deposition transcript was submitted

to the witness or to the attorney for the witness for

examination and signature and return to me within 30

Robert Davis

**120**

1   days.  If returned, the attached Changes and

2   Corrections page contains any changes and reasons

3   therefor;

4          I further certify that I am neither counsel

5   for, related to, nor employed by any of the parties or

6   attorneys in the action in which this proceeding was

7   taken, and further that I am not financially or

8   otherwise interested in the outcome of the action.

9          Certified to by me this 1st day of

10  May, 2017.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHELLY M. TUCKER, RPR, CRR
Texas CSR 4419 - Expires 12/31/18
DepoTexas - Firm Registration No. 17
1016 La Posada, Suite 294
Austin, Texas  78752
(512) 465-9100