IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., <br>     *Plaintiff,* <br><br> v. <br><br> GOVERNOR GREG ABBOTT AND ROD WELSH EXECUTIVE DIRECTOR OF TEXAS STATE PRESERVATION BOARD, <br>     *Defendants.* | § § § § § § § § § § § | NO. 1:16-CV-00233-SS |

**RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff FFRF's Motion for Partial Summary Judgment should be denied. Doc. 65. Instead, for the reasons set forth in Defendants' Second Motion for Summary Judgment, Defendants are entitled to judgment as a matter of law on all claims that remain in this case.[1] Doc. 66.

## INTRODUCTION

To prevail on summary judgment, FFRF was required to present evidence of viewpoint discrimination.[2] Rather than doing so, FFRF ignores both the factual record and the law of this case.[3] In particular, the Court has determined that the exhibit areas in the Texas Capitol "constitute, at most, a limited public forum." Doc. 38 at 15 (citing, *inter alia*, 13 TEX. ADMIN. CODE §111.13(a)(3)). In a

---

[1] FFRF characterizes its motion as seeking "summary judgment on the remaining issue of viewpoint discrimination." Doc. 65 at 1. But it only discusses how the "issue of viewpoint discrimination" relates to a Free Speech claim. It does not brief, argue, or even *mention* an Establishment Clause claim. *See id.*; Doc. 38 (Order denying 2016 cross motions for summary judgment on Free Speech and Establishment Clause claims, and otherwise granting summary judgment for Defendants). The Court stated that it would apply the *Lemmon* test to FFRF's Establishment Clause claim. Doc. 38 at 20. Because FFRF presents no evidence on any prong of the *Lemon* test, summary judgment on FFRF's Establishment Clause claim should be entered for the Defendants. *E.g., Alton v. Tex. A&M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999) (summary judgment appropriate "[w]here critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."); *cf.* Docs. 65 (no Establishment Clause discussion); 38 at 20 (denying summary judgment under *Lemmon* because "there is a fact issue with regard to whether Defendants' purpose was predominantly secular.")
[2] *See, e.g.,* Doc. 38 at 18, 20; Doc. 66 at 6 (Summary Judgment Standard).
[3] *E.g., Massey v. Novartis Pharm. Corp.*, 46 F. Supp. 3d 688, 691 (W.D.Tex. 2014) ("The existence of a prior ruling invokes the law-of-the-case doctrine, which provides that settled issues will not be revisited during the pendency of a lawsuit.") (citing *In re Ford Motor Co.*, 591 F.3d 406 (5th Cir. 2009)).

1

limited public forum, "the government may restrict speech as long as the restrictions are 'reasonable in light of the purpose served by the forum' and do 'not discriminate against speech on the basis of viewpoint.'" Doc. 38 at 15 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001) (citation omitted); citing *Pleasant Grove City v. Summum*, 555 U.S. 467, 470 (2009); *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010)).

If any evidence of viewpoint discrimination existed, FFRF has had ample opportunity to discover it and present it to the Court. Its failure to do so is dispositive. As set forth in Defendants' Second Motion for Summary Judgment, the evidence shows that FFRF's exhibit was removed for a viewpoint-neutral reason—namely violation of the public purpose requirement. Because this is so as a matter of fact, Defendants are entitled to judgment as a matter of law.

### RESPONSE TO FFRF'S STATEMENT OF FACTS

At the outset, Defendants correct several mischaracterizations of the record presented in FFRF's summary judgment motion.[4] First, FFRF characterizes the removal of its exhibit as motivated by "[t]he Defendants' personal sense of decency and propriety," Doc. 65 at 2. But the record—including FFRF's citations thereto—reflects that the exhibit was instead removed for violating the Texas Administrative Code's public purpose requirement, which undisputedly applies to such exhibits. *See* 13 TEX. ADMIN. CODE §111.13(a)(3).[5]

Second, FFRF states that "Governor Abbott has only ever requested removal of FFRF's display for failing to meet the public purpose requirement, but no other displays." Doc. 65 at 7 (citing

---

[4] In doing so, Defendants do not suggest that these mischaracterizations are necessarily relevant to resolution of this case.
[5] *See also, e.g.,* 2017 Appx. (Doc. 66-1) Tab 3, 30(b)(6) Depo at 59:7-18 ("[T]he office thought that the exhibit or display didn't satisfy the public purpose requirement in the Texas Administrative Code, because it was essentially mocking other people's religious views and was, in that respect, intolerant of other people's viewpoints. And therefore, because it was intolerant of other people's viewpoints, it did not serve the public purpose because the office felt that the public purpose is served by a diversity of viewpoints and not a stunting or mocking of other people's viewpoints. And the exhibit had the effect of mocking viewpoints.")

Reed Dep. at p. 81, L. 13-18).[6] This is misleading, because it omits the fact that there is *no evidence* that any similarly pejorative exhibit has been displayed in the Capitol in the past. *Contra* Doc. 65 at 6 (quoting Reed Dep. at p. 62, L. 7-12). Instead, the record shows that, rather than being incendiary,

> the vast majority of exhibits that the preservation board was asked to review and approve are artwork exhibits from school kids, health-related exhibits from associations like the dental association or Texas Medical Association, just kind of things that you would see all over a community. Information about diabetes, science projects, those are the kind of exhibits that, overwhelmingly, the preservation board was given to review.[7]

This refutes FFRF's attempt to characterize its exhibit as having been treated differently from others like it—there *were* no others like it.

Third, and similarly, FFRF states that "Sneed is unaware of any application for display ever being rejected for any reason, other than on the basis of rules against financial or commercial gain and campaign political advertising." Doc. 65 at 10 (citing Sneed Dep. at p. 54, L. 18- p. 55, L. 55). In this vein, FFRF also states that "Sneed is not aware of any exhibit rejected by the Preservation Board for failure to have a sufficiently educational purpose." Doc. 65 at 11 (citing Sneed Dep. at p. 74, L. 3-7). These statements are misleading to the extent they suggest that any mocking exhibit has been exhibited in the Capitol, or found to satisfy 13 Texas Administrative Code §111.13(a)(3)—either in its educational aspect or otherwise. As the testimony quoted above shows,[8] FFRF's exhibit was not removed because it expressed a different viewpoint from other exhibits, but because it was wholly different in kind from exhibits of a public purpose.

---

[6] *See also* Doc. 65 at 8 ("Governor Abbott's Office does not know of any other instance in which the Governor's office has been involved in the removal of an exhibit or display from the Capitol, except the FFRF display.") (citing Reed Dep. at p. 91, L. 23-25).
[7] 2017 Appx. Tab 2, Sneed Depo at 56:10-19. *See also, e.g.,* 2017 Appx. Tab 5, Davis Depo at 102:17-103:4 (A. [Reading from FFRF's first exhibit application] "At this season of the Winter Solstice, let reason prevail. There are no gods, no devils, no angels, no heaven or hell. There is only our natural world. Religion is but myth & superstition that hardens hearts and enslaves minds." And then it says "Freedom From Religion Foundation, FFRF.org." Q. And what are the dimensions? A. Seven feet wide by four feet tall. Doesn't give a width. Q. Okay. Had you ever in your time at the preservation board seen an exhibit application like this? A. Not – no[.])
[8] *Id.*

Fourth, FFRF misstates Sneed's testimony by asserting that "Sneed does not believe that the Preservation Board generally applied an educational function criteria." Doc. 65 at 11. Because FFRF offers no citation to support this assertion, and because it finds no support in the record, it does not amount to proper summary judgment evidence. *E.g.*, *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 3d 455, 458 (5th Cir. 1998) ("[U]nsubstantiated assertions are not competent summary judgment evidence.").

Fifth, FFRF's statement that "[u]ntil Sneed received Governor Abbott's letter requesting removal, Sneed was satisfied with the approval of FFRF's display" omits a crucial point. Doc. 65 at 11 (citing Sneed Dep. at p. 80, L. 20-p. 81, L. 3). Sneed testified that, in approving FFRF's revised exhibit, "[i]t was lost on me that there was -- what I later discovered was a manger where the copy of the Bill of Rights had been placed,"[9] at least in part because the proposed artwork on the application was not "a very good copy."[10] The exhibit's failure to comport with the public purpose requirement is emphasized by Sneed's testimony that, "later, after I realized what it was…it was concerning to me."[11] It is thus misleading to assert that Sneed had no issue with the substance of the display; he did not take issue with the application precisely because the exhibit's sardonic nature was not apparent from the application.

Sixth, FFRF misstates the testimony of Capitol Events and Exhibits Coordinator Robert Davis,[12] claiming that "[i]n terms of stating a public purpose in a display application, Davis generally accepted whatever the applicant stated[.]" Doc. 65 at 12 (citing Davis Dep. at p. 20, L. 22.) FFRF

---

[9] 2017 Appx. Tab 2, Sneed Depo at 47:12-14.
[10] *Id.* at 47:9-11.
[11] *Id.* at 47:15-17.
[12] FFRF also relies upon Mr. Davis' testimony in support of legal conclusions. *See, e.g.,* Doc. 65 at 12 ("disclaimers are useful to indicate that displays are not those of the State Preservation Board.") (citing Davis Dep. at p. 39, L. 1-4); Doc. 65 at 13 ("Davis does not necessarily see an educational purpose to the Thomas Moore nativity") (citing Davis Dep. at p. 53, L. 17-24); Doc 65 at 13 ("According to Davis, the Preservation Board gets lots of exhibits based on free speech claims.") (citing Davis Dep. at p. 70, L. 6-14); Doc. 65 at 13 ("Davis indicates that the Preservation Board considered exercise of free speech, as with the nativity scene, to be an appropriate public purpose for display in the Capitol.") (citing Davis Dep. at p. 71, L. 24- p. 72, L. 10). To the extent these assertions are even supported by the citations to Mr. Davis' testimony—which Defendants dispute—it is worth noting that Mr. Davis is not an attorney and does not purport to be offering legal opinions (which are not the proper subject of witness testimony, in any event). To the extent FFRF relies upon Robert Davis's testimony in support of its legal conclusions, this testimony is not proper summary judgment proof.

further characterizes Davis as having testified that he "does not usually consider applications in terms of promoting morals or general welfare." Doc. 65 at 12-13 (citing Davis Dep. at p. 45, L. 1-4 and L. 12-16). FFRF also cites Davis's deposition at page 46, lines 10-15 as supporting the proposition that "[i]n processing applications for events or display in the Capitol, whether a display educates also is not a criteria utilized in decision-making." Doc. 65 at 13. These citations are misleading to the extent they suggest that the public purpose requirement is not applied to all exhibits before display in the Capitol. A complete reading of Davis' testimony illustrates that all exhibits must satisfy this requirement.[13]

## ARGUMENT AND AUTHORITY

### I. FFRF's discussion of viewpoint discrimination provides no basis to enter summary judgment in FFRF's favor.

FFRF admits that the Capitol's exhibit areas are open to "diverse views and perspectives." Doc. 65 at 2. It claims, however, that excluding "offensive perspectives" amounts to a "constraint[] on speech," which is "not defensible, including because such limitations operate in reality to mute unpopular or troublesome perspectives." Doc. 65 at 2. But this statement—and FFRF's entire First Amendment analysis—ignores the Court's conclusion that the exhibit areas in the Texas Capitol "constitute, at most, a limited public forum." Doc. 38 at 15 (citing, *inter alia*, 13 TEX. ADMIN. CODE §111.13(a)(3)). In a limited public forum, "the government may restrict speech as long as the restrictions are 'reasonable in light of the purpose served by the forum' and do 'not discriminate against speech on the basis of viewpoint.'" Doc. 38 at 15 (citations omitted).

FFRF provides no authority to the contrary. First, FFRF cites *Reed v. Town of Gilbert, Arizona*, which FFRF claims "is notable in that it clarified the content-based inquiry and arguably expanded

---

[13] *E.g.*, 2017 Appx. Tab 5, Davis Depo at 23:20-24:1 (Q. Have you ever rejected an application on the grounds that it had no obvious public purpose? A. I don't recall ever doing that. Like I said earlier, we -- the first point of contact, someone will usually kind of talk to me and give me information about what they're trying to do. And if I tell them at that time that I'm not sure if it's going to fly, a lot of times they'll decide to go elsewhere to display it."); 106:16-109:19 (describing standard review of exhibit applications by the Board's executive staff).

5

the universe of content discrimination." Doc. 65 at 14 (citing 135 S.Ct. 2218, 2230 (2015)). FFRF continues, discussing several authorities that arise in the context of content based restrictions on speech. Doc. 65 at 15 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Forsyth Co. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005)). These cases are unhelpful, because even if FFRF had established a content-based restriction, such restrictions are permissible in a limited public forum.[14] *E.g.*, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07; *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010)).

FFRF then characterizes *Matal v. Tam*, decided this past June, as holding that "even offensive speech is protected from viewpoint discrimination." Doc. 65 at 15 (citing 137 S.Ct. 1744 (2017)). But *Matal* does not help FFRF, because FFRF has presented no evidence of viewpoint discrimination. Moreover, as FFRF acknowledges, *Matal* arose in the context of the Lanham Act's prohibition on registration of "disparaging" trademarks, for use in the robust marketplace that is the United States economy. Doc. 65 at 15, *see also Matal*, 137 S. Ct. at 1751.[15] The Lanham Act's ban on registration of such disparaging trademarks did operate based on the *content* of a proposed mark—*e.g.*, whether it mentioned particular subjects such as sex, race, illegal activity, or religion. It instead operated based upon viewpoint: in particular, whether the mark "may 'disparage…or bring…into contemp[t] or disrepute' any 'persons, living or dead.'" *Id.* at 1751 (citing 15 U.S.C. §1052(a)) (alterations original).

---

[14] In the event of appeal, Defendants preserve their arguments that—regardless of the applicable forum analysis, or if forum analysis applies at all—no constitutional violation has occurred here. *See, e.g.,* Docs. 17; 31.

[15] As defendants did at the motion to dismiss stage in this case, the federal government in *Matal* argued that trademarks registered with the United States Patent & Trademark Office were more properly evaluated as government speech. 137 S. Ct. at 1757. The Court applied the factors articulated in *Summum* and *Walker*, and concluded that "[t]rademarks share none of these characteristics." 137 S. Ct. at 1760. In rejecting the government speech argument, the Court considered, among other things, that "[t]he Federal Government does not dream up these marks, and it does not edit marks submitted for registration." *Id.* at 1758. Mindful of that the Court has rejected this argument here, Defendants note that, under *Matal*, Capitol exhibits might still be regarded—at least by some—as government speech, in order to preserve this argument in the event of appeal. *See, e.g.,* Doc. 17.

To the extent that FFRF suggests that government restrictions on disparaging speech are—as a matter of law—viewpoint discrimination, Justice Alito's opinion for the Court did not paint with so broad a brush. It did discuss limited public forum cases, and state that such cases were "[p]otentially more analogous" to the facts of *Matal* than cases involving compulsory contributions to labor unions. 137 S. Ct. at 1762-63 (distinguishing *Davenport v. Washington Ed. Ass'n.*, 551 U.S. 177, 181–82 (2007); *Ysursa v. Pocatello Ed. Ass'n.*, 555 U.S. 353 (2009)).

But *Matal* in no way suggested that the standard it applied to the Lanham Act's disparagement ban was the same as the standard that applies to restrictions on limited public fora. In fact, the Court recognized that "[w]hen government creates such a [limited] forum…some content- and speaker-based restrictions may be allowed[.]" *Matal*, 137 S. Ct. at 1763 (citations omitted). The Court went on to state that, "in the sense relevant *here*,"—that is, the Lanham Act's role in regulating the marketplace of goods and ideas—"[g]iving offense is a viewpoint." 137 S. Ct. at 1749 (emphasis added). Unlike the "disparagement" ban at issue in *Matal*, the public purpose requirement at issue in this case is expressly content-based. The mere fact that the public purpose requirement, like 15 U.S.C. §1052(a), "evenhandedly prohibits disparagement of all groups" does not render the requirement unconstitutional under *Matal* or any other authority.

FFRF points out that "[t]he 'public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Matal* at 1749 (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)). This is true indeed. But there is no evidence that Defendants have prohibited the public expression of any idea, either because of offensiveness or for any other reason. Instead, Defendants removed FFRF's exhibit parodying a religion from display in an area inside the Texas Capitol that has been set aside for exhibits of a public purpose. *Matal* is at best irrelevant.

FFRF's reliance upon Justice Kennedy's concurrence, which FFRF characterizes as rejecting "the Government's claim that restrictions on speech could be insulated from viewpoint discrimination

7

by tying censorship to the reaction of the speaker's audience," is also unhelpful, since Defendants make no such argument here. Doc. 65 at 17 (citing *Matal* at 1766-67); *see generally*, Docs. 17, 31, 65. Moreover, to the extent that any concurring opinion informs resolution of this case, Justice Kennedy's undermines FFRF's position. This is because *Matal* was decided "[i]n the realm of trademarks," where "the metaphorical marketplace of ideas becomes a tangible, powerful reality." 137 S. Ct. at 1768 (Kennedy, J., concurring in part and concurring in the judgment). In that context, "that real marketplace exists as a matter of state law and our common-law tradition, quite without regard to the Federal Government." *Id.* (internal cross reference omitted). By contrast, the Capitol exhibit areas would not exist *without* the Texas Capitol, the Preservation Board, and the Texas Administrative Code's specific authorization of and conditions on their display.

In other words, trademarks—according Justice Kennedy, joined by Justice Ginsburg, Justice Sotomayor, and Justice Kagan, anyway—are "the expression of everyday life." 137 S. Ct. at 1768 (citation omitted). "The central purpose of trademark registration is to facilitate source identification." *Id.* And, "[t]o serve that broad purpose, the Government has provided the benefits of federal registration to millions of marks identifying every type of product and cause…Whether a mark is disparaging bears no plausible relation to that goal." 137 S. Ct. at 1768. Justice Kennedy concluded that "[t]o permit viewpoint discrimination in this context is to permit Government censorship." *Id.*

Exhibits in the Texas Capitol are not designed to "facilitate source identification." 137 S. Ct. at 1768. Rather, they are expressly authorized to promote a public purpose. 13 TEX. ADMIN. CODE §111.13(a)(3)). Because Capitol exhibits are not analogous to trademarks "in this context," nothing in *Matal*'s majority opinion or either concurrence, informs resolution of this case. And, in any event, because the public purpose requirement is directly related to the goal behind these exhibits, restricting content to what furthers such purpose is wholly consistent with that goal. *Cf. Matal*, 137 S. Ct. at 1768.

8

## II. The record demonstrates that FFRF's exhibit was removed from the Capitol for failure to comply with the public purpose requirement.

FFRF's mistaken reading of the law aside, its allegations of viewpoint discrimination are refuted by the record. The sole question the Court left unresolved in deciding the parties' 2016 summary judgment motions is whether FFRF's exhibit was removed for the reasons stated in the December 22, 2015 letter, or whether Defendants offered that letter as a cover-up for some alternative, unarticulated, invidious purpose. FFRF's summary judgment motion makes only a weak attempt to demonstrate the latter, dedicating little more than a page to this argument, and offering no citations to the record. Doc. 65 at 17-18. Instead, it makes two unsubstantiated factual assertions, and one legal argument. These are insufficient to meet its burden.

First, FFRF characterizes (without citing) the December 22, 2015 letter explaining why FFRF's exhibit did not satisfy the public purpose requirement. The Court has already found that the reasons in this letter constitute "reasonable grounds [] for Defendants' exclusion of FFRF's exhibit" from the Capitol, because "it was reasonable to believe FFRF's display, and its satirical view of the traditional nativity scene, would not benefit the community at large." Doc. 38 at 16 (citing 13 TEX. ADMIN. CODE §111.13(a)(3); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 818 (1985)). Next, FFRF characterizes (without citing) Sneed's testimony on why he took the action recommended in that letter. Doc. 65 at 18. Sneed's testimony in this respect speaks for itself: he instructed the Board's executive staff to remove the exhibit, for the viewpoint neutral reasons expressed in the letter.[16]

FFRF's assertion that its exhibit "undeniably is constitutionally protected speech" because it "is not obscene[,]…defamatory[,] or libelous[,]…does not advocate imminent lawless action[,]…[and] does not include 'fighting words' that would tend to incite an immediate breach of the peace'" is

---

[16] "Q. And in regard to the removal, though, of that display, what was your role? A. I gave instructions to staff to remove the display. Q. And what prompted you to do that? A. Receiving a letter from the Office of the Governor. 2017 Appx. Tab 2, Sneed Depo at 8:6-9, 12-14.

9

irrelevant even if true. Doc. 65 (citing *Brandburg v. Ohio*, 395 U.S. 444, 447 (1969); quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). That is because none of these inquiries or authorities has anything to do with viewpoint-based discrimination. *See generally* Doc. 66 at 7-12. And FFRF offers no evidence of viewpoint discrimination, despite being afforded the opportunity to engage in extensive discovery.[17] Thus, summary judgment in favor of Defendants is appropriate. *E.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### III. FFRF cannot overcome Governor Abbott's qualified immunity, because it cannot show that the approval of the December 2015 letter deprived FFRF of a clearly established constitutional right.

Finally, FFRF argues that Governor Abbott is not entitled to qualified immunity because he "knowingly approved" his staff's recommendation to send a December 2015 letter to Sneed. Doc. 65 at 18. This argument misunderstands the qualified immunity analysis by focusing on causation. Doc. 65 at 18-19 (asserting that the December 2015 letter to Sneed "constituted personal involvement by the Governor, not just *respondeat superior* involvement.") The standard for qualified immunity, as Defendants have briefed,[18] is whether a government official knowingly took action that he knew violated a constitutional right. Such constitutional right must be clearly established at the time of the official act. FFRF offers no legal or factual support for the proposition that calling for removal of FFRF's exhibit violated any clearly established constitutional right. Instead, for the reasons set forth in the briefing to date, the individual capacity claims against Governor Abbott should be dismissed under the doctrine of qualified immunity.

---

[17] Defendants summarize the significant discovery FFRF has been permitted—including two rounds of written discovery and multiple depositions including a deposition of former Preservation Board Executive Director Sneed and a 30(b)(6) deposition of the Office of Governor Greg Abbott—in their Second Motion for Summary Judgment, Doc. 66 at 4-5.
[18] Docs. 49 (Motion for Judgment and Qualified Immunity on the Pleadings); 59 (Reply in Support of Motion for Judgment and Qualified Immunity on the Pleadings); 64 (Supplemental Letter Brief on Qualified Immunity); 17 at 4-8; 31 at 20.

**CONCLUSION & PRAYER**

For the forgoing reasons, FFRF's claims fail as a matter of law, and Defendants respectfully move the Court to enter summary judgment in their favor. And Defendants yet again re-urge that Governor Abbott is entitled to qualified immunity.

    Respectfully submitted,

    KEN PAXTON
    Attorney General of Texas

    JEFFREY C. MATEER
    First Assistant Attorney General

    BRANTLEY STARR
    Deputy First Assistant Attorney General

    JAMES E. DAVIS
    Deputy Attorney General for Civil Litigation

    ANGELA V. COLMENERO
    Chief, General Litigation Division

    /s/Anne Marie Mackin
    ANNE MARIE MACKIN
    Assistant Attorney General
    Texas Bar No. 24078898
    P.O. Box 12548, Capitol Station
    Austin, Texas 78711
    (512) 475-4080
    (512) 320-0667 FAX
    anna.mackin@texasattorneygeneral.gov

    ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed electronically via the Court's CM/ECF system on this the 10th day of August, 2017, causing service upon all counsel of record.

/s/Anne Marie Mackin
Assistant Attorney General
