IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FREEDOM FROM RELIGION                §
FOUNDATION, INC.,                    §
    *Plaintiff,*              §
                                     §
v.                                   §        NO. 1:16-CV-00233-SS
                                     §
GOVERNOR GREG ABBOTT AND ROD         §
WELSH, EXECUTIVE DIRECTOR OF THE     §
TEXAS STATE PRESERVATION BOARD, in   §
their official capacities,           §
    *Defendants.*             §

## BRIEF ON REMAND

Pursuant to the Court's June 16, 2020 Order to "submit briefing on the two issues remanded to this Court by the Fifth Circuit," Dkt. 105, Defendants Greg Abbott, in his official capacity as Governor, and Rod Welsh, in his official capacity as Executive Director of the Texas State Preservation Board, (collectively, "Defendants") respectfully submit their Brief on Remand.

## BACKGROUND

The Court is well-familiar with the facts of this case, so Defendants briefly summarize and update but do not belabor them here.[1]

### A. The Capitol Exhibit Program

The State Preservation Board (Board) is a state agency charged with preserving and maintaining the Texas Capitol and its grounds. TEX. GOV'T CODE §§ 443.001, .007. The Board consists of five elected officials and a member of the

---

[1] The factual background is set forth in Defendants' Second Motion for Summary Judgment, Dkt. 66.

general public. The Governor serves as chair, and the Board's day-to-day operations are managed by an Executive Director and staff. *Id.* §§ 443.003, .004, .051.

In 1987, pursuant to its authority to "adopt rules concerning the [Capitol complex] buildings, their contents, and their grounds," *id.* § 443.007(b), the Board promulgated a rule allowing placement of temporary exhibits in three designated indoor spaces in the Capitol and Capitol Extension.[2] 13 TEX. ADMIN. CODE § 111.13.[3] The rule provides that exhibits sponsored by the Governor, the Lieutenant Governor, the Speaker of the Texas House of Representatives, a Texas Senator, or a member of the Texas House of Representatives may be placed in the Ground Floor Rotunda, the North Central Gallery or the South Central Gallery, subject to space availability. *Id.* § 111.13(a)(4), (c)(3)(D), (d). These requirements remain in place today.

On May 8, 2020, the Board proposed amendments to the rule governing Capitol exhibits which clarified that, going forward, any such exhibit would be adopted as government speech. On June 26, 2020, after public notice and comment and a public hearing, the Board adopted amendments:

- Requiring the sponsoring state official to certify that any proposed exhibit is appropriate for adoption as government speech and complies with all applicable requirements, 13 TEX. ADMIN. CODE §§ 111.13(a)(4); (d)(3)(D);

- Requiring that exhibits be accompanied by a statement identifying the sponsoring state official and indicating the Board's approval, *id.* § 111.13(b);

- Specifying that a sponsoring state official may sponsor exhibits proposed by his or her constituents, *id.* § 111.13(a)(4);

---

[2] The phrases "exhibits in the Capitol" and "Capitol exhibits" refer to exhibits placed in the three indoor exhibit spaces in the Capitol and Capitol Extension.

[3] Unless otherwise indicated, citations to this rule refer to the new rule adopted June 26, 2020, *proposed by* 45 Tex. Reg. 3406–09, *to be codified as an amendment* at 13 TEX. ADMIN. CODE § 111.13.

- Stating that the Board has discretion to determine which exhibits to display and for how long, *id.* § 111.13(d)(5), (6); (e)(2); and,

- Closing the Capitol exhibit spaces as any type of public forum for private speech and expressly adopting all future Capitol exhibits as government speech, *id.* § 111.13(b).

A copy of the new rule, as adopted by the Board and submitted to the Texas Register for publication, is attached hereto as <u>Exhibit 1</u>.

The rule requires exhibits to serve a "public purpose," *id.* § 111.13(c)(2), which the old rule defined as "promotion of the public health, education, safety, morals, general welfare, security, and prosperity of all of the inhabitants or residents within the state," *id.* § 111.13(a)(3). The new rule removes the word "morals" from this definition. <u>Ex. 1</u>.

The new rule was filed with the Texas Secretary of State on June 30 and will become effective 20 days thereafter, on July 20. *See* TEX. GOV'T CODE § 2001.036; <u>Ex. 1</u>. In response to the COVID-19 pandemic, the Capitol is closed to non-essential activity (including exhibits) until further notice.[4]

### B. Procedural History

In 2015, FFRF was granted permission to exhibit a faux nativity scene under the old rule. *See* Dkts. 15, 66. Because its content deliberately mocked the sincerely held religious beliefs of Texans, the exhibit was determined not to satisfy the public purpose requirement and was removed from display in the Capitol. *See* Dkt. 66. FFRF sued the Governor and the Board's Executive Director, in their individual and official

---

[4] <u>Ex. 2</u>, *Announcements*, STATE PRESERVATION BOARD, https://tspb.texas.gov/plan/events/tspbcal.html (March 17, 2020).

capacities, challenging the December 2015 removal of FFRF's satirical nativity scene from the Capitol. Dkt. 15. FFRF raised numerous First Amendment claims, as well as Fourteenth Amendment claims under the Due Process Clause and the Equal Protection Clause. Dkt. 15.

The vast majority of these claims are no longer at issue. This Court dismissed the individual-capacity claims against the Executive Director on a motion to dismiss. Dkt. 28. In December of 2016, this Court entered an order on the parties' first cross-motions for summary judgment, holding that the Capitol exhibit spaces were a limited public forum under the applicable rule. Dkt. 38. This Court further held that "reasonable grounds existed for Defendants' exclusion of FFRF's exhibit," Dkt. 38 at 16, but found that more discovery was needed on FFRF's free speech and Establishment Clause claims to determine whether FFRF's exhibit was actually removed for its mocking tone (viewpoint-neutral), or due to a desire to "silenc[e] anti-religious speech" (viewpoint discrimination). Dkt. 38 at 20. The Court dismissed FFRF's unbridled-discretion, equal protection, and due process claims. Dkt. 38.

In October of 2018, after further discovery, this Court ruled on a second set of cross-motions for summary judgment. Dkt. 74. The Court held that, under the Supreme Court's 2017 *Matal v. Tam* decision, removing FFRF's exhibit because it was offensive was viewpoint discrimination and therefore violated the Free Speech Clause. Dkt. 74 (citing 137 S. Ct. 1744 (2017)). The remaining claims were dismissed on qualified immunity grounds, *id.* at 20, or by the parties' agreement, Dkt. 86. This Court entered final judgment declaring that "Defendants violated FFRF's First Amendment rights and engaged in viewpoint discrimination as a matter of law when

4

the FFRF's exhibit was removed from the Texas Capitol building." Dkt. 87 at 2. The Court did not order any prospective relief. *Id.*

Both sides appealed. Defendants argued that retrospective relief was improper, and that this Court correctly declined to enter prospective injunctive relief because it lacked jurisdiction to do so without any ongoing violation of federal law. FFRF argued in turn that it was entitled to prospective relief on its viewpoint-discrimination claim, and that this Court erred in granting summary judgment on its unbridled-discretion claim.

The Fifth Circuit held that this Court lacked jurisdiction to enter a retrospective declaratory judgment and remanded the case "to consider FFRF's request for injunctive relief and enter appropriate prospective relief for FFRF." *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 421 (5th Cir. 2020) ("*FFRF*"). The Fifth Circuit further "clarif[ied] the appropriate application of the unbridled discretion doctrine in the context of a limited public forum" *Id.* It stated that "prior restraints on speech in limited public forums must contain neutral criteria sufficient to prevent (1) censorship that is unreasonable in light of the purpose served by the forum and (2) viewpoint-based censorship." *Id.* at 429. And it remanded to this Court to apply that test in the first instance.

## SUMMARY OF THE ARGUMENT

This case should be dismissed for lack of jurisdiction for two separate reasons. First, the 2020 amendments to the rule close the Capitol exhibit spaces as any type of public forum, reserving them instead for government speech. Thus, there is no longer a live controversy about whether the Board's regulation of a "limited public

form" contains "neutral criteria" sufficient to guard against the risks the Fifth Circuit identified. *Id.* Indeed, Defendants cannot run afoul of the Free Speech Clause or unbridled discretion doctrine—the only remaining issues here—through the curation of exhibit spaces that are not a forum for private speech. And the voluntary cessation exception to mootness does not apply because there is no evidence that the State will reopen the forum and violate FFRF's rights therein once this litigation ends. Thus, to do anything other than dismiss this case at this stage would violate the mandate rule.

Second, even if mootness did not wholly resolve this case, this Court should still dismiss it for lack of jurisdiction because there is no ongoing violation of federal law, as required to invoke the narrow *Ex parte Young* exception to Defendants' sovereign immunity. 209 U.S. 123 (1908). As the Fifth Circuit noted, counsel for the Governor and Mr. Welsh represented "in good faith" the State's understanding that, post-*Matal*, an exhibit could not be removed from a limited public forum for offensiveness. *FFRF*, 955 F.3d at 425. Still, FFRF did not apply to display any exhibit between the entry of this Court's June 2018 final judgment, Dkt. 87, and the forum's closure. In fact, FFRF has not applied to place *any* exhibit in the Capitol since 2015. As such, there is no basis to find ongoing injury, and any injunctive relief that could be awarded to FFRF would necessarily be retrospective and therefore barred by immunity. *Id.* at 426.

Accordingly, Defendants respectfully request that the Court enter final judgment dismissing this case for lack of jurisdiction.

ARGUMENT AND AUTHORITY

**I.     This Case is Moot Because the New Rule Closes the Capitol Exhibit Spaces as a Forum.**

    **A.     Changes to a statutory or regulatory scheme typically moot a constitutional challenge.**

The Constitution permits federal courts to adjudicate only "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988); *see also* U.S. CONST. art. III, § 2. If events outrun the controversy such that the Court can grant no meaningful relief, the case must be dismissed as moot. *E.g., Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006). This live-controversy requirement applies independently to each claim and each form of relief sought, *see Friends of the Earth v. Laidlaw*, 528 U.S. 167, 185 (2000). And it "subsists through all stages of federal judicial proceedings," *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990).

The Fifth Circuit has long held that "*any* set of circumstances that eliminates the actual controversy after the commencement of a lawsuit" generally "renders the claim moot." *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quoting *Carmouche*, 449 F.3d at 661) (emphasis added). Those circumstances include "statutory changes that discontinue a challenged practice," which are "usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed." *Fantasy Ranch, Inc. v. City of Arlington, Tex.*, 459 F.3d 546, 564 (5th Cir. 2006) (finding that city's amended ordinance addressed all issues in the pre-amendment complaint, rendering the challenge to pre-amendment ordinance moot); *see also, e.g., N.Y. State Rifle & Pistol Ass'n v. City of*

7

*New York*, 140 S. Ct. 1525 (2020). This principle applies not only in the context of laws and ordinances, but also state agency policies and administrative rules. *See Stauffer v. Gearhart*, 741 F.3d 574, 581–83 (5th Cir. 2014) (per curiam).

For non-governmental defendants, the general rule is that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" unless the defendant shows that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011) (quoting *Friends of the Earth,* 528 U.S. at 189, 190). "On the other hand, courts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity." *Id.* (citations omitted); *see also Moore v. Brown*, 868 F.3d 398, 406–07 (5th Cir. 2017) ("A government entity . . . bears a lighter burden to prove that challenged conduct will not recur.") (citing *Stauffer*, 741 F.3d at 582). This is because "[g]overnment actors in their sovereign capacity and in exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties." *Sossamon*, 560 F.3d at 325.

As a result, when a government policy change eliminates any live dispute, the party seeking to avoid dismissal bears the burden of proving that the voluntary cessation exception to mootness applies. *See, e.g.*, *Stauffer*, 741 F.3d at 582 ("Without evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing.") (quoting *Sossamon*, 560 F.3d

at 325); *Brazos Valley Coal. for Life, Inc. v. City of Bryan*, 421 F.3d 314, 322 (5th Cir. 2005) (rejecting applicability of voluntary cessation exception because the record contained "nothing whatever to suggest that the City intends to repeal [the amendment to the challenged ordinance] when this case is over"). Because mootness goes to the ability of the Court to consider a claim for relief, it bars both declaratory and injunctive relief. *See, e.g.*, *Stauffer*, 741 F.3d at 583 n.6.

### B. The new rule moots this case because there is no longer a limited public forum for exhibits in the Capitol.

#### 1. Under the new rule, Capitol exhibits are government speech.

The new rule moots the only controversy before the Court because that controversy presupposes the existence of a limited public forum that no longer exists.

Under the new rule, Capitol exhibits are explicitly adopted as government speech. 13 Tex. Admin. Code § 111.13(b). To that end, proposed exhibits must be certified as appropriate for adoption as government speech by a sponsoring state official before even being considered. *Id.* §§ 111.13(a)(4); (d)(3)(D). The Board also has exclusive authority to control the content of exhibits by, *inter alia*, reviewing "every word" prior to display, *id.* § 111.13(d)(3)(A), retaining discretion as to whether and for how long to display an exhibit, *id.* §§ 111.13(d)(6), (e)(2), and reserving the right to require "any changes" to any exhibit, *id.* § 111.13(d)(5). The new rule further requires that exhibits be accompanied by a statement identifying the sponsoring state official and indicating Board approval. *Id.* § 111.13(b).

The old rule did not contain such requirements. Moreover, rather than requiring a sponsoring state official to certify any proposed exhibit as appropriate for

adoption as government speech, the old rule simply required a signature indicating sponsorship. *See* Dkt. 31-1 at 31–33 (Request for Exhibits in the Capitol and Capitol Extension, Revised January 2013). In this vein, exhibits under the old rule were either attributed to the exhibit holder (as FFRF's 2015 mock-nativity was) or to no one at all. *See* Dkt. 38 at 10. And exhibits under the old rule were not explicitly adopted as government speech.

Thus, the new rule closes the Capitol exhibit spaces as a forum, and exhibits displayed under the new rule constitute government speech. The three-part test adopted in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), and expounded upon in *Walker v. Texas Division, Sons of Confederate Veterans*, 576 U.S. 200 (2015), confirms this. As this Court has noted, that test requires consideration of "three relevant factors: (1) whether the government has historically used the medium of speech at issue to speak; (2) whether a reasonable observer would interpret the speech as conveying a message on the government's behalf; and (3) whether the government retained control and final authority over the content of the message." Dkt. 38 at 8–9 (citing *Walker*, 135 S. Ct. at 2248–50; *Summum*, 555 U.S. at 470–73).

As to the first factor, there is admittedly little evidence, as the character of the exhibit spaces changed with the closure of the forum. *Cf. Summum*, 555 U.S. at 470 (noting that "[g]overnments have long used monuments to speak to the public"). But without evidence either way, this factor is neutral at best. And in any event, historically, governments have used signs and displays in statehouses to speak to the public. Texas law at least implicitly recognizes as much by giving the Board authority to "adopt rules concerning the [Capitol complex] buildings, their contents, and their

grounds," TEX. GOV'T CODE § 443.007(b). Like the parks in *Summum*, the halls of the Capitol "commonly play an important role in defining the identity that [the State] projects to its own residents and to the outside world," and as such, the State may "take some care in accepting donated" exhibits. 555 U.S. at 472.

The evidence on the second factor overwhelmingly supports a finding of government speech. After all, the new rule *expressly adopts* Capitol exhibits as such. 13 TEX. ADMIN. CODE § 111.13(b); *see also id.* § 111.13(a)(3) (specifying that the State "exercise[s]" its "sovereign powers" by approving exhibits for display in the Capitol). With the new requirement to identify the sponsoring state official and indicate the Board's approval, an individual passing through the Capitol will likely (and reasonably) identify Capitol exhibits with the State. This serves the very function the *Walker* Court contemplated: "[t]he governmental nature of the plates is clear from their faces: the State places the name 'TEXAS' in large letters across the top of every plate." 576 U.S. at 201. This association is amplified by placement in the Capitol—one can hardly conceive of a place more identified with the State of Texas than the halls of its seat of government.

Finally, the new rule vests the Board with direct control over the selection and content of Capitol exhibits. First, applications are not even considered unless accompanied by a sponsoring state official's certification that the proposed exhibit is appropriate for adoption as government speech. 13 TEX. ADMIN. CODE §§ 111.13(a)(4); (d)(3)(D). But even with such certification, the Board retains discretion to determine which exhibits to display and for how long, and the Board may expressly request any changes to an exhibit, even after it is on display. *Id.* §§ 113.13(d)(5), (6); (e)(2). Thus,

11

"like the city government in *Summum*," and the license plates in *Walker*, "Texas has effectively controlled the messages conveyed by exercising final approval authority over their selection." *Walker*, 576 U.S. at 213 (quoting *Summum*, 555 U.S. at 473; *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560–561 (2005)) (cleaned up).

The fact that private parties able to secure official sponsorship may propose exhibits does not change this result. Indeed, the Supreme Court has repeatedly "rejected the premise that the involvement of private parties in designing [content] was sufficient to prevent the government from controlling which [content] it placed in its own [facilities]." *Walker*, 576 U.S. at 210 (citing *Summum*, 555 U.S. at 470–71; *Rust v. Sullivan*, 570 U.S. 173, 192–96 (1991)). Rather, where the government is "using its 'editorial discretion in the selection and presentation of'" content created by private parties it is "'engage[d] in speech activity'" because even the government's "'compilation of the speech of third parties' is a communicative act." *Raven v. Sajet*, 334 F. Supp. 3d 22, 31 (D.D.C. 2018), *aff'd sub nom. Raven v. United States*, No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17, 2019), *cert. denied*, 140 S. Ct. 866 (2020) (quoting *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)).

### 2.    The new rule forecloses any live claim.

"[T]he Free Speech Clause does not regulate government speech." *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (quoting *Summum*, 555 U.S. at 467). As such, the closure of the Capitol exhibit spaces as a forum and express reservation of those spaces for messages of the government's choosing "eliminates the actual controversy" before the Court. *Fontenot*, 777 F.3d at 747 (quoting *Carmouche*, 449 F.3d at 661). Since the new rule "discontinue[s] [the] challenged practice" of providing a limited

public forum in the Capitol exhibit spaces, there can be no live controversy over Defendants' management of that now-defunct forum. *Fantasy Ranch*, 459 F.3d at 564.

The voluntary cessation exception does not apply because there is "nothing whatever to suggest that the [Board] intends to repeal" the new rule "when this case is over." *Brazos Valley Coal. for Life,* 421 F.3d at 322. Absent such evidence, FFRF cannot invoke this exception against "[g]overnment actors in their sovereign capacity and in exercise of their official duties." *Sossamon*, 560 F.3d at 325. Put differently, "[w]ithout evidence to the contrary, [courts] assume that formally announced changes to official governmental policy are not mere litigation posturing." *DeMoss v. Crain*, 636 F.3d 145, 151 (5th Cir. 2011) (quoting *Sossaman*, 560 F.3d at 325); *see also Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018) (in assessing whether voluntary cessation exception applies to government actors, "[a]bsent evidence to the contrary, we are to presume public-spiritedness, says the Supreme Court").

Courts confronting analogous fact patterns have found mootness. For example, the Idaho District Court held that the "rewriting of agency rules" governing use of the Idaho Capitol mall "moot[ed] Occupy Boise's [First Amendment] challenge to the [old] definitions of 'Event,' 'Exhibit,' and 'Public Use'" under those rules. *Watters v. Otter*, 981 F. Supp. 2d 912, 935 (D. Idaho 2013). Just so here, since the new rule rewrites the framework governing the Capitol exhibit spaces and closes the forum. FFRF's challenge to the (former) public purpose requirement in the context of a (now-defunct) limited public forum is moot.

Similarly, the Seventh Circuit considered a City's argument that it forced a protester to remove anti-homosexuality signs from overpasses—not because of their

anti-homosexuality viewpoint—but because they violated the City's traffic-hazard policy. *Ovadal v. City of Madison*, 469 F.3d 625, 628–629 (7th Cir. 2006), *cert. denied*, 127 S. Ct. 2914 (2007). The City later adopted an ordinance prohibiting any signs visible from highways with speed limits over forty miles per hour. *Id.* at 628. The Court held that the plaintiff's "request for declaratory and injunctive relief" against the old traffic-hazard policy "has been rendered moot by the passage of the ordinance" because "the ordinance now replaces the behavior that is the subject of the complaint, making the alleged unconstitutional behavior effectively impossible." *Id.* at 629.

Voluminous Fifth Circuit jurisprudence supports a similar result here. For example, *Yarls v. Bunton* considered a challenge to the Louisiana public defender's practice of placing indigent, non-capital defendants on waitlists because it had insufficient resources to provide them all with counsel. 905 F.3d 905, 907 (5th Cir. 2018). After the State provided an influx of funding to the public defender's office, the Court observed, "[c]urrent waitlists in the districts for non-capital defendants are non-existent." *Id.* at 908. Despite the plaintiffs' argument that "the revenue boost [w]as an insufficient stopgap given public defenders' caseloads," the Fifth Circuit found "the legal upshot . . . unmistakable: The controversial waitlists are no longer in controversy. And no waitlists = no live case or controversy = no jurisdiction." *Id.*

*Yarls* is particularly instructive here because it contemplated injury of constitutional dimension, recognizing that "[c]ertainly, the constitutional safeguards due indigent arrestees awaiting representation is a weighty matter." *Id.* at 907. But, as *Yarls* recognized, "[s]o too is another constitutional safeguard: the mootness doctrine derived from Article III's 'case or controversy' requirement." *Id.* Defendants

14

acknowledge (indeed, revere) the First Amendment. But no limited public forum = no live case or controversy = no jurisdiction. *See id.* at 908. *See also, e.g., Moore*, 868 F.3d at 407 (holding that a First Amendment challenge to a rule governing speech in a public park was moot when it became clear that the rule would not be applied to plaintiff's conduct); *Staley v. Harris Cty.*, 485 F.3d 305, 307 (5th Cir. 2007) (holding that Establishment Clause challenge to courthouse monument was moot where "the County removed the monument from the public grounds and placed it in storage" and "it is not known when, where, or under what circumstance the monument and Bible will be restored on the Courthouse grounds").[5]

Finally, even if FFRF argues that the new rule is unconstitutional, this case would still be moot because the basis for FFRF's challenge no longer exists. *See, e.g., Am. Charities for Reasonable Fundraising Regulation, Inc. v. O'Bannon*, 909 F.3d 329, 332–334 (10th Cir. 2018) (holding that "fundamental changes" to a statute pending appeal of a district court's order passing on its constitutionality "moot[ed] the appeal even though [the plaintiff] views the new version as unconstitutional," because the provision that was the basis for the challenge was eliminated).

---

[5] Defendants further note that—while they reserve all rights to dispute that FFRF is entitled to attorneys' fees—that issue has no bearing on mootness. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990) (stating that an interest in attorneys' fees does not "create an Article III case or controversy where none exists on the merits of the underlying claim") (citation omitted). Put differently, FFRF cannot survive dismissal for mootness merely because it is seeking attorneys' fees.

### 3. Texas was under no obligation to indefinitely retain a limited public forum in the Capitol exhibit spaces.

To the extent that FFRF argues that the Board was obligated to continue providing a limited public forum in the Capitol exhibit spaces, this argument has been resoundingly rejected.

The First Amendment guarantees free speech in a public forum but does not guarantee "access to property simply because it is owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981). The Supreme Court has long recognized that, in the case of "public property which the state has opened for use by the public as a place for expressive activity . . . a state is not required to indefinitely retain the open character of the facility." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983); *cf. FFRF*, 955 F.3d at 426 ("Limited public forums are places that the government has opened for public expression of particular kinds or by particular groups."). This is what the Court held that Texas did here.

Though the government speech doctrine is "recently minted," *Summum*, 555 U.S. at 481 (Stevens, J., concurring), the principle stated in *Perry* is no less applicable where the government changes the "character" of a facility by closing a space to the public but leaving it open for government speech. *See* 460 U.S. at 46. For example, the Fourth Circuit considered changes to a City's rule for who could hang flags from flag standards on City-owned light-posts. *Sons of Confederate Veterans, Va. Div. v. City of Lexington*, 722 F.3d 224, 231 (4th Cir. 2013). Under the City's old rule, private organizations could hang flags with the City's approval, but after the plaintiff secured

approval to hang Confederate flags, the City reversed course, limiting use of the standards to specific, City-selected flags. *Id.* at 226–27. In concluding that this was within the City's discretion, the Fourth Circuit noted, "[i]t is important to our resolution of this case that the Supreme Court has recognized that 'a state is not required to indefinitely retain the open character of [a designated public forum].'" *Id.* at 231 (quoting *Perry*, 460. U.S. at 46) (alteration in *Sons*).

The Fourth Circuit further noted that the City's motive in closing the forum was irrelevant:

> Reading a clean-hands requirement into the closure of such a forum is not supported by precedent and could produce an absurd result. For example, the City could be beholden to the S[ons of] C[onfederate] V[eterans] and other private groups or individuals (e.g., pro-choice activists, the Ku Klux Klan, the Libertarian Party, etc.) that insisted on hoisting their flags on City-owned standards, notwithstanding that the City would prefer to reserve its equipment purely for government speech. it appears that the City experimented with private speakers displaying flags on the City's standards, and that effort turned out to be troublesome. It was entitled, under the controlling principles, to alter that policy.

*Id.* at 232. So too here. Texas has determined that it "would prefer to reserve its" Capitol exhibit spaces for government speech and "was entitled, under the controlling principles, to alter [its] policy" governing Capitol exhibits. *Id.*

## C.   Since this case has become moot, the mandate rule compels dismissal.

"The mandate rule requires a district court on remand to effect [the court of appeals'] mandate and to do nothing else." *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (citation omitted). In complying with the mandate rule, "district courts are guided by the Supreme Court's instruction that 'the scope of

injunctive relief is dictated by the extent of the violation established.'" *ODonnell v. Harris Cty.*, 892 F.3d 147, 163 (5th Cir. 2018) (*ODonnell I*) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). To satisfy this rule, "[t]he district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).

The *ODonnell* cases illustrate the tailoring required to comply with the mandate rule. In *ODonnell I*, the Fifth Circuit found Harris County's pretrial detention practices violated due process and equal protection insofar as they denied bail to misdemeanor arrestees unable to post bond, thereby effecting "the automatic imposition of pretrial detention on indigent misdemeanor arrestees." 892 F.3d at 160. But rather than outlaw pretrial detention for such arrestees altogether, the Court ordered that magistrates "specifically enunciate their individualized, case-specific reasons for [imposing bail]," concluding that this would be "a sufficient remedy" to preserve the rights of indigent misdemeanor arrestees not released. *Id.*

On remand, in a "diligent and well-intentioned effort to comply with *ODonnell I*," the district court ordered that "the County cannot hold indigent arrestees for the 48 hours preceding their bail hearing if the same individual would have been released had he been able to post bond." *ODonnell v. Goodhart*, 900 F.3d 220, 224, 222 (5th Cir. 2018) (*ODonnell II*). On appeal from that order, the Fifth Circuit found that the district court had violated the mandate rule because "the scope of injunctive relief is dictated by the extent of the violation established." *Id.* at 224 (citations omitted). In doing so, the Court explained the purpose of remand: "so the district court could craft a revised injunction—one that is narrowly tailored to cure the constitutional

deficiencies the district court properly identified." *Id.* at 225 (citation omitted). Because the "problem that the district court claims to address . . . is not a deficiency that was originally identified," the Court concluded, "it falls outside the confines of our narrow remand." *Id.* at 225. *See also, e.g.*, *In re Abbott*, 956 F.3d 696, 710 (5th Cir. 2020) (noting that, under the mandate rule, a district court "may not disregard the explicit directives of th[e appellate] court") (quoting *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004); *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002)).

This principle is no less applicable when a case becomes moot on remand. For example, in *McAlister v. Livingston*, an inmate Wicca practitioner challenged a prison policy that he claimed treated practitioners of conventional religions more favorably than Wiccans. No. H-05-3228, 2010 U.S. Dist. LEXIS 5008 (S.D. Tex. Jan. 21, 2010). The Fifth Circuit articulated how such policies were to be evaluated under the First Amendment and RLUIPA and remanded with instructions to enter appropriate prospective relief for the inmate. *Id.* at *7. The inmate, however, was released from prison before such relief could be entered. *Id.* "Because [the plaintiff's] claims have been rendered moot," the Court dismissed the case for lack of jurisdiction, noting that "the mandate rule requires a district court on remand to effect the appellate court's mandate and to do nothing else." *Id.* at *7–8 (citation omitted).

*McAlister* mirrors the facts here. This case is moot. And because "the scope of injunctive relief is dictated by the extent of the violation established," *ODonnell II*, 900 F.3d at 224, any result besides dismissal would violate the mandate rule.

## II.   Because There Is No Ongoing Violation of Federal Law, Any Relief for FFRF Would Be Retroactive and Barred by Sovereign Immunity.

Even if FFRF's lawsuit somehow outlived the rule it challenged, this Court would lack jurisdiction because sovereign immunity bars any potential relief. "State sovereign immunity is a fundamental aspect of the sovereignty that the States enjoyed before the ratification of the Constitution and the Eleventh Amendment, and it was preserved intact by the Constitution." *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 240 (5th Cir. 2005). State sovereign immunity prevents a private party from subjecting a State to suit without its consent. *E.g., Alden v. Maine*, 527 U.S. 706, 712–13 (1999); *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 267–68 (1997); *Hans v. Louisiana*, 134 U.S. 1, 9–21 (1890).

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized a narrow exception to this immunity under which "a litigant may sue a state official in his official capacity as long as the lawsuit seeks prospective relief to redress an ongoing violation of federal law." *FFRF*, 955 F.3d at 424 (citing *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394–95 (5th Cir. 2015)). The *Ex parte Young* exception is "narrow." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). It "rests on the premise—less delicately called a fiction—that when a federal court commands a state official to do nothing more than refrain from violating a federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart,* 563 U.S. 247, 255 (2011) (citation omitted).

As the Fifth Circuit noted on appeal, "[t]he applicability of this exception has been tailored to conform as precisely as possible to those specific situations in which

it is necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." *FFRF*, 955 F.3d at 424 (quoting *Papasan v. Allain*, 478 U.S. 265, 277 (1986); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984)) (cleaned up). "Therefore, in order to fall within the *Ex parte Young* exception, a suit must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law." *Id.* (citing *NiGen Biotech*, 804 F.3d at 394–95).

FFRF cannot meet this standard because—with the relevant forum now closed—any relief entered on its claims would necessarily be retrospective, and because it does not allege any ongoing violation of federal law.

### A. Because the rule that FFRF claims was unconstitutional no longer exists, any relief would be retrospective and impermissible.

The Supreme Court has been clear that sovereign immunity bars retrospective relief (even where prospective relief is proper). In *Edelman v. Jordan*, for example, the lower court entered a prospective injunction against state officers to stop an ongoing violation of federal law, yet the Supreme Court still held that the lower court's injunction ordering retroactive benefits was barred by sovereign immunity. 415 U.S. 651, 666–69 (1974). As the Court later explained in *Quern v. Jordan*, "[t]he distinction between that relief permissible under the doctrine of *Ex parte Young* and that found barred in *Edelman* was the difference between prospective relief on one hand and retrospective relief on the other." 440 U.S. 332, 337 (1979).

21

The reasoning that allows a federal court to enter prospective relief against state officials simply does not apply to retrospective relief, regardless of whether there is an ongoing violation of federal law. *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young*, however, to claims for retrospective relief."); *see also Chiz's Motel & Rest., Inc. v. Miss. State Tax Comm'n*, 750 F.2d 1305, 1308 (5th Cir. 1985) (stating that "federal courts remain barred under the eleventh amendment from granting legal or equitable retroactive relief").

Thus, when changes in the law moot a claim for prospective relief, any available relief—whether declaratory or injunctive—is *inherently* retrospective and, as such, barred by state sovereign immunity. For example, in *Green*, private plaintiffs sued state officials for calculating welfare benefits in violation of federal law. *Id.* at 65. Congress changed the law while the suit was pending, bringing the officials' conduct into compliance and mooting any claim for prospective relief. *Id.* Plaintiffs nevertheless sought "a declaratory judgment that [the officials] violated federal law in the past," among other relief. *Id.* at 67. But the Court held in no uncertain terms that state sovereign immunity prevented federal courts from issuing the backwards-looking declaratory judgment that the plaintiffs sought. *Id.* at 71–73. It explained:

> Both prospective and retrospective relief implicate Eleventh Amendment concerns, but the availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of federal law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.

*Id.* at 68 (citations omitted).

As the Fifth Circuit held on appeal in this case, *Green's* holding and reasoning control here. The Court of Appeals considered this Court's prior injunction:

> IT IS ORDERED, ADJUDGED, and DECREED that judgment is granted in favor of FFRF on FFRF's First Amendment freedom of speech claim; and

> IT IS FURTHER DECLARED that Defendants violated FFRF's First Amendment rights and engaged in viewpoint discrimination as a matter of law when the FFRF's exhibit was removed from the Texas Capitol building under the circumstances of this case

*FFRF*, 955 F.3d at 423. The Court held that, as a "backwards-looking, past-tense declaratory judgment," this injunction was "'tantamount to an award of damages for a past violation of law, even though styled as something else.'" *Id.* at 425 (quoting *Young*, 209 U.S. at 279). And it further recognized that, in a case brought under the *Ex parte Young* fiction, "the Eleventh Amendment bar[s] a claim for declaratory relief once [a] claim for injunctive relief [i]s rendered moot." *Id.* at 425–26 (citing *Green*, 474 U.S. at 68–69).

The limited public forum that gave rise to FFRF's lawsuit no longer exists. Thus, any available injunctive relief would necessarily be connected to past (rather than ongoing) injury, and is therefore barred by sovereign immunity. *FFRF*, 955 F.3d at 425; *Young*, 209 U.S. at 279. Any declaratory relief is similarly barred. *FFRF*, 955 F.3d at 425–26; *Green*, 474 U.S. at 68–69. Indeed, at most, a "declaratory judgment could have some future effect by clarifying the contours of the First Amendment and deterring similar actions by the state," but "'compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.'" *FFRF*, 955 F.3d at 426 (quoting *Green*, 474 U.S. at 68). Awarding FFRF relief with respect to the

23

discontinued practice at issue here would directly contradict the Fifth Circuit's ruling because there is no basis to enter a retroactive injunction.

## B.    FFRF cannot show any ongoing violation of federal law.

On appeal, the Fifth Circuit found an ongoing violation of federal law based upon a letter that the Board's previous Executive Director[6] sent—long before *Matal*—indicating that "any application to display the same exhibit which was removed last year" in the limited public forum in the Capitol exhibit spaces "will be denied for failure to satisfy the public purpose requirement." *FFRF*, 955 F.3d at 425. In finding an ongoing violation, the Court considered it "important[]" that Defendants "ha[d] not retracted their previous statement to FFRF that future applications for the relevant display will be denied." *Id.* This can no longer support a finding of ongoing injury, for at least two reasons. First, there is no post-*Matal* evidence that Defendants would violate the pronouncement in that case. And second, the closure of the forum has rendered it impossible for them to do so.

The determination that removal of FFRF's mock-nativity from the Capitol amounted to viewpoint discrimination was based upon *Matal v. Tam*, where

> In the [Supreme] Court's view, denying registration to offensive marks constituted viewpoint discrimination because '[g]iving offense is a viewpoint.' Here, Defendants have justified removal of FFRF's exhibit by arguing the exhibit's satirical tone rendered it offensive to some portion of the population. That is viewpoint discrimination.

Dkt. 74 at 11–12 (quoting *Matal*, 137 S. Ct. at 1763). But as this Court noted, "*Matal* was decided in June 2017, roughly six months after the Court issued its first

---

[6] The Executive Director who sent this letter, John Sneed, was named as a defendant in this case in his individual capacity. Those claims were rejected at the motion to dismiss stage. Dkt. 28.

summary judgment order in this case," *id.* at 10, and "subsequent to the events in question here," *id.* at 15.[7] Thus, *Matal* modified the limited public forum jurisprudence insofar as it held that "[g]iving offense is a viewpoint" in this context. 137 S. Ct. at 1763; *see also, e.g.*, Wyatt Kozinski, *Our Proudest Boast*, 53 TULSA L. REV. 523, 523 (2018) (noting that *Matal* is "destined to become a landmark case").[8] There is no evidence that Defendants—who did not even appeal this Court's finding of viewpoint discrimination under *Matal*, *see FFRF*, 955 F.3d at 420—will not follow the law in this regard.

True, prior to *Matal*, Defendants argued that the Board could constitutionally exclude a display that mocked the sincerely held beliefs of millions of Texans from the limited public forum of the Capitol exhibit spaces, as a permissible content-based restriction. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001). And while "the distinction between content discrimination and viewpoint discrimination is somewhat imprecise," *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018) (cleaned up), a restriction prohibiting offensive exhibits because

---

[7] Though not at issue on appeal, the panel suggested that it was unclear before *Matal* whether offensive speech could be excluded from limited fora. *FFRF*, 955 F.3d at 425 (stating that after *Matal* "it is *now* clear that speech cannot be prohibited on the basis of offensiveness") (emphasis added).

[8] Courts of appeal have struggled, without reaching clear consensus, to ascertain whether and to what extent *Matal* applies in the context of limited or nonpublic fora, and the Supreme Court has thus far declined to elucidate the issue. *Compare Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 520 (6th Cir. 2019), *cert. denied sub nom. Youkhanna v. City of Sterling Heights, Mich.*, 140 S. Ct. 1114 (2020) (finding that although *Matal* "does not address speech in limited public forums," it "does at least suggest that" a rule forbidding attacks on people or institutions in a limited forum "could be considered viewpoint discrimination") (citing 137 S. Ct. at 1763), *with Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 364 (D.C. Cir. 2018), *cert. denied sub nom. Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 139 S. Ct. 2665 (2019) (rejecting application of *Matal*'s "anodyne statement that '[s]peech may not be banned on the ground that it expresses ideas that offend'" in nonpublic forum because *Matal* "did not engage in a forum analysis at all" nor did it deal "with the Government permitting speech on government property.") (quoting 137 S.Ct. at 1751).

they failed to promote a "public purpose," 13 TEX. ADMIN. CODE § 111.13(a)(3), seemed to be on the content-based side of that divide. This was an eminently reasonable position based on the law as it stood at the time—indeed, it was the position that this Court adopted prior to *Matal*. Dkt. 38 at 16 ("Given that the Capitol exhibition area is a limited forum used to display exhibits that have a 'public purpose,' it was reasonable to believe FFRF's display, and its satirical view of the traditional nativity scene, would not benefit the community at large.") (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 808 (1985)).

But *Matal* changed this understanding. As this Court explained, *Matal* "held a prohibition on registration of trademarks offensive to any group, institution, or belief constituted viewpoint discrimination as a matter of law," because "'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" Dkt. 74 at 24 (quoting 137 S. Ct. at 1763). With this "substantial guidance regarding viewpoint discrimination in the context of speech labeled 'offensive,'" *Wandering*, 879 F.3d at 31, this Court recognized that it would be unconstitutional to exclude FFRF's exhibit from a limited public forum solely because of its offensiveness. Dkt. 74 at 11–12. And the Supreme Court recently confirmed *Matal* in the context of the Lanham Act's prohibitions on "immoral" or "scandalous" trademarks. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2297 (2019).

There is no evidence that, after *Matal*, Defendants will exclude a display from a limited public forum solely because the display is offensive. To the contrary, counsel for Defendants represented in the Fifth Circuit repeatedly and "in good faith" that they would *not* exclude a display from the relevant limited public forum on grounds

26

of offensiveness. *FFRF*, 955 F.3d at 425. Nevertheless, in the more than 18 months since Defendants first made that representation—and more than nine since the State's Solicitor General essentially invited FFRF to reapply in open court in the Fifth Circuit—FFRF never applied to display a new exhibit. Oral Argument, *FFRF v. Abbott*, 955 F.3d 417 (5th Cir. 2020) (Oct. 10, 2020) ("They won't take yes for an answer, Your Honor.").[9] There is thus no evidence that, post-*Matal,* Defendants disobeyed that holding or excluded FFRF from the limited public forum for exhibits in the Capitol.

Moreover, it is now impossible for Defendants to do so. As explained above, the Capitol exhibit spaces were closed as a limited public forum and set aside as a space for the government to select messages it wishes to associate with. *See supra*, I(B).

With no post-*Matal* evidence, and no limited public forum at issue in Capitol exhibit spaces, there is no evidence of any ongoing violation of federal law. And in the absence of such evidence, this Court must presume that defendants will follow the law. *See Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (per curiam).

---

[9] *See also* Br. for Appellants-Cross-Appellees at 14 & n.3, *FFRF v. Abbott*, 955 F.3d 417 (5th Cir. 2020) (filed Dec. 28, 2018); Response and Reply Br. for Appellants-Cross-Appellees at 1, *FFRF v. Abbott*, 955 F.3d 417 (5th Cir. 2020) (filed Mar. 25, 2019).

## CONCLUSION

For the foregoing reasons, this Court should dismiss this case.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Texas Bar No. 24078898
BENJAMIN S. WALTON
Texas Bar No. 24075241
Assistant Attorneys General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov
benjamin.walton@oag.texas.gov

**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that on July 9, 2020, the foregoing instrument was filed electronically

via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General

29