**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **FREEDOM FROM RELIGION** | § | |
| **FOUNDATION, INC.** | § | |
|     **Plaintiff,** | § | |
| | § | |
| **-vs-** | § | **CASE NO. 1-16: CV-00233** |
| | § | |
| **GOVERNOR GREG ABBOTT,** | § | |
| **And ROD WELSH, Executive Director of the** | § | |
| **Texas State Preservation Board,** | § | |
|     **Defendants.** | § | |

**FFRF'S RESPONSE TO DEFENDANTS' CLAIM OF MOOTNESS**

I.    **Introduction.**

The Defendants disingenuously claim to have mooted FFRF's action 4.5 years after this dispute began, and after losing in the district court, and recently in the Fifth Circuit Court of Appeals.  The Defendants, however, do not claim to have ended their adjudicated practice of viewpoint discrimination.  Instead, they claim to have transformed a longstanding forum for private speech into a venue in which they can continue to discriminate at will.  The Defendants' gambit seeks to vitiate the First Amendment protections of speech in public forums by *ipse dixit* declaration that preferred private speech has become government speech.  The Defendants otherwise admit that FFRF is entitled to prospective relief and that the Preservation Board's "public interest" standard is unconstrained by objective and definite standards.  The Defendants rely entirely on their claim to have transformed a public forum for private speech into a venue used exclusively for government speech.

The supposed transformation of an established public forum constitutes eleventh hour litigation posturing without any evidence of actual substantive changes in usage of the public

spaces of the Texas State Capitol building. The Defendants offer no evidence to support their claim of transformative reincarnation of private speech into government speech, other than declaration by fiat. Public forums and government speech, however, are concepts with substance beyond simple proclamation. The Defendants, in short, have not met their heavy burden to prove mootness. They instead double down on their stubborn insistence on the right to engage in viewpoint discrimination, which is precisely why FFRF is entitled to prospective relief as ordered by the Court of Appeals.

## II.    Defendants Have a Heavy Burden to Prove Mootness.

A defendant claiming mootness "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Fontenot vs. McCraw*, 777 F.3d. 741, 747 (5th Cir. 2015), quoting *Friends of the Earth, Inc. vs. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 190 (2000). Additionally, a defendant must demonstrate that interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *Fantasy Ranch Inc. vs. City of Arlington*, 459 F.3d. 546, 564 (5th Cir. 2006).

Defendant-induced mootness is viewed with particular caution. *Fontenot,* 777 F.3d. at 747, quoting *United States vs. W.T. Grant Company*, 345 U.S. 629, 633 (1953). Allegations by a defendant that its voluntary conduct has mooted the plaintiff's case "require closer examination than allegations that happenstance or official acts of third parties have mooted the case." *Id., quoting Environmental Conservation Organization vs. City of Dallas*, 529 F.3d. 519, 528 N.4 (5th Cir. 2008). The overarching goal is to determine whether the defendants' actions are mere "litigation posturing" or whether the controversy is truly extinguished. *Fontenot*, 777 F.3d. at 748.

Here, the Defendants argue that voluntary governmental action by the Texas State Preservation Board should be treated with "some solicitude." *Sossamon vs. Lone Star State of*

*Texas*, 560 F.3d. 316, 325 (5th Cir. 2009).  They argue that "without evidence to the contrary," courts should assume that formally announced changes to official governmental policy are not mere "litigation posturing."  Evidence to the contrary exists in this case. The timing of a defendant-induced claim of mootness, as in this case, has been deemed particularly telling.  See *Opulent Life Church vs. City of Holly Springs*, 697 F.3d. 279, 284-86 (5th Cir. 2012) (a city's repeal of an ordinance the night before oral argument did not moot the plaintiff's challenges to the ordinance).

To show that a supposed change of heart is not mere litigation posturing, a defendant asserting mootness must demonstrate "that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Freedom From Religion Foundation vs. Abbott*, 955 F.3d. 417, 425 (5th Cir. 2020); see also *Yarls vs. Bunton*, 905 F.3d. 905, 910 (5th Cir. 2018) ("Essentially, the goal is to [decide] whether the defendants' actions constitute 'litigation posturing' or whether the controversy is actually extinguished.").  In this respect, eleventh hour efforts to moot a plaintiff's case are readily distinguishable from early actions by a defendant.  See *Brazos Valley Coalition for Life, Inc. vs. City of Bryan, Texas*, 421 F.3d. 314, 321 (5th Cir. 2005) discussing *City of Mesquite vs. Aladdin's Castle, Inc.*, 102 S. Ct. 1070, 1074 (1982) (challenged ordinance was repealed while the case was pending on appeal, after adverse final judgment had been entered by the district court, and mootness was raised for the first time before the Supreme Court).

The Supreme Court's decision in *Trinity Lutheran Church of Columbia, Inc. vs. Comer*, 137 S.Ct. 2012 (2017), illustrates the formidable nature of Defendants' burden.  Trinity Lutheran sued the Missouri Department of Natural Resources after being denied access to program that would have funded the resurfacing of the church's playground. But even though the governor of Missouri, while the case was on appeal, "announced that he directed the Department to begin

allowing religious organizations to compete for and receive grants on the same terms as secular organizations" "that announcement [did] not moot this case" because "the Department has not carried the 'heavy burden' of making 'absolutely clear' that it could not revert to its policy of excluding religious organizations." *Id. at 2019 n.1 (*citing *Friends of the Earth*, 528 U.S. at 189).

Solicitude is not appropriate in the present case.  This matter has been pending since February of 2016; this Court granted summary judgment in favor of FFRF in October of 2017 after protracted litigation; the Defendants appealed this court's summary judgment ruling but then did not argue in briefing against the decision on the merits; the 5th Circuit Court of Appeals held oral argument on Defendants' appeal on October 10, 2019; and the Court of Appeals rendered a decision entitling Plaintiff to prospective relief on April 3, 2020.  Only then, in May of 2020, did the Defendants initiate any action that allegedly mooted the pending case.

The Defendants' good faith and sincerity is further called into question by their lack of candor after initiating potential administrative changes.  Counsel for FFRF reached out to Defendants' counsel after the Court of Appeals decision in order to see if the parties could agree on appropriate prospective relief in early June of 2020. (Bolton Declaration, ¶ 4.)  Counsel then conferred on June 10. FFRF's counsel suggested at that time that the parties mutually exchange proposed judgments, but defense counsel requested FFRF to "go first." (*Id.* at ¶ 7-8.)  FFRF then provided a proposed judgment to defense counsel on June 16, and followed up on two separate occasions seeking a response.  (*Id.* at ¶10.)  Defense counsel eventually advised FFRFs' counsel on June 25 that administrative rule changes had been initiated back on May 22, 2020, with a public hearing scheduled for the very next day. (*Id.* at ¶ 13.)  The Defendants' delay in telling FFRF that rule changes were already underway evidences a lack of transparency and sneakiness, charitably

described as "dirty pool."  <u>See</u> *Dearmore vs. City of Garland*, 237 F.R.D. 573, 577 (N.D.TX. 2006).  Litigation posturing is undeniable.

A corollary of the litigation posturing principle holds that an alleged change of circumstance, including administrative rule changes, must actually address the defendants' wrong-doing.  When a defendant has made legislative changes that continue the harmful conduct, the case is not moot.  In *Opulent Life Church*, 697 F.3d. at 286, the 5th Circuit recognized precisely this principle.

> Instead of imposing special burdens on Opulent Life before it can occupy its leased property, Holly Springs has doubled down and banned Opulent Life from the property altogether.  This may present an even weaker case for mootness than *Associated General Contractors*.  Regardless, the case is not moot.

<u>See also</u> *American Freedom Defense Initiative vs. Washington Metro Area Transit Authority*, WMATA, 901 F.3d. 356, 362 (D.C. Cir. 2018) (fundamentally unchanged policy, differing only in minor respects, does not moot case); *Smith vs. Executive Director of Indiana War Memorials Commission*, 742 F.3d 282, 287-88 (7th Cir. 2014) (case is not mooted if a substantially similar policy has been instituted with merely superficial exchanges); *Polaris Amphitheater Concerts, Inc. vs. City of Westerville*, 267 F.3d. 503, 507-08 (6th Cir. 2001) (ordinance amendment that does not remove language that gives rise to constitutional challenge does not moot case); *Horton vs. City of St. Augustine, Florida*, 272 F.3d. 1318, 1326 (11th Cir. 2001) (post-judgment legislative alterations do not moot a case if they leave challenged features substantially undisturbed); and *Perez vs. Abbott,* 253 F.Supp.3d. 864, 874 (N.D.GA 2017) (fact challenged law is amended does not alone moot the underlying claim unless the law has been sufficiently altered so as to present a substantially different controversy).

The Defendants in this case rely on administrative amendments that do not effectively transform private speech into government speech, as discussed below.  A public forum for private

speech cannot be converted into a place of government speech *ipse dixit* by declaring it to be so. "The government cannot simply declare the First Amendment status of property regardless of its nature and its public use." *First Unitarian Church vs. Salt Lake City Corp.*, 308 F.3d. 1114, 1124 (10th Cir. 2002). The Defendants' purported "adoption" of private speech, by fiat, does not satisfy the burden to prove a real alteration of policy, necessary to moot the present case. This case, therefore, is unlike *Sons of Confederate Veterans vs. City of Lexington*, 722 F.3d. 224, 231 (4th Cir. 2013), relied upon by Defendants, where the City of Lexington "closed a designated public forum by disallowing all private expression."

## III. The Government Speech Doctrine is a Narrow Exception to Viewpoint Neutrality with a Specific Functional Purpose.

The government speech doctrine is not intended as an abnegation or repudiation of the First Amendment's bedrock principle of viewpoint neutrality toward private speech. The underlying rationale for the government speech doctrine is that the government could not "function" if it did not favor or disfavor points of view in enforcing its programs and policies. See *Pleasant Grove City vs. Summum*, 55 U.S. 460, 468 (2009) ("Indeed it is not easy to imagine how government could function if it lacked this freedom [to express its own views].").

At the same time, however, speech that is otherwise private does not become speech of the government merely because the government labels it as such. The Supreme Court unanimously has underscored that it exercises "great caution before extending government-speech precedents," citing the risk that "private speech could be passed off as government speech" and, "silenced by simply affixing a government seal of approval." *Matal vs. Tam,* 137 S.Ct. 1744, 1758 (2017). The Supreme Court further emphasized in *Matal* that the government speech doctrine is "susceptible to dangerous misuse." *Id.* See also *Wandering Dago, Inc. vs. Destito*, 879 Fed.3d. 20, 35 (2nd Cir. 2018); and *Knight First Amendment Institute at Columbia University vs. Trump*, 928 Fed.3d 226,

239-40 (2nd Cir. 2019). "At a time when free speech is under attack, it is especially important for this Court to remain firm on the principle that the First Amendment does not tolerate viewpoint discrimination." *Lancu vs. Brunetti*, 139 S.Ct. 2294, 2302-03 (2019) (Alito, J. concurring).

The government speech doctrine does not apply if a government entity has created a limited public forum for speech. *Pleasant Grove*, 555 U.S. at 470 and 478-80. Forum analysis is applicable, rather than the government speech doctrine, "in situations in which government-owned property or a government program is capable of accommodating a large number of public speakers without defeating the essential function of the land or the program." *Id. at 478*.

Viewpoint-based restrictions are not proper when the government does not itself speak or subsidize transmittal of messages it favors, but instead seeks "to encourage a diversity of views from private speakers." *Rosenberger vs. Rector and Visitors of University of Virginia*, 515 U.S. 819, 834 (1995). Prohibiting discrimination based on the viewpoint of private persons whose speech the government facilitates does not restrict the government's own speech. *Id.*

Viewpoint discrimination is not tolerated in government programs intended to facilitate the speech of private individuals. *Board of Regents of the University of Wisconsin System vs. Southworth*, 120 S.Ct. 1346, 1354 (2000). "The speech the University seeks to encourage in the program before us is distinguished not by discernable limits but by its vast, unexplored bounds. To insist upon asking what speech is germane would be contrary to the very goal the University seeks to pursue." *Id. at 1355*. By contrast, viewpoint neutrality is excused only "when the government speaks, for instance to promote its own policies or to advance a particular idea." *Id.* at 1357.

The Supreme Court further discussed the distinction between government speech on the one hand, and programs to facilitate private speech on the other, in *Legal Services Corporation vs.*

*Velazquez*, 121 U.S. 542 (2001).  The Court again recognized that viewpoint-based restrictions are not proper as to programs intended to encourage a diversity of views from private speakers. Viewpoint discrimination is barred by the First Amendment where "there is no programmatic message of the kind recognized in *Rust* and which sufficed there to allow the government to specify the advice deemed necessary for its legitimate objectives."  *Id. at 548*.  A critical distinguishing feature of government speech, therefore, is the requirement that the message "from beginning to end" be established by the government, such as with the delineation of an "overarching message." *Johanns vs. Livestock Marketing Association*, 544 U.S. 550, 560-61 (2005).

The Supreme Court again considered the private speech/government speech dichotomy in *Walker vs. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015).  That case considered whether a specialty license plate program was subject to the prohibitions of viewpoint discrimination, or whether the State of Texas could restrict the messages of specialty plates as a matter of government speech.  The Court concluded that the program was subject to the government speech doctrine, including because the licensing of automobiles was a function not historically treated as a matter of private speech in a public forum.  The licensing of automobiles, instead, was, and is, associated with a government identification purpose, i.e., license plates are required by the government, and associated with the government's mandate to visibly display plates when driving.  Automobiles bear license plates, in the first instance, not as a means to facilitate private speech, but as a required means of identification while on the road.

The Supreme Court later described the *Walker* decision as marking "the outer bounds of the government speech doctrine."  *Matal*, 137 S.Ct. at 1760.  The Court began its analysis in *Matal* by discussing the practical problem of imposing viewpoint-neutrality when a government entity embarks on a course of action that necessarily takes a particular viewpoint and rejects others.  *Id.*

*at 1757.* The Court, nonetheless, emphasized the danger of an overbroad interpretation of the government speech doctrine, concluding with respect to trademarks that "it is far-fetched to suggest that the content of a registered mark is government speech. If the federal registration of a trademark makes the mark government speech, the Federal Government is babbling prodigiously and incoherently." *Id.* Only when the government seeks to convey its own message may it take steps to ensure that the message is neither garbled nor distorted. *Planned Parenthood of Hidalgo County, Texas vs. Suehs*, 692 F.3d. 343, 351 (5th Cir. 2012).

A number of guiding principles emerge from the Supreme Court's decisions for assessing a government speech claim. First, does the government have a need to restrict private speech in order to function, i.e., to pursue and carry out its viewpoint-oriented policies and objectives? Second, is the government program under review, in fact, intended to communicate the government's defined message, or instead is the program intended to facilitate private speech?

With this backdrop in mind, courts have considered three factors informing the analysis of a government speech claim. When considering whether speech or expressive conduct constitutes government speech, courts have identified the following three relevant factors from the Supreme Court's analysis of the issue: (1) Has the government historically used the medium of speech to convey a message on the government's behalf; (2) would a reasonable observer  interpret this speech as conveying a message on the government's behalf; and (3) has the government retained control and final authority over the content of the message from beginning to end. Applying these principles to the case at hand, the conclusion is unavoidable that the Defendants have not established a transformation of the exhibition areas of the State Capitol building. The exhibition

areas of the Capitol remain limited public forums under the Preservation Board's program, rather than venues of strictly government speech.

## IV.  The Preservation Board's Amendments to Administrative Rules do not Substantively Change the Character of Private Speech.

The Defendants triumphantly announce that they will now adopt as their own the speech of private exhibitors in the State Capitol building, whatever the expression may be as long as it is "appropriate as government speech." The Defendants, however, are completely silent as to the message that they, as the government, seek to express. Without such communicative intent, there is not government speech. Here, any official government message by the Preservation Board is missing, and far too attenuated to evade FFRF's First Amendment protections.

The reality remains the same as it was before the Defendants' crude maneuver to persist in their viewpoint discrimination. The State Preservation Board is not engaging in government speech, but continues to facilitate private speech. That was previously the case, and nothing in the Board's amendment to rules changes that reality. There was no government message before and none is created by the Board's amendments. Hence, the need to engage in viewpoint discrimination is not necessary in order for the Board to function.

The Defendants' inability to identify a government message is not surprising as the exhibition areas of the State Capitol building have historically been used as a public forum for private expression. The Court in this matter, in fact, reached exactly this conclusion, the merits of which the Defendants did not challenge on appeal. That ruling is now conclusively the law of the case. Thus, the Defendants' argument that the first *Walker* consideration does not weigh in favor

of either party suggests conscious amnesia: The exhibition areas of the State Capitol have historically served as limited public forums for private speech.

The Defendants, in fact, advance no evidence to meet their burden that the Preservation Board has historically used the medium of speech in exhibition areas of the State Capitol building to convey a message on the government's behalf. The public comments regarding the Defendants proposed amendments, moreover, reflect that the public views the exhibition areas of the State Capitol to be forums for private expression. (Dkt. 111-1 at 3-5.) The hundreds of diverse exhibits that have already been displayed in the State Capitol further support the conclusion that the Preservation Board has not used exhibition areas as a medium for communicating a government message.

The Defendants' government speech argument is far-fetched in its claim that all of the Texas Capitol exhibits communicate a government message rather than the multifarious expressions of many private speakers. (*See* Dkt. 33-1 at ¶ 61-64, Declaration of Sam Grover, identifying examples of the diverse exhibits that have been displayed in the Capitol Building exhibition areas.) As in *Matal*, claiming the historical use of the exhibition areas as a venue to communicate government speech through displayed exhibits requires a belief in babbling incoherence. Such intellectual gymnastics are not necessary, however, because the display areas undeniably have not historically been used to communicate government speech.

Furthermore, the Defendants do not carry their burden to show that exhibits in the State Capitol building are closely identified in the public mind with the state government. By definition, speech in a limited public forum occurs on government property with government approval. A limited forum "exists where the government has reserved a forum for certain groups or for the discussion of certain topics." *Walker*, 135 S.Ct. at 2250 (citing *Rosenberger*, 515 U.S. at 829).

Proximity and endorsement in a limited public forum, therefore, are more normative than exceptional.  See *Capitol Square Review and Advisory Board vs. Pinette*, 515 U.S. 753 (1995), where the Supreme Court concluded that a religious display next to the State House in Columbus, Ohio, constituted private expression despite private parties needing to apply for permission in order to display their messages.  Administrative regulations made this Square available in *Pinette* "for use by the public . . . for free discussion of public questions, or for activities of a broad public purpose" and gave the Capitol Square Review and Advisory Board responsibility for regulating public access.  To use the Square, a group had to fill out an official application form and meet several criteria, yet the Court concluded that the religious display at issue did not constitute government speech.  *Id. at 757-58 and 765-66.*

In *Summum*, 555 U.S. at 480, the Supreme Court further recognized that temporary displays, such as in *Pinette*, may constitute private speech precisely because of the temporary nature, while permanent monuments pose a completely different problem.  The Court explained the distinction as follows:

> Respondent compares the present case to *Capitol Square Advisory Board vs. Pinette*, 515 U.S. 573, 115 S.Ct. 2440, 132 L.Ed.2nd 650 (1995), but that case involved a very different situation – a request by a private group, the Ku Klux Klan, to erect a cross for a period of 16 days on public property that had been opened up for similar temporary displays, including a Christmas tree and a Menorah.  See *Id. at 758*, S.Ct. 2440, 132 L.Ed.2nd 650.  Although some public parks can accommodate and be made generally available for temporary private displays, the same is rarely true for permanent monuments.

Requiring approval to use government property, in short, is fully consistent with the existence of a public forum.  It is not transformative of private discourse into government speech. In *Thomas vs. Chicago Park District*, 534 U.S. 316 (2002), for example, the Supreme Court ruled that a park-permitting ordinance did not convert private speakers into public speakers, and noted

that "even content-neutral time, place and manner restrictions can be applied in such a manner as to stifle free expression." *Id. at 323* (<u>citing</u> *Forsyth County vs. Nationalist Movement*, 505 U.S. 123, 131 (1992)). In the present case, moreover, nothing in the Preservation Board's amended rules prevents private parties who create exhibits from including signage and explanatory language about the purpose of the exhibit, the creator(s) of the exhibit, etc., which would further serve to make unlikely that the public would closely identify the exhibit with the State.

The Preservation Board's "adoption" of approved exhibits also does not transform private speech into government speech. The direct control factor in the government speech analysis is intended to correlate with the conception of the expressed message. The control is measured, therefore, "from beginning to end." *Johanns*, 544 U.S. at 560. Here, adoption of private speech, after the fact, is not the same as conception.

Direct government control in the government speech context also is not met simply by requiring that an approved government official sponsor or sign-off on an exhibit. <u>See</u> *Higher Society of Indiana vs. Tippecanoe County, Indiana*, 858 F.3d. 1113 (7th Cir. 2017) (applying the *Walker* factors and holding that sponsored events held on courthouse grounds by private parties were still private speech; and *Miller vs. City of Cincinnati*, 622 F.3d. 524 (6th Cir. 2010) (applying *Walker* factors and finding that rally or press conference held in city hall by private groups did not constitute government speech).

Sponsorship by an approved official also is not equivalent to direct control over an exhibit's message, nor is a sponsorship requirement enough to transform private speech into government speech. The Preservation Board is not thereby the originator of the many expressions conveyed by the innumerable exhibits displayed in the Capitol. The various and diverse exhibits, such as student art exhibitions, are simply not "from beginning to end" a message established by the State

of Texas.  The sponsorship requirement, by many elected officials, in fact, detracts from the Defendants' own conclusion that exhibits in the State Capitol building convey a government message, rather than suggesting a constituency service provided by elected officials.

The sponsorship requirement, in any event, does nothing to define the message, including the required statement by each sponsor that an exhibit "is appropriate for adoption as government speech." (Dkt. 111-1 at 6.)  To say that government speech is that which is appropriate for adoption as government speech is no more than double talk masquerading as thoughtfulness.  The record, moreover, includes no evidence that visitors to the State Capitol will associate constituency sponsorship as conveying a message of State conceived and generated speech.

The Preservation Board's own final approval of exhibits also does not transform private speech into government speech.  A permitting process is fully consistent with a limited public forum without transforming private speech into government speech.  The Defendants previously made precisely the same argument in support of summary judgment in this case, and the Preservation Board's amended rules do not require any change with respect to the Board's internal approval process.

According to the Board's Events and Exhibits Coordinator, Robert Davis, reviewing applications for display, as far as giving approval, is routinely granted.  (See Dkt. 65 at 11.) Ultimately, in reviewing applications, according to the Exhibits Coordinator, once an applicant has obtained sponsorship, applications are generally "on cruise control to being approved in some way, shape, or form except for aesthetic changes and logistic details." (*Id. at 14*.)  The Board has utilized such a process for approval despite the fact that the "public purpose" requirement for exhibits was the same before and under the Board's amended rules.  The Defendants, moreover, present no evidence that this internal laissez faire approach to exhibit approval will be different in

14

practice than before.  In fact, the Board estimates that the amendment of rules will result in no additional internal costs that might be occasioned by a more rigorous review process. (Bolton Declaration, Exh. D at 2.)

The approval process, moreover, remains flawed in a very significant way.  The amendments to rules do not eliminate the continued possibility that the Defendants will continue to engage in viewpoint discrimination.  The Defendants do not argue otherwise.  On the contrary, they believe that continued viewpoint discrimination is now permissible with impunity.  Their confidence is based on the false premise that the First Amendment protections of public forums can be destroyed by the simple expedient of proclaiming adoption of favored speakers.  This is the realization of the concern that prompted the Supreme Court's warning in *Matal*.  In the end, however, it is merely ineffective litigation posturing.

The Preservation Board's amendments, in fact, make matters worse in this case.  The Defendants now purport to eliminate even the patina of viewpoint neutrality.  If the First Amendment protections afforded speech in public forums can be abolished by such fiat "adoption" of preferred speech, then the government speech doctrine will supplant public forum protections. The Supreme Court has not intended this outcome and has warned against it.

## V.    FFRF remains entitled to prospective relief to remedy the ongoing threat that Defendants will censor its exhibit from the Texas Capitol.

FFRF is seeking, and has always sought, prospective relief in this case, as the Fifth Circuit explicitly recognized. *See* 955 F.3d at 421 ("FFRF sought prospective relief, and there was, and still is, a live controversy between the parties.").  FFRF has never abandoned that position and need not periodically renew its demand during the pendency of disputed litigation. In Section II of their brief, Defendants impermissibly invite this Court to go beyond the Fifth Circuit's mandate on remand and explore anew whether FFRF has met the three-part test laid out in *Ex Parte Young*.

(Defs' Br. at 20-21.)  Defendants raise two arguments for why the Court should undertake this analysis. First, in subsection A, they argue that the rule that FFRF challenges in this case "no longer exists" and therefore any relief FFRF could request from this Court would be impermissibly retrospective. (Defs'. Br. at 21.) This is simply a reiteration of the argument that FFRF refutes above in this Response Brief, but with an added nod toward the requirement in *Ex Parte Young* that any relief against the State be prospective. Because the harm to FFRF is ongoing, for the reasons identified above, this Court can properly grant prospective relief. Thus, any concern Defendants raise about sovereign immunity is misplaced.

Second, in subsection B, Defendants argue that FFRF's claims "can no longer support a finding of ongoing injury" because "there is no post-*Matal* evidence that Defendants would violate the pronouncement in that case." (Def. Br. at 24.) Defendants are precluded from relitigating this argument, as the Fifth Circuit already unambiguously rejected it. Defendants made this exact argument in their response brief on appeal, where they wrote, "There is no evidence in the record to suggest that, after *Matal*, defendants and the Board will exclude a display from the Capitol's limited public forum solely because the display is offensive," and "With no post-*Matal* evidence, this Court should presume that defendants will follow the law as declared by *Matal*." (Appellants' Resp. Br. at 14-15.)  In response, the Fifth Circuit wrote that, "FFRF established an ongoing violation of federal law. Governor Abbott and Mr. Welsh do not contest that Mr. Sneed's letter to FFRF . . . initially established the ongoing nature of the violation. Rather, they contend that the Supreme Court's decision in [*Matal*] constituted a sea change in the law, obligating plaintiffs to provide new evidence illustrating the ongoing nature of the violation.  *Even assuming that a sea change in the law would obligate FFRF to re-establish the ongoing nature of the violation,* Matal *did not constitute such a change*." 955 F.3d at 425 (emphasis added). The Fifth Circuit went on to

reject the same argument as a claim of mootness: "Governor Abbott and Mr. Welsh have only presented arguments through counsel that their behavior will change post-*Matal*. Importantly, they have not retracted their previous statement to FFRF that future applications for the relevant display will be denied." *Id*. The Court concluded "Therefore, we find that the district court had jurisdiction to entertain the suit, and the controversy is ongoing." *Id*.

The Fifth Circuit rejected this exact argument by Defendants in April of this year, just as this court previously did on summary judgment, but the Defendants remain intransigent. Meanwhile, nothing regarding *Matal* has changed in the intervening three months, nor have Defendants taken this time to offer FFRF an official retraction of their statement that "any application to display the same exhibit which was removed last year [in 2015] will be denied for failure to satisfy the public purpose requirement." Thus, Defendants are precluded from relitigating these same arguments on remand and the arguments remain unconvincing for the reasons identified by the Fifth Circuit.  Defendants' current litigation posturing, moreover, evinces a continuing effort to exclude FFRF's exhibit from the exhibition areas of the State Capitol.

**VI.   Conclusion.**

The Defendants misapprehend the supposed elasticity of the public speech doctrine. Government speech is intended to allow for the functioning of government, which involves making policy and program preferences and choices.  Government speech, however, is limited and not so expansive as to permit viewpoint discrimination in programs intended to facilitate private speech. The reason for the exception does not exist in this case.  FFRF, accordingly, remains subject to the continuing viewpoint discrimination of the Defendants, and the chilling effect therefrom.

Prospective relief is warranted and needed.  If anything, the Defendants' continuing violation of FFRFs' First Amendment speech rights is greater now than ever.

The Defendants, for their part, have not met the "formidable burden" to establish mootness. The mandate of the Court of Appeals to enter prospective relief remains controlling, in spite of Defendants' litigation posturing to avoid responsibility under the Constitution.

Dated this 22nd day of July, 2020.

<div style="margin-left:40%">

Respectfully submitted,

BOARDMAN AND CLARK, LLP
1 S. Pinckney St., Suite 410
Madison, Wisconsin  53703-4256
Telephone:  608-257-9521
Telecopier:  608-283-1709

BY: */s/ Richard L. Bolton*
Richard L. Bolton
Wisconsin State Bar No. 1012552
Email:  rbolton@boardmanclark.com

Sam Grover
Wisconsin State Bar No. 1096047
Email:  sgrover@ffrf.org
Patrick Elliott
Wisconsin State Bar No. 1074300
Email:  pelliott@ffrf.org
FREEDOM FROM RELIGION
FOUNDATION, INC.
P. O. Box 750
Madison, Wisconsin  53701
Telephone:  608-256-8900
Telecopier:  608-204-0422

</div>

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed electronically via the Court's

CM/ECF system on this the 22nd day of July, 2020, which will send notification to the following:

> Anne Marie Mackin
> Email: Anna.mackin@oag.texas.gov
> Office of the Attorney General
> P.O. Box 12548, Capitol Station
> Austin, TX 78701
> Telephone: (512) 463-2798
> Telecopier: (512) 320-0667

*/s/ Richard L. Bolton*
Richard L. Bolton